IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel., | § | |
| MICHAEL J. DEKORT, and | § | |
| MICHAEL J. DEKORT, individually, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:06-CV-1792-O |
| | § | |
| INTEGRATED COAST GUARD | § | |
| SYSTEMS, A JOINT VENTURE, | § | |
| LOCKHEED MARTIN CORPORATION, | § | |
| A JOINT VENTURE PARTNER, and | § | |
| NORTHROP GRUMMAN SHIP SYSTEMS, | § | |
| INC., A JOINT VENTURE PARTNER, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Defendants Integrated Coast Guard Systems LLC ("ICGS") and Lockheed Martin Corporation ("Lockheed"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), have each filed a motion to dismiss Relator Michael J. DeKort's Fifth Amended Complaint, arguing that Relator has failed to plead a *qui tam* cause of action under § 3729(a) of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq*. Defendant Northrop Grumman Shipbuilding, Inc., formerly Northrop Grumman Ship Systems, Inc. ("Northrop Grumman"), has moved to dismiss Relator's Fifth Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction under the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4), or, in the alternative, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6). On February 9, 2010, the Court converted Northrop Grumman's Rule 12(b)(1) jurisdictional challenge into a motion for summary judgment, and allowed further briefing and evidentiary submissions. (Doc. #146). All motions are ripe for adjudication. Having

considered the pleadings, motions, responses, replies, appendices thereto and applicable law, and for the reasons set forth below, the Court: denies in part and grants in part Defendant Lockheed Martin Corporation's Motion to Dismiss the Fifth Amended Complaint (doc. #117); denies in part and grants in part Defendant Integrated Coast Guard Systems LLC's Motion to Dismiss Fifth Amended Complaint (doc. #114); denies Northrop Grumman's Motion to Dismiss under Rule 12(b)(1), since converted to a motion for summary judgment (doc. #116); and grants in part and denies in part Northrop Grumman's alternative Motion to Dismiss under Rule 9(b) and 12(b)(6).

## I.      Lockheed's and ICGS's Motions to Dismiss

### A.      Relator's Factual Allegations and Procedural History

For purposes of deciding the pending motions to dismiss, the Court accepts as true the well-pleaded factual allegations of Relator Michael J. DeKort's ("Dekort's") Fifth Amended Complaint ("Complaint"), and views all facts in the light most favorable to DeKort. *See Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The background facts recounted below are therefore based on the well-pleaded factual allegations of DeKort's Complaint.

*The Coast Guard's Deepwater Program and the Deepwater Contract*

Beginning in the late 1990s, the United States Coast Guard ("Coast Guard") began evaluating ways to modernize or replace its fleet of ships, planes and helicopters, an effort which became known as the Coast Guard's Integrated Deepwater System Program ("Deepwater"). (Compl., Exs. A, K and L). This modernization effort included conversion of forty-nine 110-foot patrol boats into 123-foot patrol boats. (*Id.*) In June 2002, following a lengthy proposal evaluation period, the Coast Guard awarded the Integrated Deepwater System Contract ("Deepwater Contract") to ICGS, a limited liability company created under Delaware law. (*Id.* ¶¶ 8, 10). Pursuant to the

Deepwater Contract, ICGS was to design, construct, deploy, support and integrate Deepwater assets to meet Coast Guard requirements.  (*Id.*, Ex. L at 3).

Defendants Lockheed and Northrop Grumman are members of ICGS, as well as first-tier subcontractors to ICGS on Deepwater, responsible for different portions of the Deepwater program work. (*Id.* ¶ 10).  Lockheed was responsible for modernizing the patrol boats' "Command, Control, Communications, Computer, Intelligence, Surveillance, and Reconnaissance" ( "C4ISR") systems. (*Id.*, Ex. K at 1).  Northrop Grumman, through its subcontractor Bollinger Shipyards, was primarily responsible for ship design, including propeller shaft alignment and hull construction necessary to convert the 110-foot patrol boats into 123-foot patrol boats.  (*Id.* ¶¶ 126-137, and Ex. K at 1).

*Relator DeKort's Involvement with Deepwater*

From July 2003 to February 2004, Lockheed employed DeKort as the Deepwater Lead Systems Engineer for the conversion of 110-foot patrol boats to 123-foot patrol boats.  (*Id.* ¶ 27). DeKort is a C4ISR systems expert, and although he wanted to remain on the Deepwater program, Lockheed removed him as Lead Systems Engineer in February 2004 "because of apparent friction arising from his complaints to his direct management about ICGS's concealed defects and its improper and shoddy work." (*Id.*).  Since his termination, DeKort has been "seeking a remedy for ICGS's corruption on the Integrated Deepwater System contract." (*Id.*).

During prior employment with Lockheed in or around 2001, DeKort was a member of ICGS's proposal-planning group for the Deepwater Contract.  (*Id.* ¶ 154).  In proposal-planning meetings, ICGS, primarily through Lockheed, developed a strategy of persuading the Coast Guard to delete its standard "will" or "shall" language from much of the requirements of the Deepwater Contract.  ICGS's and Lockheed's expressed intention was to persuade the Coast Guard to replace "requirements" language with "guidance" language, allowing the ICGS joint venture nearly

**Memorandum Opinion and Order – Page 3**

unlimited latitude in developing the Deepwater "system of systems." (*Id.*). "ICGS, by and through Lockheed, planned to promise the Coast Guard that ICGS, through both Lockheed and Northrop, would deliver superior design and products if the Coast Guard would 'untie the contractors hands' from inflexible requirements." (*Id.*). In the summer of 2003, in his role as Lockheed's Deepwater Lead Systems Engineer, DeKort "learned that ICGS, primarily through Lockheed, had succeeded with its 'guidance' pitch; the contractual project requirements included guidance language rather than firm 'shall' or 'will' requirements." (*Id.* ¶ 155).

*Delivery of Flawed and Non-Compliant 123-Foot Patrol Boats to Coast Guard*

Between March 1, 2004 and January 13, 2006, ICGS delivered eight 123-foot patrol boats to the Coast Guard, specifically: the Matagorda; the Vashon; the Metompkin; the Padre; the Attu; the Nunivak; the Monhegan; and the Manitou. (*Id.*, Exs. C-J). The 123-foot patrol boats ICGS delivered to the Coast Guard had numerous flaws relating to both the C4ISR systems, and the hull, mechanical and electrical ("HM&E") work. With regard to the C4ISR systems, the following flaws rendered the eight vessels non-compliant: (1) externally mounted equipment was not compliant with military standards (MIL-STD-1399C) or Section 3 of the Performance Specifications for 123-foot patrol boats, resulting in equipment that would not survive the environmental requirements, and which could thereby render the vessel unable to communicate or navigate; (2) the FLIR video cable, required to be compliant with Section 3 of the Performance Specifications pertaining to the infra-red sensory capabilities of the 123-foot patrol boats, was the incorrect type and not weatherproofed, which could lead to loss of system video and thereby render the navigation system inoperable; (3) the labeling of the cables on the vessels was not compliant with military specifications pertaining to the marking and designating of electrical equipment, cables and systems (namely, 1995 GEN SPEC 305 and 1995 GEN SPEC 400d), nor was the labeling compliant with Section 3 of the

Performance Specifications; (4) the video/camera surveillance system did not meet the patrol boats' physical security requirements, leaving all eight 123-foot patrol boats with blind spots directly over the pilot house and bridge windows, which could result in loss of life and loss of the vessel; (5) communications systems failed to meet requirements for both secure voice systems (SIPRNET, the government-wide secret network) and security parameters (TEMPEST)[1], resulting in corrupted communications systems exposed to unwanted eavesdropping on all governmental organizations; and (6) low smoke cable was not used, thereby endangering the crew's safety in the event of a fire. (*Id.* ¶¶ 29-125).  With regard to the hull, mechanical and electrical work performed by Northrop Grumman through its subcontractor Bollinger Shipyards, due to overall design flaws and poor workmanship, the hulls were buckling causing, among other problems, shaft misalignment.  (*Id.* ¶¶ 126-137).

Even though Defendants were aware of the flaws, Defendants continued to invoice for the work completed and certified that the delivered assets met all requirements.  ICGS certified and signed conformance documents falsely representing that all eight of the 123-foot patrol boats met contractual requirements.  More specifically, with regard to the lead vessel, the Matagorda, on or about March 1, 2004, ICGS submitted to the Coast Guard a Certificate of Compliance (sometimes referred to as, "COC"), signed on behalf of ICGS by or for its Domain Program Manager, Quality Assurance Manager, and Director of Contracts, which provided:

> **Description**: This [Delivery Task Order] provides the detailed design and construction for major modification of the 110-foot patrol boat Matagorda, including completion of all design, analyses, construction, and testing to deploy the lead vessel

---

[1]TEMPEST "is an unclassified short name referring to investigations and studies of compromising emanations.  Compromising emanations are unintentional intelligence-based signals that, if intercepted and analyzed, will disclose classified information when they are transmitted, received, handled, or otherwise processed by any information processing equipment."  (Compl., Ex. A at 2).

of the proposed 123-Ft Cutter Class, and to demonstrate compliance requirements. Included in the modifications was an extensive ultrasonic survey of the hull . . . resulting in the replacement of over 800 square feet of wasted hull plate; a new deckhouse providing an enlarged, 360-degree bridge and berthing for a dual-gender crew; a stern extension with a stern ramp and door for launch and recovery of the Short-Range Prosecutor; and upgraded C4ISR suite to ensure interoperability with the IDS; and all related logistics and training.

       I certify that on 1 March 2004, the ICGS Deepwater Program furnished the supplies and/or services called for in accordance with all applicable requirements. I further certify that the supplies and/or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification, and are in the quantity shown on the attached acceptance document.

(*Id.*, Ex. D at 2). ICGS submitted nearly identical Certificates of Compliance with: the March 9, 2004 delivery of the Vashon (*id.*, Ex. C at 2); the May 13, 2004 delivery of the Metompkin (*id.*, Ex. E at 2); the June 24, 2004 delivery of the Padre (*id.*, Ex. F at 2); the August 2, 2004 delivery of the Attu (*id.*, Ex. G at 2); the February 14, 2005 delivery of the Nunivak (*id.*, Ex, H at 2); the October 3, 2005 delivery of the Monhegan (*id.*, Ex, I at 2); and the January 13, 2006 delivery of the Manitou (*id.*, Ex, J at 2).

In addition to a Certificate of Compliance, each delivery was accompanied by a "Material Inspections and Receiving Report," also knows as a "DD Form 250" ("DD-250"), signed by the Coast Guard's contracting officer. (*Id.*, Exs. C-J) (showing Contracting Officer's signature next to attestation that "[q]uantities shown . . . were received in apparent good condition except as noted"); (*id.*, Exs. H-J) (showing additional government signature next to attestation that "acceptance of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.").

Further, ICGS, primarily through Lockheed, was contractually required to enter certain information into an Action Item Database System. (*Id.* ¶ 173). ICGS, primarily through Lockheed,

fraudulently omitted information and data regarding: (1) the environmental survivability of externally mounted equipment; (2) the FLIR video cable defects; (3) the Physical Configuration Audit and mislabeled cables; (4) the video/camera surveillance system defects; (5) the classified communications and SIPRNET/TEMPEST requirement defects; and (6) the low smoke cable defects. (*Id.*). In addition to the fraudulent omissions from the Action Item Database System, ICGS, primarily through Lockheed, never advised the Coast Guard of the falsely incomplete information. (*Id.*). ICGS, primarily through Northrop, fraudulently omitted information and data regarding the shaft alignment and hull damages from the contractually mandated Action Item Database System, and failed to advise the Coast Guard of the incomplete information. (*Id.* ¶ 174). When DeKort entered some of this information himself in January 2004, Lockheed's Paul J. Messer removed the entries, stating that DeKort's entries lacked detail. (*Id.* ¶ 175). After deleting DeKort's entries, Defendants never re-entered any information regarding the above-listed defects, nor did they disclose the concealed facts. (*Id.*).

The Coast Guard eventually decommissioned all eight 123-foot patrol boats due to problems with the vessels, primarily associated with the hull, mechanical and electrical issues. (*Id.* ¶ 131). The total loss of the patrol boats due to Defendants' "shoddy and deceptive work" likely caused a loss of $11.75 million dollars per patrol boat, or $96 million dollars. (*Id.* ¶ 26).

*"Joint Venture" and "Alter-Ego" Allegations*

At various times, Lockheed and ICGS executives, as well as ICGS's website, have referred to ICGS, which is a limited liability company, as a "joint venture" between Lockheed and Northrop, and used the term "partners" to describe Lockheed and Northrop. (*Id.* ¶¶ 7-11, 18, and Exs. K and L). Further, ICGS operated as an alter-ego of Lockheed and of Northrop, and "[f]or all the purposes of the Deepwater program ICGS, Lockheed and Northrop are all one and the same." (*Id.* ¶ 11, and

**Memorandum Opinion and Order – Page 7**

Ex. L).  ICGS did not have any of its own employees, but was operated by Lockheed and Northrop employees, and its Board of Directors was dominated by members of Lockheed's and Northrop's Boards.  (*Id.* ¶ 8).  ICGS was funded by Lockheed and Northrop and ICGS had no business other than the Deepwater Contract, the tasks of which were carried out by Lockheed and Northrop employees using Lockheed and Northrop resources.  (*Id.* ¶ 13).  ICGS operated with grossly inadequate capital of its own, and the daily operations of ICGS were not kept separate and distinct from those of Lockheed and Northrop.  (*Id.*).  Lockheed and Northrop had common business departments and ICGS used Lockheed's and Northrop's engineering and development departments. (*Id.*).  Lockheed and Northrop executed the actions that gave rise to the allegations of wrongdoing in this lawsuit.  Because the controlling directors of ICGS are also the directors of Lockheed and Northrop, ICGS took orders from the participating Lockheed and Northrop directors, rather than the other way around.  Lockheed's and Northrop's representatives were, simultaneously, duty-bound to act in Lockheed's and Northrop's best interests.  (*Id.* ¶¶ 14-15).

*Count One of Complaint - Violations of False Claims Act*

Based on the foregoing allegations, DeKort alleges in his eighty-eight page one-count Fifth Amended Complaint that Defendants violated the FCA, specifically 31 U.S.C. §§ 3729(a)(1), (2), (3) and (7), which prohibit: (1) the presentment of false claims to the Government; (2) the use of a false record or statement to get a false claim paid by the Government; (3) conspiracies to get false claims paid by the Government; and (4) the making or using of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. (Compl., Count One ¶¶ 245-249).  More specifically, he alleges that, based on the Certificates of Compliance and DD-250s (*see id.*, Exs. C-J), as well as the alleged omissions from the Action Item Database System (*id.* ¶¶ 173-177), and the alleged deficiencies in the C4ISR systems and HM&E

work (*id.* ¶¶ 29-137), Defendants: (i) knowingly or with deliberate ignorance or reckless disregard for the truth **"falsely certified"** equipment as compliant with relevant standards, Deepwater contractual requirements, and a laundry list of requirements in Section 3 of the 123-foot patrol boat "Performance Specifications"; and (ii) "submitted **claims for payment** to the United States Government on the 123's while knowing or with deliberate ignorance or reckless disregard for the truth that the ships were not compliant with relevant standards, contractual requirements, and performance specifications." (*Id.* ¶ 157) (original emphasis). DeKort also alleges that "[b]ecause of the pervasive false statements and fraudulent conduct in obtaining the Deepwater contract, every claim or request for payment submitted to the Coast Guard by ICGS under the Deepwater contract constituted a false claim under the FCA." (*Id.* ¶ 178).

In addition, DeKort contends that Lockheed and Northrop, members of ICGS and first-tier contractors on the Deepwater Contract, were in fact joint venture partners in ICGS, and are therefore jointly and severally liable for each other's actions, as well as ICGS's. Finally, he contends that the Court should "pierce the corporate veil," and hold ICGS accountable for the acts of Lockheed and Northrop, and hold Lockheed and Northrop liable for the acts of ICGS, since ICGS was the alter-ego of Northrop Grumman and Lockheed. (*Id.* ¶¶ 12-18).[2]

---

[2]Although the live pleading is Relator's Fifth Amended Complaint, filed September 8, 2009 (doc. #144), Relator initially filed this lawsuit on September 29, 2006 (doc. #1). Under the FCA, after a relator has filed suit, the action is sealed and stayed and the United States is notified. 31 U.S.C. § 3730(b)(2). The complaint must remain sealed for at least 60 days while the government decides whether to intervene. *Id.* If the government declines to take over the action, "the person bringing the action shall have the right to conduct the action[.]" 31 U.S.C. § 3730(b)(4)(B). Since the inception of this case, the Court has granted the United States numerous extensions of its deadline to intervene. On February 4, 2009, noting that the case had been on file since September 29, 2006, the Court directed the Government to make its intervention decision by February 6, 2009. The United States informed the Court that it was unable to decide whether to intervene in this action by the Court's deadline, but reserved the right to intervene at a later time. (Doc. #45). On January 14, 2010, the Court unsealed the entire record.

On October 15, 2009, Defendants Lockheed and ICGS filed separate motions to dismiss, both arguing that DeKort has failed to plead a *qui tam* cause of action under § 3729(a) with the particularity required by Federal Rule of Civil Procedure 9(b), and that DeKort has failed to state a claim upon which relief may be granted under Rule 12(b)(6).  Prior to addressing the pending motions to dismiss, the Court sets forth the applicable legal standards.

**B.     Applicable Legal Standards**

**1.     Federal Rule of Civil Procedure 12(b)(6)**

To defeat a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal*, __ U.S. __,129 S.Ct. 1937, 1949 (2009).  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Id.*  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly,* 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff.  *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).  The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Iqbal*, 129 S.Ct. at 1949-50.  When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief.  *Id.*  In ruling on a motion to dismiss under 12(b)(6), the Court cannot look beyond the

**Memorandum Opinion and Order – Page 10**

pleadings. *Spivey v. Robertson,* 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the

complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496,

498-99 (5th Cir. 2000).

### 2. Federal Rule of Civil Procedure 9(b)

Rule 9(b) applies to actions under the FCA. *United States ex rel. Williams v. Bell Helicopter*

*Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). A dismissal for failure to plead with particularity

in accordance with Federal Rule of Civil Procedure 9(b) is treated as a Rule 12(b)(6) dismissal for

failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir.1996).

Rule 9(b) provides, in pertinent part, that, "[i]n all averments of fraud or mistake, the circumstances

constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The amount

of particularity required for pleading fraud differs from case to case. *See Benchmark Elec., Inc. v.*

*J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir.), *modified on other grounds*, 355 F.3d 356 (5th Cir.

2003); *see also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) (noting that "courts

have emphasized that Rule 9(b)'s ultimate meaning is context-specific"). In the Fifth Circuit, the

Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be

fraudulent, the speaker, when and why the statements were made, and an explanation of why they

were fraudulent." *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005); *see also Southland*

*Secs. Corp. v. Inspire Ins. Solutions, Inc*., 365 F.3d 353, 362 (5th Cir. 2004).

In a recent post-*Twombly* decision, the Fifth Circuit set forth the interplay of *Twombly*, Rule

9(b) and Rule 8(a) in the context of a FCA case:

> The particularity demanded by Rule 9(b) is supplemental to the Supreme Court's
> recent interpretation of Rule 8(a) requiring "enough facts [taken as true] to state a
> claim to relief that is plausible on its face." The *Twombly* standard replaces the
> lenient and long-standing rule that "a complaint should not be dismissed for failure
> to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts

in support of his claim which would entitle him to relief." The new reading raises a hurdle in front of what courts had previously seen as a plaintiff's nigh immediate access to discovery – modest in its demands but wide in its scope. In cases of fraud, Rule 9(b) has long played that screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later. We apply Rule 9(b) with "bite" and without "apology," but also aware that Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading. Rule 9(b) does not "reflect a subscription to fact pleading" and requires only "simple, concise, and direct" allegations of the "circumstances constituting fraud," which after *Twombly* must make relief plausible, not merely conceivable, when taken as true.

*United States ex rel. James H. Grubbs, M.D. v. Kanneganti*, 565 F.3d 180, 185-86 (5th Cir. 2009)

(internal footnotes and citations omitted).

After noting that Rule 9(b)'s "time, place, contents, and identity" standard originated in common law fraud and securities fraud cases where the "elements of reliance and damages are intertwined with the misrepresentation and heighten the need for attention to the misrepresentation itself[,]" the court contrasted the FCA:

> The False Claims Act, in contrast, lacks the elements of reliance and damages. Rather it protects the Treasury from monetary injury. Put plainly, the statute is remedial and exposes even unsuccessful claimants to liability. [. . .] It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim. *Thus, a claim under the False Claims Act and a claim under common law and securities fraud are not on the same plane in meeting the requirements of "stat[ing] with particularity" the contents of the fraudulent misrepresentation.*

*Id.* at 189 (emphasis added).

With respect to 31 U.S.C. § 3729(a)(1), which makes it a civil violation to "knowingly present[] or cause[] to be presented, [to the Government] a false or fraudulent claim for payment or approval," as to the express presentment requirement, the Fifth Circuit stated that: "[f]raudulent presentment requires proof only of the claim's falsity, not of its exact contents." *Id.* at 189. Further, "a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove

to a preponderance that fraudulent bills were actually submitted." *Id.* "To require these details at pleading is one small step shy of requiring production of the actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Id.* at 189-90. "[T]o plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

With regard to a False Claims Act violation of section 3729(a)(2) (creating a civil violation for any person that "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"), the *Grubbs* court, noting the lack of an express presentment requirement, stated: "[f]or this section, the recording of a false record, when it is made with the requisite intent, is enough to satisfy the statute; we need not make the step of inferring that the record actually caused a claim to be presented to the Government." *Id.* at 192-93. As to section 3729(a)(3), which subjects to civil liability any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid[,]" the court held that a plaintiff alleging conspiracy to commit fraud must "plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy." *Id.* at 193. As with § 3792(a)(2), the Fifth Circuit concluded that "presentment of a false claim need not be proven or pled to prevail on a False Claims Act conspiracy charge." *Id.*

### C.    Discussion

#### 1.    Elements of Relator's False Claims Act Causes of Action

The False Claims Act allows private litigants to bring actions on behalf of the government against anyone who, in relevant part:

> (1)    knowingly presents or causes to be presented, [to the Government] a false or fraudulent claim for payment or approval;

> (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

> (3)    conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; [or]

> (7)    knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government[.]

31 U.S.C. §§ 3729(a)(1), (2), (3) and (7) (repealed 2009).[3]  The terms "knowing" and "knowingly" in the False Claim Act context mean that a person, with respect to information:

> (1) has actual knowledge of the information;

> (2) acts in deliberate ignorance of the truth or falsity of the information; or

> (3) acts in reckless disregard of the truth or falsity of the information,

---

[3]On May 20, 2009, Congress enacted the Fraud Enforcement Recovery Act of 2009 ("FERA"), which amended the FCA, and reorganized various subsections.  *See generally* Pub. L. No. 111-21, § 4; 123 Stat. 1617 (2009).  In keeping with the parties' briefing, statutory references will be to the prior version of the statute.  The FERA contains a retroactivity clause, which provides that "[t]he amendments made by this section . . . shall apply to conduct on or after the date of enactment, except that [the amendments to § 3729(a)(2)] *shall take effect as if enacted on June 7, 2008, and apply to all claims . . . that are pending on or after that date*."  Pub. L. No. 111-21, § 4(f)(1), 123 Stat. at 1625 (emphasis supplied).  As the conduct alleged in the Fifth Amended Complaint occurred well prior to May 20, 2009, with the exception of the amendments to § 3729(a)(2), none of the amendments apply to this case.

The amendments to section 3729(a)(2) include "materiality" as an element of a claim under the FCA. *See* 31 U.S.C. § 3729(a)(1)(B).  As the Fifth Circuit has already judicially imposed a materiality requirement on FCA claims, the Court need not examine the retroactivity provision of FERA to determine whether the amendments to § 3729(a)(2) apply in this case.  *See United States v. Southland Management Corp.*, 326 F.3d 669, 679 n.3 (5th Cir. 2003) ("the civil FCA 'interdicts *material* misrepresentations made to qualify for government privileges or services.'" (original emphasis) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997))).

**Memorandum Opinion and Order – Page 14**

"and no proof of specific intent to defraud is required."  31 U.S.C. § 3729(b).

The Supreme Court has cautioned that the False Claims Act was not designed to punish every type of fraud committed upon the government.  *See United States v. McNinch*, 356 U.S. 595, 599 (1958). The FCA attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, "but to the claim for payment," which must be false or fraudulent. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999). "Therefore, a central question in False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government." *Id.*

In addition to the archetypal *qui tam* action under the FCA, where the actual claim for payment is literally false or fraudulent (such as for services not performed or for an incorrect amount), courts have recognized two other doctrines that attach potential liability to claims for payment under the FCA, namely, the doctrines of false certification and fraud in the inducement, both of which DeKort is alleging here.  *See generally Harrison*, 176 F.3d at 785-88 (and cases cited therein).  As to the false certification cases, courts have found violations of the False Claims Act when a government contract or program requires compliance with certain conditions as prerequisites to a government benefit, payment or program.   Where a defendant fails to comply with these conditions, but falsely certifies that it has complied in order to induce payment from the Government, courts have found a violation of the FCA.  *See id.* at 786-87 (and cases cited therein); *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997), *aff'g in part and vacating in part* 938 F.Supp. 399 (S.D. Tex. 1996).  In the Fifth Circuit, liability for false certification will only lie if compliance with the statute or regulation was a prerequisite to gaining the benefit, and defendant affirmatively certified compliance. *Thompson*, 125 F.3d at 902 ("where the government has conditioned payment of a claim upon a claimant's

certification of compliance with . . . a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation.")

In addition to imposing FCA liability in cases of false certification, "FCA liability has in certain cases been imposed when the contract under which payment is made was procured by fraud." *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 384 (5th Cir. 2003). The legislative history of the FCA supports claims based upon a fraud-in-the-inducement theory:

> When Congress amended the FCA in 1986, its legislative history recognized fraud-in-the-inducement liability under the Act. Specifically, Congress noted that, under FCA case law, "each and every claim submitted under a contract, loan guarantee, or other agreement that was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim."

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005)(quoting S. Rep. No. 99-345, at 9, *reprinted in* 1986 U.S.C.C.A.N. at 5274); *see also United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) (FCA liability triggered when contractors colluded to artificially inflate the bid price on a public-works project, thereby inducing the government to pay more than it otherwise would have, and each claim submitted under the contracts, although not literally false, constituted a separate false or fraudulent claim since "[t]his fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid be the [government]...."), *superseded in part by statute as stated in United States ex rel. McKenzie v. Bellsouth Telecoms.*, 123 F.3d 935, 938 (6th Cir. 1997)). In many cases brought under the fraud-in-the-inducement doctrine, the claims submitted were not in and of themselves false, but liability under the FCA attached "because of the

fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder." *Harrison*, 176 F.3d at 788.

DeKort seeks to impose FCA liability on Lockheed and ICGS based on both the "fraud-in-the-inducement" and "false certification" theories of liability for violations of 31 U.S.C. §§ 3729(a)(1), (2), (3) and (7). The Court now turns to Lockheed's motion to dismiss.

### 2.   Lockheed's Motion to Dismiss

Lockheed moves to dismiss DeKort's FCA allegations pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b). In analyzing this motion, in addition to the pleadings (§I.A., *supra*), the Court has considered:

• Defendant Lockheed's Motion to Dismiss Fifth Amended Complaint ("Lockheed Mot.") (doc. #117);

• Memorandum of Points and Authorities in Support of Defendant Lockheed's Motion to Dismiss Fifth Amended Complaint and Appendix thereto ("Lockheed Brief") (doc. #118);

• Relator's Opposition to Defendant Lockheed's Motion to Dismiss Fifth Amended Complaint and Appendix thereto ("Relator Opp.") (doc. #128); and

• Reply Memorandum in Support of Defendant Lockheed's Motion to Dismiss Fifth Amended Complaint ("Lockheed Reply") (doc. #134) and Appendix thereto (doc. #135).

According to Lockheed:

> Two sets of claims under the [FCA] are discernable in Relator's Fifth Amended Complaint. First, Relator asserts that Defendants committed "fraud in the inducement" of the Deepwater Contract by persuading the Coast Guard to "replace 'requirements' language with 'guidance' language." Second, he argues that Defendants submitted COCs and DD-250s to the Coast Guard, and made entries in the Action Item Database System, without disclosing certain supposed failures to comply with contractual requirements. Both of these claims are without merit and should be dismissed.

Lockheed Brief at 4 (internal citations omitted).[4]  The Court will first address Lockheed's arguments in support of its motion to dismiss Relator's fraud-in-the-inducement allegations, followed by Relator's contractual non-compliance claims.

### a.   Fraud-in-the-Inducement Allegations

As set forth in more detail above (§ I.A., *supra*), DeKort alleges that ICGS, primarily through Lockheed, violated the FCA by committing "fraud in the inducement" of the Deepwater Contract by persuading the Coast Guard to "replace 'requirements' language with 'guidance' language."  *See* Compl. ¶¶ 154-156, 159-61, 178.  DeKort alleges that ICGS, primarily through Lockheed:

> did not intend or believe – as evidenced by discussions at proposal planning meetings attended by Relator – that guidance language rather than firm requirements language in the Deepwater contract would produce superior design or products. Rather, ICGS and Lockheed simply wanted the contract to give the joint venture maximum flexibility to conduct the work in whatever manner it saw fit and to circumvent fiscal or timing impediments that might be encountered in the course of the program.  ICGS and Lockheed **misled** the Coast Guard into believing the less stringent "Guidance" language would **yield superior ships and materials** that would still satisfy the needs of the Coast Guard and be able to withstand the rigors of use on the sea better then boats and materials built under the less flexible, and more commonly used, "Requirements" language.  The joint venture sold the Coast Guard the "free lunch theory."

*Id.* ¶ 156 (original emphasis).  Based on these allegations, DeKort alleges that "every claim or request for payment submitted to the Coast Guard by ICGS under the Deepwater contract constituted a false claim under the FCA."  *Id.* ¶ 178.

### i.   Rule 12(b)(6)

---

[4] Relator does not oppose Lockheed's characterization of the Complaint as attempting to allege an FCA violation under the fraud-in-the-inducement and false certification theories of liability.  Further, the Court interprets the pleadings similarly.

**Memorandum Opinion and Order – Page 18**

In support of its motion to dismiss pursuant to Rule 12(b)(6), Lockheed argues that Relator complains about the nature of the Deepwater Contract, but does not actually assert any fraud. Lockheed Brief at 4. "Absent falsity or fraud, of course, no FCA action may proceed." *Id.* at 6 (citations omitted). Lockheed contends: "First and most glaringly, Relator does not actually allege any falsity or fraud on the part of Lockheed Martin. Rather, to paraphrase his allegations, he asserts that ICGS persuaded the Coast Guard to include guidance language rather than 'shall' or 'will' requirements in the Deepwater Contract (even though ICGS did not believe guidance language would give rise to better design or products) because IGGS wanted to obtain greater flexibility, and, consequently, less responsibility for any potential problems." *Id.* at 5-6. Lockheed posits that, "[e]ven accepting these allegations as true, these statements do not (individually or collectively) constitute a claim that Defendants **lied** to the Coast Guard, made objectively false statements, or otherwise acted with reckless disregard to, or deliberate ignorance of, the truth or falsity of information, as required by 31 U.S.C. § 3729." *Id.* at 6 (original emphasis). In further support of this argument, Lockheed explains:

> [T]here is nothing false or fraudulent about a contractor seeking to persuade a government agency to adopt guidance language instead of rigid requirements. Even if the contractor's subjective motivations are to lower costs and increase its profits, the contractor has not set forth "expressions of **fact** which '(1) admit[] of being adjudged true or false in a way that (2) admits of **empirical verification.**'"

*Id.* at 6-7 (quoting *Harrison*, 176 F.3d at 792) (in turn quoting *Presidio Enters., Inc. v. Warner Bros. Distributing Corp.*, 784 F.2d 674, 679 (5th Cir. 1986)) (Lockheed's emphasis); *id.* at 7 ("[i]t is not **impossible** for guidance language to result in better products than rigid requirements.") (original emphasis).

In opposition, DeKort repeats the allegations in his Complaint, and offers no response to Lockheed's central arguments, summarized directly above. *See* Relator Opp. at 11-12. Further, as

**Memorandum Opinion and Order – Page 19**

Lockheed correctly asserts in its reply brief, Relator does not address any of the cases upon which Lockheed relies. *See* Lockheed Reply at 2 ("And Relator fails to rebut – or even mention – any of the case law cited by Lockheed Martin. *See, e.g., Harrison*, 176 F.3d at 782 (dismissing FCA claim based on analogous 'scheme and plan'); *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (party's secret intentions do not give rise to FCA liability). Instead Relator seeks to wish away the defects in his latest pleading.").

In order to prove a fraudulent inducement claim, a plaintiff must demonstrate that: (1) "there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." *Harrison*, 176 F.3d at 782; *see also Willard*, 336 F.3d at 384 ("FCA liability has in certain cases been imposed when the contract under which payment is made was procured by fraud.").

The first deficiency in Relator's fraud-in-the-inducement claim is that persuading the Coast Guard to include guidance language rather than "shall" or "will" requirements in the Deepwater Contract, with an eye to Defendants obtaining greater flexibility (and less responsibility), even assuming its truth, is not a "false statement or fraudulent course of conduct" for purposes of the FCA. Quite simply, these allegations do not amount to an expression of fact which admits "of being adjudged true or false in a way that [] admits of empirical verification." *Harrison*, 176 F.3d at 792; *see also United States ex rel. Wilson v. Kellogg, Brown & Root*, 525 F.3d 370, 377 (4th Cir. 2008) (fraud-in-the-inducement allegations dismissed where the "representations at issue . . . do not include objective falsehoods" but rather "involve several general and relatively vague maintenance provisions."); *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F.Supp.2d 787, 797 (E.D.Va. 2007) ("It is well-established that the FCA requires proof of an objective falsehood.").

**Memorandum Opinion and Order – Page 20**

The Court contrasts Relator's fraud-in-the-inducement allegations with the type of allegations found actionable by the Fourth Circuit in *Harrison*, where the relator alleged that the defendant made several objectively misleading statements in an attempt to fraudulently induce the government to award it a Department of Energy contract. For example, the defendant allegedly represented that a particular project would take no more than 1.5 years to complete, even though it knew it would take significantly longer. *Harrison*, 176 F.3d at 781.  In addition, the defendant purposefully underestimated specific overhead costs when submitting a bid, a practice commonly known as "low-balling." *Id.* at 781-83, 791. The court found that such representations, if indeed untrue, constituted false statements under the FCA. Another example is *Hess*, where the Supreme Court found contractors liable under the FCA for claims submitted under government contracts which the defendants obtained by collusive bidding, and defendants had certified that their bids "were genuine and not sham or collusion." *Hess*, 317 U.S. at 543. *See also United States v. General Dynamics Corp.*, 19 F.3d 770, 772, 775 (2d Cir. 1994)(defendant liable for submitting inflated cost estimates in subcontract submitted for approval to government).  Unlike the allegations of objective falsehoods in those cases, the Court agrees with Lockheed that Relator has not set forth "expressions of **fact** which '(1) admit[] of being adjudged true or false in a way that (2) admits of **empirical verification.**'" *See* Lockheed Brief at 6-7 (original emphasis).

The second deficiency in Relator's fraud-in-the-inducement claim is Relator's failure to adequately allege materiality, that is, to allege how persuading the Coast Guard to include guidance language rather than "shall" or "will" requirements in the Deepwater Contract somehow influenced the Coast Guard's action in awarding the Deepwater Contract to ICGS. *See generally Harrison*, 176 F.3d at 782 (materiality is essential element to fraud-in-the-inducement claim).  "The accepted definition of materiality for civil FCA claims . . . equates materiality with having a natural tendency

**Memorandum Opinion and Order – Page 21**

to influence, or being capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Southland Management Corp.*, 326 F.3d 669, 679 (5th Cir. 2003)(citation and internal punctuation omitted). According to Lockheed, "beyond the bald assertion that ICGS 'succeeded with its guidance pitch' [Compl. ¶ 155], Relator provides no evidence that the Coast Guard was in any way influenced by ICGS's supposed misrepresentations. He does not contend the Coast Guard would not have awarded ICGS the Deepwater Contract had it known about the alleged fraud, nor would such a contention be plausible given that the actions described by Relator occurred **after** the contract had been awarded." Lockheed Brief at 10 (original emphasis). Having considered the pleadings, the parties' respective arguments, and applicable law, the Court agrees with Lockheed and concludes that Relator has failed to adequately allege materiality. Absent such allegations, Relator's fraud-in-the-inducement claim must be dismissed under Rule 12(b)(6).

In sum, Lockheed's motion to dismiss Relator's fraud-in-the-inducement claim under Rule 12(b)(6) should be granted since Relator has failed to sufficiently allege (i) an objective falsehood by Relator in procuring the Deepwater Contract, or (ii) materiality.[5]

### ii.      Rule 9(b)

Alternatively, Lockheed moves to dismiss Relator's fraud-in-the-inducement allegations pursuant to Rule 9(b), arguing:

---

[5]In light of the Court's decision granting Lockheed's Rule 12(b)(6) motion, the Court need not address Lockheed's alternative arguments in support of dismissing Relator's fraud-in-the-inducement claims pursuant to Rule 12(b)(6), including: (i) that any efforts by Defendants to persuade a government agency to adopt guidance language instead of rigid requirements "is a proper exercise of a contractor's First Amendment right, protected by the *Noerr-Pennington* doctrine, to petition the government[,]" (*see* Lockheed Brief at 6; *see also* Lockheed Reply at 3), and (ii) that Relator's allegations are inconsistent with the government's contract formation rules under the Federal Acquisition Regulations (Title 48 of the Code of Federal Regulations). *See* Lockheed Brief at 5; Lockheed Reply at 4.

> Here, even if the Complaint could somehow be read to allege falsity or fraud, Relator
> fails to specify the "who, what, when, and where" or the "time, place, and contents"
> of Defendants' supposed false statements to the Coast Guard.  Compl. ¶¶ 154-56,
> 159-61.  For example: When did the contract negotiations between Lockheed Martin,
> Northrop Grumman, ICGS, and the Coast Guard take place?  Where did they take
> place?  Who represented the parties at these negotiations?  Who told the Coast Guard
> that guidance language was preferable to rigid requirements?  What form did this
> communication take?  What indication is there that whoever was responsible for this
> communication secretly believed that guidance language was not preferable?  What
> indication is there that Defendants secretly intended to produce sub-standard designs
> and products? . . . These are all crucial queries for  Rule 9(b) purposes, but they all
> remain entirely unanswered.

Lockheed Brief at 10; *see also id.* at 4 (Relator, "even after *five* amendments" fails to "provide

nearly enough specificity to satisfy the explicit requirement of FRCP 9(b).") (original emphasis).

In opposition, Relator asserts, with no argument in support, that he "has stated a claim for fraudulent

inducement, with particularity."  Relator Opp. at 11.

 Having considered the pleadings, parties' arguments, and applicable law, the Court

concludes that Relator has fallen short of pleading his fraud-in-the-inducement claim with the

requisite particularity required by Rule 9(b).  *See, e.g., United States ex rel. Richardson-Eagle, Inc.

v. Marsh & McLennan Cos.*, 2005 WL 3591014, at *7 (S.D. Tex. Dec. 20, 2005) (dismissing fraud-

in-the-inducement claim under Rule 9(b) where complaint "does not allege who was involved in the

contract negotiations, or where and when the negotiations took place" and "[t]here are no facts

alleged as to what was said before, during, or after the contract negotiations."); *Willard*, 336 F.3d

at 385 (dismissing fraud-in-the-inducement claim under Rule 9(b) where complaint "does not allege

who was involved in the negotiations, or where or when the negotiations took place, or . . . what was

said before, during, or after the contract negotiations.").[6]

---

[6]Further, although no Court has so held, to the extent the Fifth Circuit's decision in *Grubbs* can be read to obviate the "time, place, contents and identity" standard in FCA cases, as Relator appears to be suggesting, the Court determines that, given the vague allegations relating to Defendants' attempt to convince

In sum, in addition to dismissal for failure to state a claim, the Court grants Lockheed's motion to dismiss Relator's fraud-in-the-inducement claim under Rule 9(b) for failure to allege fraud with the requisite particularity.

### b. False Certification Allegations

Lockheed moves to dismiss Relator's allegations of FCA violations based on false certifications pursuant to Rule 12(b)(6) for failure to state a claim, and pursuant to Rule 9(b) for failure to plead fraud with particularity. As set forth in more detail above (§ I.A., *supra*), DeKort alleges Defendants violated the FCA by way of presentment of false claims to the government and using false records to get claims paid by the government (in violation of 31 U.S.C. §§ 3729(a)(1)-(2)), in connection with alleged flaws in the C4ISR systems (which was Lockheed's responsibility under the Deepwater Contract), including: (1) environmental survivability of externally mounted equipment; (2) FLIR video cable; (3) mislabeled cables; (4) video/camera surveillance systems; (5) communications systems; and (6) low smoke cable defects, as well as deficiencies in the hull, mechanical and electrical work (which was Northrop Grumman's responsibility under the Deepwater Contract). Compl. ¶¶ 29-137. Specifically, based on the Certificates of Compliance and DD-250s (*id.*, Exs. C-J), and alleged omissions from the Action Item Database system (*id.* ¶¶ 173-177), DeKort alleges that Defendants: (i) knowingly or with deliberate ignorance or reckless disregard for the truth "**falsely certified**" equipment as compliant with relevant standards, Deepwater contractual requirements, and a laundry list of requirements in Section 3 of the 123-foot

---

the Coast Guard to replace rigid contract requirements with flexible ones, Relator has failed to "state with particularity, the circumstances constituting fraud" in relation to procurement of the Deepwater Contract. *See generally Grubbs*, 565 F.3d at 188 (noting "there is no single construction of Rule 9(b) that applies in all contexts").

patrol boat "Performance Specifications"; and (ii) "submitted **claims for payment** to the United

States Government on the 123's while knowing or with deliberate ignorance or reckless disregard

for the truth that the ships were not compliant with relevant standards, contractual requirements, and

performance specifications." *Id.* ¶ 157 (original emphasis).  The Court first turns to Lockheed's

motion to dismiss Relator's false certification claims under Rule 12(b)(6).

### i.      Rule 12(b)(6)

In support of dismissal for failure to state a claim, Lockheed argues:

> (1) Relator does not properly allege, as he must, that payment from the government
> was conditioned on any certification of compliance by the contractor; (2) DD-250s
> cannot support FCA liability as a matter of law because they are signed by the
> government, not the contractor; (3) several of the instances of supposed contractual
> noncompliance relied upon by Relator were not actually contract violations at all (as
> proven by the February 2007 IG Report that Relator attaches as Exhibit A); (4) all
> of these instances were contemporaneously known to (and acquiesced in) by the
> government; and (5) Lockheed Martin had no involvement with the alleged hull,
> mechanical and electrical problems.

Lockheed Brief at 4-5.  The Court will examine Lockheed's five arguments in support of dismissal

in turn.

Lockheed first contends that dismissal is required since Relator "does not properly allege,

as he must, that payment from the government was conditioned on any certification of compliance

by the contractor." *Id.* at 4.  When a government contract or program requires compliance with

certain conditions as prerequisites to a government benefit, payment or program, a defendant

violates the FCA where it fails to comply with these conditions, but falsely certifies that it has

complied in order to induce payment from the Government.  *See Harrison*, 176 F.3d at 786-88;

*Thompson*, 125 F.3d at 902.  In the Fifth Circuit, liability for false certification will only lie if

compliance with the statute or regulation was a prerequisite to gaining the benefit, and defendant

affirmatively certified compliance.  *Thompson*, 125 F.3d at 902 ("where the government has

conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation."); *Southland Management*, 326 F.3d at 680 (Jones, J., concurring) ("to create liability under the FCA, a false certification of compliance must be a prerequisite to obtaining a government benefit.").

DeKort alleges that "[e]ach of the false Certificates of Compliance referred to in this Complaint, and others submitted in connection with requests for progress payments were a pre-condition for payment."  Compl ¶ 157.  He further attaches to his Complaint copies of the eight COCs submitted to the Coast Guard upon delivery of the 123-foot patrol boats, as well as the accompanying DD-250s. *Id.*, Exs. C-J.  In his opposition, DeKort states that he is "not in possession of all of the contract documents."  Relator Opp. at 15 n.50.  In support of dismissal, Lockheed counters that these allegations "merely restate the FCA's conditionality requirement and so cannot possibly meet the applicable standard."  Lockheed Brief at 14 n.10.

At the motion to dismiss stage, the question before this Court is whether, with regard to the Fifth Circuit's conditionality requirement, Relator has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  The Court is mindful that the plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Iqbal*, 129 S.Ct. at 1949.  Based on Relator's allegations, the Court agrees with Relator that, "[i]t can  reasonably be inferred from the allegations of the Complaint that fulfilling intrinsic factual contract requirements, such as a requirement that topside equipment on Coast Guard water craft be weather  resistant, *[was] a condition of payment* upon delivery of the cutters."  Relator Opp. at 17 (original emphasis).  Otherwise stated, while the Court does not herein make any determination that certification of compliance with contractual terms in

connection with delivery of the eight 123-foot patrol boats was a *sine qua non* to payment by the Coast Guard, the Court, cognizant that Relator is  "not in possession of all of the contract documents[]" (Relator Opp. at 15 n.50), is satisfied that the Complaint sufficiently alleges that it was.  Accordingly, the Court rejects Lockheed's first argument in support of its motion to dismiss Relator's false certification allegations.

Second, Lockheed contends that "DD-250s cannot support FCA liability as a matter of law because they are signed by the government, not the contractor."  Lockheed Brief at 4-5.  Relator, in opposition, argues that, although DD-250s standing alone "do not comprise . . . express certification[s] of compliance[,]" in this instance, "the DD-250s are not standing alone but are accompanied by express certificates of compliance and/or performance."  Relator Opp. at 19.

A "DD-250 is a form supplied by the government which the contractor fills in, identifying the contract by number and providing a description of the item; the government then signs the form. The form has a variety of uses, and can be used as an invoice."  *United States ex rel. Butler v. Hughes Helicopters*, 71 F.3d 321, 330 (9th Cir. 1995).  In *Butler*, cited by Lockheed in support of its argument that the DD-250s, as a matter of law, lend no support to a claim that contractor engaged in fraud (*see* Lockheed Reply at 6), the appellate court affirmed a directed verdict against the relator because the DD-250s were not used as invoices containing misrepresentations and the Relator did not "introduce into evidence any proof of misrepresentation in the supporting documents accompanying the DD-250s." *Id.*  By contrast, as Relator correctly argues in his opposition brief, "Relator has alleged that the Certificates of Compliance and/or Conformance accompanying the DD-250s contained misrepresentations, and that as a result of the misrepresentations, the claims identified by invoice numbers in the DD-250s were false.  Relator identifies false statements, and

false claims associated with the DD-250s by invoice number and the amounts thereof[.]" Relator Opp. at 19-20.

In this case, as Relator correctly points out, the DD-250s were not "standing alone," but rather were accompanied by the Certificates of Compliance and/or Conformance which Relator asserts contained the misrepresentations at issue. Under these circumstances, at the motion to dismiss stage, the Court rejects Lockheed's argument that Relator's claims automatically fail to the extent they are based on the DD-250s. *See Butler*, *supra*.[7]

Third, Lockheed argues that the instances of noncompliance alleged by Relator do not support FCA liability. Lockheed Brief at 17-21. To reiterate, the six instances of noncompliance are, as related to C4ISR systems (for which Lockheed was responsible under the Deepwater Contract): (1) environmental survivability of externally mounted equipment; (2) FLIR video cable; (3) mislabeled cables; (4) video/camera surveillance systems that failed to provide a 360 degree view; (5) communications systems (SIPRNET and TEMPEST) left vulnerable due to installation of unshielded cable; and (6) low smoke cable defects, as well as deficiencies in the hull, mechanical and electrical work (for which Northrop Grumman was responsible under the Deepwater Contract). Compl. ¶¶ 29-137. Specifically, based on the Certificates of Compliance and DD-250s (*id.*, Exs.

---

[7]The Court rejects Lockheed's reliance on *United States ex rel. Stebner v. Stephenson Servs., Inc.*, 144 Fed. App. 389 (5th Cir. 2005) for the proposition that submission of a DD-250 can never support a false certification claim. *See* Lockheed Brief at 15-16. In *Stebner*, the appellate court affirmed entry of summary judgment in a *qui tam* action against a government contractor where, after reviewing the evidence (which included progress payment reports and DD-250s), the Court concluded that neither piece of evidence "expressly certified compliance with every provision of the overall contract." 144 Fed. App. at 394. Absent adoption of an "implied theory of certification," which the Fifth Circuit has not done, the *Stebner* court on summary judgment affirmed that relators in that case had failed to introduce sufficient evidence of false claims. The *Stebner* court did not foreclose the possibility, however, that, as recognized in *Butler*, the result might be different where a relator introduces into evidence proof of misrepresentation in the supporting documents accompanying the DD-250s. *See generally Butler*, 71 F.3d at 330.

C-J), as well as the alleged omissions from the Action Item Database system (*id.* ¶¶ 173-177), and the alleged deficiencies in the C4ISR systems and HM&E work (*id.* ¶¶ 29-137), Relator alleges FCA violations under 31 U.S.C. §§ 3729(a)(1)-(2).

Under this third heading, Lockheed seeks dismissal of Relator's allegations pertaining to deficiencies in the type of cabling used as part of the Coast Guard's upgrade to 123-foot vessels, as well as deficiencies in the video surveillance system installed.  As set forth in more detail above (§I.A., *supra*), Plaintiff alleges that Defendants' installation of non-shielded cables (where shielded cables should have been used) created deficiencies in the classified communication certification system (SIPRNET and TEMPEST).  Compl. ¶¶ 98-125.  As to the video surveillance system installed on the 123-foot vessels, Relator alleges that this system was deficient because it failed to provide a 360 degree view, and therefore did not meet the patrol boats' physical security requirements, leaving all eight 123-foot patrol boats with blind spots directly over the pilot house and bridge windows, which could result in loss of life and loss of the vessel.  *See id.* ¶¶ 71-97.

Specifically, in support of its motion to dismiss these particular allegations, Lockheed contends that a 2007 report from the Inspector General attached to Relator's Complaint as Exhibit A ("IG Report") establishes that these two claims (which Lockheed refers to as the "TEMPEST" and "video camera" allegations) are without merit.  Lockheed Brief at 21-22; Lockheed Reply at 9.  In the Report, the Inspector General concluded that:

> Aspects of the C4ISR equipment installed aboard the 123' cutters do not meet the design standards set forth in the Deepwater contract.  Specifically, two of the four areas of concern identified by the complainant were substantiated and are a result of the contractor not complying with the design standards identified in the Deepwater contract.  For example, the contractor did not install low smoke cabling aboard the 123' cutter, despite a Deepwater contract requirement that stated "all shipboard cable added as a result of the modification of the vessel shall be low smoke." [ . . .] Additionally, the contractor installed C4ISR equipment aboard both the 123' cutters and prosecutors, which either did not comply or was not tested to ensure compliance

**Memorandum Opinion and Order – Page 29**

with specific environmental performance requirements outlined in the Deepwater
contract.

Compl., Ex. A at 2.  With regard to the type of cabling and the video surveillance system installed,

however, the Inspector General concluded that minimum contract requirements were met:

> The remaining two areas of concern identified by the complainant were in technical
> compliance with the Deepwater contract and deemed acceptable by the Coast Guard.
> Specifically, while the type of cabling installed during the C4ISR system upgrade to
> the 123' cutter was not high-grade braided cable, the type of cable used met the Coast
> Guard's minimum-security standards as required by the Deepwater contract.
> Concerning the installation of the video surveillance system, while the system did
> not provide 360 degrees of coverage, it met minimum contractual requirements.

*Id.* at 2-3.

Based on the IG Report, Lockheed argues that "Relator's TEMPEST and video camera

allegations must be dismissed."  Lockheed Reply at 9.  In opposition to Lockheed's motion to

dismiss these allegations based on the IG Report, Relator states that the "IG Report and other

documents attached to Relator's Complaint are provided as background information; Relator does

not necessarily agree with every statement or conclusion therein, and the documents do not

constitute 'written instruments' pursuant to Rule 10(c)."  Relator Opp. at 21-22 n.68.

Having considered the parties' positions, the pleadings and the IG Report, the Court rejects

Lockheed's suggestion that, based on the IG Report, the Court should dismiss Relator's FCA claims

stemming from the deficient installation of non-shielded cables on the upgraded vessels (and the

associated threat to the classified communication certification system) (Compl. ¶¶ 98-125), or the

installation of a video surveillance system which failed to provide a 360 degree view, leaving the

upgraded vessels with dangerous blind spots.  *See id.* ¶¶ 71-97.  Rather, whether the type of cabling

and the video surveillance system installed met minimum contract requirements is more

appropriately resolved on the full record, and not on a report that Relator asserts he attached as background material on the investigation.[8]

Also, under this third heading, Lockheed argues that Relator has failed to state actionable claims based on database omissions, since: "[t]o state a claim under the FCA, subsection (a)(1), a relator must allege that the defendant 'knowingly' made a 'false or fraudulent claim' to the United States Government."  Lockheed Brief at 18 (citation omitted).  According to Lockheed, Relator has failed to state a claim for a FCA violation under section 3729(a)(1), because he fails to allege a false statement to the government concerning the database omissions.  *See id.*  Lockheed also contends that "even if the alleged Database System omissions somehow constitute a 'false record,' FCA liability would still be possible only if they were used 'to get a false or fraudulent claim paid.'"  Lockheed Reply at 6 n.10.  According to Lockheed, "Relator has alleged no such 'nexus' between the supposed Database System omissions and the government's payments."  *Id.*

Relator counters Lockheed's argument, stating: "Relator has alleged that maintenance and disclosure in the Action Item Database System of the failures to comply with contract requirements and specifications is in itself an intrinsic contract requirement, and failure to disclose such information in the database renders claims for performance payments 'false claims' pursuant to 31 U.S.C. § 3729(a)(1)."  Relator Opp. (citing Compl. ¶¶ 157-58, 162-67, 173-77).  In addition, Relator contends that Defendants "used materially false records – the Action Item Database system, which was false by virtue of Defendants' knowing omissions and deletion of information regarding material noncompliance - in violation of section 3729(a)(2)."  *Id.*

---

[8]By Lockheed's logic, based on the Inspector General's report, the Court could similarly find in Relator's favor with regard to the alleged failure to install low smoke cabling and alleged failure to comply with environmental performance requirements, both of which the Inspector General concluded were deficient under the requirements of the Deepwater Contract.  *See* Compl., Ex. A at 2-3.

The FCA imposes civil liability on any person who "knowingly presents . . . to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" or "knowingly makes [or] uses . . . a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. §§ 3729(a)(1)-(2).  In statutory terms, Relator's argument appears to be that submission of claims for performance payments to the Coast Guard (absent fulfilling the alleged contractual requirement to maintain and disclose information in the database), constitutes the fraudulent presentment of a claim under section 3729(a)(1), and that Defendants then used the false records to fraudulently obtain payment in violation of section 3729(a)(2).

Even broadly construing the FCA, the Court rejects Relator's argument.  First, no section 3729(a)(1) violation is apparent with regard to alleged omissions from the Action Item Database system.  Relator nowhere alleges that any Defendant, much less Lockheed, made a false statement to the government concerning the database submissions.  As Lockheed correctly notes, "[c]ontractual noncompliance, standing alone, is not a basis for FCA liability.  A contractor must also make a knowing false statement."  Lockheed Brief at 18-19.  Relator nowhere alleges that Lockheed lied to the Coast Guard about whether it was in compliance with the requirements surrounding the Action Item Database system.  As to section 3729(a)(2), the Court agrees with Lockheed that Relator has failed to allege a "nexus" between the supposed Action Item Database system omissions and the government's payments.  Lockheed Reply at 6 (citing *United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 491 F.3d 254, 261 (5th Cir. 2007)).  Accordingly, the Court grants Lockheed's motion to dismiss Relator's false certification claims insofar as they are based on alleged omissions from the Action Item Database system.

**Memorandum Opinion and Order – Page 32**

Fourth, Lockheed argues that Relator's pleadings admit the Government knew about all instances of supposed noncompliance, thus precluding liability. Lockheed Brief at 10. Relator counters that where, as here, "whether the Government's knowledge was so complete as to disprove that Defendants' false claims were made knowingly is a fact issue, and not a basis for a Rule 12 motion." Relator Opp. at 22. The court agrees.

Prior to amendments in 1986, the FCA contained the following language: "The court shall have no jurisdiction to proceed with any [FCA] suit . . . whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer, or employee thereof, at the time such suit was brought." Act of Dec. 23, 1943, 57 Stat. 609 (codified at 31 U.S.C. § 232(C)). This so-called "government knowledge bar" was repealed in 1986, however, and government knowledge of a contractor's wrongdoing is no longer an automatic defense to an FCA action. *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000) (citing *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1420 (9th Cir.1991)). While the Court is cognizant that "there may still be occasions when the government's knowledge of or cooperation with a contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA[,]" (*Shaw*, 213 F.3d at 534), based on the allegations herein, the Court will take up the extent of Government knowledge at a later date. *Cf. Butler*, 71 F.3d at 327-28 (where relator argued the defendant falsified test reports because different types of tests were performed than those identified in the reports, but the evidence showed that the tests were the subject of discussion between the defendant and the Army, and the Army knew of and had approved the testing method actually used, affirming a directed verdict for the government contractor since, "[t]he only reasonable conclusion a jury could draw from the evidence was that [defendant] and the Army had *so completely*

**Memorandum Opinion and Order – Page 33**

*cooperated and shared all information* . . . that [defendant] did not 'knowingly' submit false claims. . . .")(emphasis added). In short, based on the 1986 amendments to the FCA, as well as case law, the Court rejects Lockheed's argument that, as a matter of law, Government knowledge in this case precludes FCA liability.

Fifth, and finally, Lockheed contends that it cannot be held liable for FCA violations stemming from deficiencies in the hull, mechanical and electrical work, since the Complaint alleges that Northrop Grumman, not Lockheed, was charged with the HM&E work under the Deepwater Contract. Lockheed Brief at 22-23; Lockheed Reply at 9-10. Relator, in opposition, argues that, nevertheless, Lockheed and Northrop Grumman are estopped from denying that they were partners in a joint venture, and are thus jointly liable. Relator Opp. at 2-5.

To reiterate, Relator alleged that at various times, Lockheed and ICGS executives, as well as ICGS's website, have referred to ICGS, a limited liability company, as a "joint venture" between Lockheed and Northrop, and used the term "partners" to describe Lockheed and Northrop. Compl. ¶¶ 7-11, 18, and Exs. K and L. From these allegations, Relator seeks to hold Lockheed and Northrop Grumman jointly liable. In support, Relator contends that Defendants, in light of these "repeated public admissions that they are a joint venture" (*id.* ¶ 7), should be estopped from denying they are a joint venture.

ICGS is a registered limited liability company under Delaware law, not a partnership or joint venture, and thus joint and several liability does not apply. *See* Del. Code Ann. tit. 6, § 18-303. Further, estoppel requires that the Coast Guard: (1) must have been unaware of ICGS's actual legal form, (2) must have acted in reliance on this misunderstanding; and (3) must have been harmed as a result. *See Bragg v. Johnson*, 229 A.2d 497, 498-99 (Del Super. 1966); *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903-04 (Del. 1965). As Lockheed correctly notes, Relator makes no such allegations.

**Memorandum Opinion and Order – Page 34**

Accordingly, the Court grants this portion of Lockheed's motion to dismiss Relator's false certification allegations, and dismiss the HM&E claims with respect to Lockheed.

### ii.      Rule 9(b)

Lockheed also moves to dismiss Relator's false certification claims under Rule 9(b), making essentially the same arguments it made to support its motion to dismiss Relator's fraud-in-the-inducement allegations pursuant to Rule 9(b).  (*See* § I.C.2.a.ii, *supra*).  Unlike Relator's fraud-in-the-inducement allegations, however, Relator's false certification allegations are well-pled.  Under *Grubbs*:  "[T]o plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Grubbs*, 565 F.3d at 190.  Here, Relator has done both.  He has alleged the details of the alleged false claims, as well as the details of a scheme to submit false claims, along with sufficient indicia to lead to a strong inference that the claims were actually submitted. The Court has before it the Certificates of Compliance as to the Matagorda (*see* Compl., Ex. D at 2 ); the Vashon (*id.*, Ex. C at 2); the Metompkin (*id.*, Ex. E at 2); the Padre (*id.*, Ex. F at 2); the Attu (*id.*, Ex. G at 2); the Nunivak (*id.*, Ex, H at 2); the Monhegan (*id.*, Ex, I at 2); and the Manitou (*id.*, Ex, J at 2).  In addition to the Certificates of Compliance, the Court has before it the DD-250s (*id.*, Exs. C-J).

Based on Relator's allegations of Defendants' scheme to defraud the Coast Guard (§ I.A., *supra*), as well as the copious detail set forth in the Certificates of Compliance, as well as DD-250s, the Court determines that Relator's false certification allegations satisfy Rule 9(b), and, accordingly, the Court denies Lockheed's motion to dismiss pursuant to Rule 9(b).  *See generally Grubbs*, 565 F.3d at 189 ("[A] claim under the False Claims Act and a claim under common law and securities

fraud are not on the same plane in meeting the requirements of 'stating with particularity' the contents of the fraudulent misrepresentation.")

### 3. ICGS's Motion to Dismiss

ICGS has filed a motion to dismiss Relator's FCA allegations. In addition to the pleadings, the Court has before it:

- Defendant ICGS's Motion to Dismiss Fifth Amended Complaint (doc. #114);

- Brief in Support of Defendant ICGS's Motion to Dismiss Fifth Amended Complaint (doc. #115) ("ICGS Brief") and Appendix thereto;

- Relator's Opposition to Defendant ICGS's Motion to Dismiss Fifth Amended Complaint (doc. #125) and Appendix thereto; and

- Reply Brief in Support of Defendant ICGS's Motion to Dismiss Fifth Amended Complaint (doc. #132).

ICGS moves to dismiss Relator's FCA allegations, arguing that: (i) it is a Delaware limited liability company and, therefore, cannot be held responsible for the actions of Lockheed and/or Northrop Grumman under either Relator's joint venture allegations or alter-ego allegations, and (ii) Relator's allegations of FCA violations should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim, and Rule 9(b) for failure to allege fraud with particularity.

### a. Joint Venture and Alter-Ego Allegations

The Court first addresses ICGS's argument that, as a limited liability company formed under Delaware law, it cannot be held responsible for Lockheed's actions under either Relator's joint venture allegations or alter-ego allegations. As already stated by the Court in the context of addressing Lockheed's motion to dismiss, Relator alleges that, notwithstanding that ICGS is a limited liability company formed under Delaware law, and Lockheed and Northrop are its members,

**Memorandum Opinion and Order – Page 36**

based on Defendants' "repeated public admissions that they are a joint venture" (Compl. ¶ 7), Defendants should be estopped from denying they are a joint venture.  In granting Lockheed's motion to dismiss Relator's joint venture allegations, the Court has already rejected Relator's attempts to hold all Defendants jointly liable based on his allegations that Defendants held themselves out as a joint venture and partnership, and are estopped from denying the same.  (*See* § I.C.2.b.i., *supra*).  Accordingly, the Court incorporates by reference its prior analysis, and grants ICGS's motion to dismiss Relator's joint venture allegations for the same reasons.

The Court now turns to ICGS's argument that Relator's alter-ego allegations should be dismissed. To repeat, Relator alleges that ICGS operated as an alter-ego of Lockheed and Northrop Grumman, and that "[f]or all the purposes of the Deepwater program ICGS, Lockheed and Northrop are all one and the same."  Compl. ¶ 11, and Ex. L.  Although not yet addressed by the Fifth Circuit, other circuits have held that federal common law (rather than the law of the state where a corporation is incorporated), governs the veil-piercing question in a FCA case.  *See United States v. Jamieson Science and Eng'g, Inc*., 191 F.Supp.2d 17, 20-21 (D.D.C. 2002) (citation omitted); *United States v. Pisani*, 646 F.2d 83, 85-86 (3d Cir. 1981).[9]

The Fifth Circuit has developed a list of factors to consider when determining whether an alter-ego situation exists: (1) common stock ownership; (2) common directors or officers; (3) common business departments; (4) consolidated financial statements and tax returns; (5) one corporation finances the other; (6) one corporation caused the incorporation of the other; (7) one corporation operates with grossly inadequate capital; (8) one corporation pays the salaries and other

---

[9]The Court notes that under Texas law, the law of the state of incorporation would control, in this case Delaware.  *See Alberto v. Diversified Group, Inc.*, 44 F.3d 201, 203 (5th Cir. 1995).  The Court agrees with ICGS that, "[f]or purposes of [its] motion, however, the result is the same whether Delaware law or federal common law is applied."  *See* ICGS Brief at 13 n.6.

expenses of the other; (9) one corporation receives no business except that given to it by the other; (10) one corporation uses the other's property as its own; (11) the daily operations of the two corporations are not kept separate; and (12) one corporation does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings. *See Gundle Lining Constr. Corp. v. Adams Co. Asphalt, Inc.*, 85 F.3d 201, 208 (5th Cir.1996). The Fifth Circuit has recognized fraud as one basis for disregarding the corporate form. *United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985); *see also Subway Equip. Leasing Corp. v. Sims*, 994 F.2d 210, 217-18 (5th Cir. 1993) (corporate form disregarded where equity demanded).

Relator alleges several factors to plead that ICGS operated as an alter-ego of Lockheed, and in support of his contention that "[f]or all the purposes of the Deepwater program ICGS, Lockheed and Northrop are all one and the same." *See* Compl. ¶ 11, and Ex. L. Here the Court is only concerned with allegations pertaining to ICGS and Lockheed, but for purposes of clarity, includes all the pertinent allegations. According to Relator, ICGS did not have any of its own employees, but was operated by Lockheed and Northrop employees, and its Board of Directors was dominated by members of Lockheed's and Northrop's Boards. *Id.* ¶ 8. ICGS was funded by Lockheed and Northrop, and ICGS had no business other than the Deepwater Contract, the tasks of which were carried out by Lockheed and Northrop employees using Lockheed and Northrop resources. *Id.* ¶ 13. ICGS operated with grossly inadequate capital of its own, and the daily operations of ICGS were not kept separate and distinct from those of Lockheed and Northrop. *Id.* Lockheed and Northrop had common business departments and ICGS used Lockheed's and Northrop's engineering and development departments. *Id.* Lockheed and Northrop executed the actions that gave rise to the allegations of wrongdoing in this lawsuit. Because the controlling directors of ICGS are also the directors of Lockheed and Northrop, ICGS took orders from the participating Lockheed and

Northrop directors, rather than the other way around. Lockheed's and Northrop's representatives were, simultaneously, duty-bound to act in Lockheed's and Northrop's best interests. *Id.* ¶¶ 14-15.

Further, Relator alleges the details of the alleged scheme by which ICGS submitted false claims to the Coast Guard for payment, along with sufficient indicia to lead to a strong inference that the claims were actually submitted, notwithstanding ICGS's knowledge of deficient and non-compliant C4ISR systems installed by Lockheed and flawed HM&E work by Northrop (via its subcontractor, Bollinger Shipyards). The Court has before it the Certificates of Compliance as to the Matagorda (*see* Compl., Ex. D at 2 ); the Vashon (*id.*, Ex. C at 2); the Metompkin (*id.*, Ex. E at 2); the Padre (*id.*, Ex. F at 2); the Attu (*id.*, Ex. G at 2); the Nunivak (*id.*, Ex, H at 2); the Monhegan (*id.*, Ex, I at 2); and the Manitou (*id.*, Ex, J at 2). In addition to the Certificates of Compliance, the Court has before it the DD-250s (*id.*, Exs. C-J).

In short, having considered Relator's allegations, the parties' arguments, and applicable law, the Court concludes that Relator has stated a claim sufficient to withstand ICGS's motion to dismiss allegations that ICGS and Lockheed are alter-egos. Whether a preponderance of the evidence supports these allegations, and whether justice and fairness will ultimately require that the Court pierce the corporate veil, is fact-intensive, and thus an issue to be decided later. *See generally Jon-T Chemicals*, 768 F.2d at 694 (alter-ego is "heavily fact-specific" determination reviewed for clear error); *cf. Alberto v. Diversified Group, Inc.*, 55 F.2d 201 (5th Cir. 1995) (affirming summary judgment for parent company where evidence showed that recognizing parent and subsidiary as separate entities would not result in unfairness or injustice).

### b.        Fraud-in-the-Inducement and False Certification Allegations

Having denied ICGS's motion to dismiss Relator's allegations that ICGS and Lockheed are alter-egos, the Court now turns to ICGS's motion to dismiss Relator's FCA cause of action pursuant

**Memorandum Opinion and Order – Page 39**

to Rule 12(b)(6) and Rule 9(b). ICGS's arguments are essentially the same as Lockheed's. *Compare* doc. #115 (ICGS Brief) *with* doc. #118 (Lockheed Brief).[10] Accordingly, the Court incorporates by reference its analysis of Lockheed's motion to dismiss (§ I.C.2., *supra*), and therefore grants ICGS's motion to dismiss Relator's fraud-in-the-inducement allegations under both Rule 12(b)(6) and 9(b), grants ICGS's motion to dismiss Relator's false certification allegations insofar as they arise from alleged omissions in the Action Item Database system, or relate to deficiencies in HM&E work (which was Northrop Grumman's responsibility under the Deepwater Contract), and denies ICGS's motion to dismiss in all other part.

### 4.    *Sua Sponte* Dismissal of Alleged Violations of 31 U.S.C. § 3729(a)(3) and § 3729(a)(7) as to Defendants Lockheed and ICGS

The Court dismisses the alleged violation of 31 U.S.C. § 3729(a)(3) (conspiracy to defraud the Government) and 31 U.S.C. § 3729(a)(7) (the so-called "reverse false claim" action) set forth in Count One.   (*See* Compl. ¶ 246).   Although neither Lockheed nor ICGS has included these grounds in their respective motions to dismiss, the Court may take this action *sua sponte*.   *See Coates v. Heartland Wireless Communications, Inc.*, 55 F.Supp.2d 628, 633 (N.D. Tex. 1990) (Fitzwater, J.) (and cases cited therein).   "Even if a party does not make a formal motion, the court on its own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair." *Id.* (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 301 (2d ed. 1990)).

---

[10]ICGS incorporates one argument in support of its motion to dismiss which was not made by Lockheed.  Specifically, ICGS argues that Relator has failed to allege that "ICGS knowingly made a false or fraudulent statement or presented a false claim."  ICGS Brief at 19.  The Court rejects ICGS's argument. First, having denied ICGS's motion to dismiss Relator's alter-ego allegations, at this juncture, allegations of scienter against Lockheed can be attributed to ICGS. Second, the Court agrees with Relator's argument that he has adequately alleged scienter sufficient to withstand a motion to dismiss.  *See* Relator Opp. at 17-19 (citations omitted).

**Memorandum Opinion and Order – Page 40**

a.      Section 3729(a)(3) of the FCA

DeKort alleges that "Defendant, jointly or severally, knowingly or with deliberate ignorance or reckless disregard for the truth[,]" "conspired to defraud the Government by getting a false or fraudulent claim allowed or paid."  Compl. ¶ 246c.  To establish a cause of action for conspiracy under the FCA, a relator must show: (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by the government; and (2) at least one act performed in furtherance of that agreement.  *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008).  In addressing the pleading requirements of an FCA conspiracy claim, the Fifth Circuit recently confirmed that a relator alleging conspiracy to defraud the government by getting a false or fraudulent claim allowed or paid must "plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy."  *Grubbs*, 565 F.3d at 193.

DeKort alleges that "[e]ach of the three joint venture members [Defendants]  has violated the FCA, on some occasions, and has agreed to or acquiesced in violations by the other Defendant(s), on other occasions." (Compl. ¶ 18).  Absent this conclusory pleading, which is merely a formulaic recitation of the legal elements of conspiracy, the Court finds no allegations regarding an unlawful agreement among alleged coconspirators, nor allegations of any overt acts taken in furtherance of a conspiracy.  Based on the allegations, the Court concludes that Relator has failed to state a claim of conspiracy to defraud the government by getting a false or fraudulent claim allowed or paid, and has failed to "plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy."  *Grubbs*, 565 F.3d at 193.  Accordingly, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), the Court *sua sponte* dismisses Relator's Section 3729(a)(3) claim.  *Cf. Lynch v. Cannatella*, 810 F.2d 1363, 1370 (5th Cir. 1987) (dismissing conspiracy claim "in the absence of factual allegations from which a conspiracy . . . can reasonably be inferred[.]")

**Memorandum Opinion and Order – Page 41**

### b.      Section 3729(a)(7) of the FCA

In his one-Count Complaint, DeKort includes an allegation that Lockheed and ICGS violated Section 3729(a)(7) of the FCA, sometimes referred to as a "reverse false claim" action.  (Compl. ¶ 246d).  This section imposes liability on one who "knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(7).  "In a reverse False Claims Act suit, there is no improper payment by the government to defendant, but rather there is an improper reduction in the defendant's liability to the government."  *United States ex rel. Marcy v. Rowan Companies, Inc.*, 520 F.3d 384, 390 (5th Cir. 2008).  A claim can arise under this section only where the defendant owes a payment or obligation to the government and submits a false claim or statement to avoid that payment obligation.  *See United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325 (5th Cir. 2003).  An "obligation" under the FCA means "an obligation sufficiently certain to give rise to an action of debt at common law."  *See United States ex rel. Coppock v. Northrop Grumman Corp.*, 2003 WL 21730668, at * 14 (N.D. Tex. July 23, 2003) (Fitzwater, J.) (quoting *Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 736 (6th Cir. 1999)).  As stated in *Coppock*:

> A defendant risks liability when making a false statement to conceal, avoid or decrease obligations such as his prior acknowledgment of indebtedness, a final court or administrative judgment that the defendant owes money or property to the government, or a contractual duty to pay or transmit money or property to the government.

*Id.* (quoting *Am. Textile*, 190 F.3d at 736).

Even accepting all well-pleaded factual allegations in the Complaint as true, and viewing them in the light most favorable to DeKort (*see Sonnier*, 509 F.3d at 675), the Court is unable to discern from the pleadings any allegations pertaining to an improper reduction in Defendants'

**Memorandum Opinion and Order – Page 42**

liability to the government, or that false statements were made to decrease an obligation. *See Marcy*, 520 F.3d at 390; *Coppock*, 2003 WL 21730668, at * 14.  While DeKort does allege that under the Deepwater Contract, ICGS entered into a contract with the Coast Guard involving delivery of modernized patrol boats, there are no allegations that Defendants made false statements to "conceal, avoid or decrease" obligations to transmit property under the contract.  Instead, the Complaint only alleges that Defendants submitted false claims to the Coast Guard *for payments*.  *See* Compl. ¶ 40 (with regard to allegedly environmentally non-compliant externally mounted equipment, "[t]he ICGS joint venture, by and through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** on the basis of false statements or misrepresentations in the compliance certifications and the omissions from the Action Item Database System") (original emphasis); *id.* ¶ 49 (with regard to non-complaint installation of FLIR video cable, "[t]he ICGS joint venture, by and through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** without disclosing the false statements or misrepresentations in the compliance certifications and the omissions from the Action Item Database System") (original emphasis); *id.* ¶ 59 (with regard to mislabeled cables, "[t]he ICGS joint venture, by and through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** while failing to disclose the false statements or misrepresentations in the compliance certifications and the omissions from the Action Item Database System") (original emphasis); *id.* ¶ 70 (with regard to alleged low smoke cable defects, "ICGS, through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** . . .") (original emphasis); *id.* ¶ 97 (with regard to installation of allegedly defective video/camera surveillance system, "ICGS, through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** . . .") (original emphasis); *id.* ¶ 125 (with regard to alleged classified communication certification deficiencies (SIPRNET and TEMPEST), "ICGS, through Lockheed and

**Memorandum Opinion and Order – Page 43**

Northrop, submitted **false claims** to the Coast Guard for **payment** . . .") (original emphasis).   In sum, DeKort alleges false statements to the Coast Guard for improper payment by the government to Defendants, *not* an improper reduction in the defendant's liability to the government, which is the hallmark of a reverse false claim action.  *See Marcy*, 520 F.3d at 390.   Under these alleged facts, the Court concludes that no claim has been stated for a violation of 31 U.S.C. § 3729(a)(7). Accordingly, pursuant to Fed. R. Civ. P. 12(b)(6), the Court *sua sponte* dismisses Relator's Section 3729(a)(7) claim.

## II.   Northrop Grumman's Motion to Dismiss

Also before the Court is Defendant Northrop Grumman's Motion to Dismiss Fifth Amended Complaint and Brief in Support thereof, filed October 15, 2009 (doc. #116).  As a threshold matter, Northrop Grumman moves to dismiss Relator's FCA allegations arising from the HM&E work[11] pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction under the FCA's public disclosure bar.  Alternatively, Northrop Grumman moves to dismiss Relator's allegations pursuant to Fed. R. Civ. P. 12(b)(6) and Rule 9(b).  The Court first considers Northrop Grumman's jurisdictional challenge.

### A.   Northrop Grumman's Challenge to the Court's Subject Matter Jurisdiction

On February 9, 2010, the Court converted Northrop Grumman's Rule 12(b)(1) motion into a motion for summary judgment, allowing further briefing and evidentiary submissions.  Doc. #146. The motion is ripe for adjudication.  In considering Northrop Grumman's jurisdictional challenge, the Court has before it:

---

[11]As set forth above (§I.A., *supra*), "HM&E" work (hull, mechanical and electrical work) refers to Relator's allegations regarding the "shaft alignment," "hull damage" and "inferior design" of the 123-foot patrol boats.  *See generally* Compl ¶¶ 126-27; 134-35.

**Memorandum Opinion and Order – Page 44**

- Defendant Northrop Grumman's Motion to Dismiss Fifth Amended Complaint and Brief in Support thereof, filed October 15, 2009 (doc. #116) ("Northrop Brief") and Appendix thereto;

- Relator's Opposition to Defendant Northrop Grumman's Motion to Dismiss Fifth Amended Complaint, filed November 18, 2009 (doc. #129) ("Relator Opp.") and Appendix thereto;

- Defendant Northrop Grumman's Reply in Support of its Motion to Dismiss the Fifth Amended Complaint, filed December 1, 2009 (doc. #133) ("Northrop Reply");

- the Court's Summary Judgment Conversion Order, dated February 9, 2010 (doc. #146);

- Relator's Supplemental Evidence in Support of Opposition to Defendant Northrop Grumman's Motion to Dismiss Fifth Amended Complaint Pursuant to the February 9, 2010 Court Order, filed March 1, 2010 (doc. #150) ("Relator Supp. Evidence"); and

- Northrop Grumman's Responsive Briefing and Supplemental Evidence Submitted Pursuant to the Court's February 9, 2010 Order, filed March 11, 2010 (doc. # 152)("Northrop Responsive Briefing and Supplemental Evidence").

### 1.        Relevant Facts & Procedural History

#### a.        Relevant Facts

Relator worked for Lockheed as a Lead Systems Engineer on the Deepwater project.[12] Relator Supp. Evid., Decl. of Michael DeKort ¶ 1 ("DeKort Decl."). During his tenure with Lockheed, but prior to holding the position of Lead Systems Engineer, DeKort spent considerable time at Bollinger Shipyards in Louisiana where the 110-foot vessels were being upgraded to 123-foot vessels. *Id.* ¶ 2. These upgrades included, among other things, "the repair and refurbish[ment] [of] the hulls and associated hull, mechanical and electrical systems (HM&E) and add[ing] critical Command, Control, Communications, Computer, Intelligence, Surveillance and Reconnaissance

---

[12]As set forth directly below, with regard to resolving a motion for summary judgment (§II.A.2, *infra*), in its recitation of the relevant facts, the Court views the evidence and inferences drawn from that evidence in the light most favorable to Relator, the non-moving party.

**Memorandum Opinion and Order – Page 45**

systems (C4ISR)." *Id.* After the contractors made their design presentation and certified that they had met requirements and began purchasing equipment, Relator began his role as Lead Systems Engineer with Lockheed. *Id.* Within 30 days of his arrival, "the majority of critical flaws, and the associated fraud," was apparent to him, with the exception of the hull and shaft issues, which were Northrop Grumman's responsibility through its subcontractor Bollinger Shipyards. *Id.* According to DeKort: "It was during my presence at the combined ICGS, Lockheed, Northrop and Bollinger status and/or stand up daily meetings that I learned of the shaft problems. Bollinger's leadership team apprised the team of shaft alignment problems. They stated that they were having difficulty keeping them aligned." *Id.* Present at all or most of the meetings at Bollinger Shipyards where shaft problems were discussed in DeKort's presence were: Danny Bufford, Jim Hested, Rich Wharton, Bill Dickens and TJ Hamblin. *Id.* Dekort had no reasons at the time to think that the shaft problems were part of a larger program failure, and assumed the shaft issues would be properly resolved, as they had been identified on a Master List of Open Items dated September 3, 2003 (the period during which DeKort spent time at Bollinger Shipyards), which reflected shaft problems with the 123-foot vessels. *Id.* ¶ 5 and Ex. 1 (Master List of Open Items).

In February 2004, DeKort was removed from the Deepwater Program one month before the first upgraded vessel, the Matagorda, was delivered to the Coast Guard. *Id.* ¶ 3. In 2005, the Matagorda suffered severe hull buckling when it tried to escape a hurricane, and subsequently, the other 123-foot vessels also experienced hull deformation. *Id.* The Coast Guard's engineering organization (the Engineering and Logistics Center) documented that the flawed hull design resulted in flawed installation which resulted in the hull bending and putting unacceptable stresses on the shafts which forced them to go out of alignment. *Id.* These events took place between early 2005 and late 2006. *Id.* DeKort states that: "It was during that time that I learned that the shaft problems

**Memorandum Opinion and Order – Page 46**

identified in 2003 had not been remedied as contractually required. I discovered that the shaft issues persisted, because of the hull deformation arising from the design defects, all of which rendered the 123s unseaworthy." *Id.* When DeKort "learned that the early shaft problems had never been properly resolved, but were part of a larger systemic failure," he amended his complaint to reflect the hull and shaft defects for which he knew that ICGS had been paid. *Id.*

ICGS and Northrop Grumman failed to disclose the systemic defective design flaws or the resulting unseaworthiness of the 123-foot vessels as the Coast Guard took delivery. *Id.* Rather, they falsely certified and signed conformance documents falsely representing that all eight of the 123-foot vessels met with contractual requirements." *Id.*

### b.      Relevant Procedural History

Relator filed this *qui tam* action on September 29, 2006 against Defendant Lockheed, alleging FCA violations based on the C4ISR installation. Doc. #1. After amending his Complaint on November 26, 2006 to add Northrop Grumman and ICGS as defendants (*see* doc. #4), Relator filed a Second Amended Complaint on December 4, 2006, adding FCA claims stemming from Northrop Grumman's allegedly false certifications of compliance with contractual requirements, notwithstanding its knowledge of the inadequate repair of vessel hulls and installation of defective propeller shafts and engines. Doc. #9. Three years later, on September 8, 2009, in response to Defendants' motions to dismiss, Relator filed his Fifth Amended Complaint, removing allegations regarding the engines, maintaining his allegations regarding the shaft alignment and hull repair, and adding allegations that the vessel "designs were inferior," and that Northrop Grumman provided "incomplete and inaccurate information to the Coast Guard regarding the design." Doc. 144, Fifth Am. Comp. ¶ 134.

Based on allegations of false certifications of compliance regarding the HM&E work to the Coast Guard and use of false records to get claims paid by the government, DeKort alleges that Northrop Grumman violated the FCA, specifically 31 U.S.C. §§ 3729(a)(1), (2), (3) and (7), which prohibit: (1) the presentment of false claims to the Government; (2) the use of a false record or statement to get a false claim paid by the Government; (3) conspiracies to get false claims paid by the Government; and (4) the making or using of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. (Compl., Count One ¶¶ 245-249)

### 2. Summary Judgment Standard

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. To carry this burden, the "opponent must do more than simply show. . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 249.

**Memorandum Opinion and Order – Page 48**

Neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Summary judgment in favor of the Defendant is proper if, after adequate time for discovery, the Plaintiff fails to establish the existence of an element essential to her case and to which she will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

When weighing the evidence on a motion for summary judgment, the court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

### 3.       The Public Disclosure Bar

Northrop Grumman argues that this Court lacks subject matter jurisdiction under the FCA's "public disclosure bar" (*see* 31 U.S.C. § 3730(e)(4)(A)) because DeKort's allegations of fraud arising from the HM&E work were based on publicly disclosed information, and DeKort was not an "original source." Prior to analyzing these arguments, the Court sets forth the relevant provisions of the FCA.

The FCA authorizes private individuals, acting on behalf of the United States, to bring a civil action against those who defraud the government, and provides a successful *qui tam* litigant with

**Memorandum Opinion and Order – Page 49**

a portion of the recovery.  31 U.S.C. § 3730(d).  As recently stated by the United States Supreme

Court, "[a]s originally enacted, the FCA did not limit the sources from which a relator could acquire

the information to bring a *qui tam* action."  *Graham County Soil and Water Conservation Dist. v.*

*United States ex rel. Wilson*, No. 08-304, slip op. at 12-13, 2010 WL 1189557, at *8 (U.S. Mar. 30,

2010).  In 1943, however, Congress amended the statute and enacted a Government knowledge bar,

which precluded *qui tam* actions "based upon evidence or information in the possession of the

United States, or any agency, officer or employee thereof, at the time such suit was brought."  *Id.*

(internal citation omitted).  After the 1943 amendment, the "volume and efficacy of *qui tam*

litigation dwindled."  *Id.*

In 1986, "[s]eeking the golden mean between adequate incentives for whistleblowing

insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who

have no significant information to contribute of their own[,]" (*id.*) (citation omitted), Congress again

amended the statute to its current form, which provides:

> No court shall have jurisdiction over an action under this section based upon the
> public disclosure of allegations or transactions in a criminal, civil, or administrative
> hearing, in a congressional, administrative, or Government Accounting Office report,
> hearing, audit, or investigation, or from the news media, unless the action is brought
> by the Attorney General or the person bringing the action is an original source of
> information.

31 U.S.C. § 3730(e)(4)(A). (footnote omitted).[13]  An "original source" is defined as "an individual

who has direct and independent knowledge of the information on which the allegations are based

---

[13]As noted by the Supreme Court in *Wilson*, on March 23, 2010, the President signed into law the
Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119.   Section 10104(j)(2) of this
legislation replaces the prior version of 31 U.S.C. § 3730(e)(4) with new language.  *See generally Wilson*,
2010 WL 1189557, at *2 n.1.  Given that the legislation makes no mention of retroactivity, this Court, like
the Supreme Court in *Wilson*, will "use the present tense in discussing the statute as it existed at the time the case
was argued."  *Id.*

and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B)

In the Fifth Circuit, the jurisdictional inquiry requires the Court to consider three questions: "(1) whether there has been a public disclosure of allegations or transactions, (2) whether the *qui tam* action is based upon such publicly disclosed allegations, and (3) if so, whether the relator is the original source of the information." *United States ex rel. Reagan v. East Texas Medical Center Regional Healthcare Sys.*, 384 F.3d 168, 173-74 (5th Cir. 2004) (internal citation and punctuation omitted).

Under 31 U.S.C. § 3730(e)(4), the first question for the Court is whether there has been a public disclosure of "allegations or transactions." The public disclosure bar only applies where the "allegations or transactions" have been disclosed "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media". 31 U.S.C. § 3730(e)(4)(A). Further, a *qui tam* action that is "even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transactions" for purposes of a jurisdictional inquiry. *Federal Recovery Servs., Inc. v. United States*, 72 F.3d 447, 450 (5th Cir. 1995) (citation omitted).

"The plain language of the statute suggests that there are three sub-parts to the public disclosure prong: (1) the public disclosure; (2) in a particular form specified in the statute, such as an administrative report or hearing; (3) of allegations or transactions." *United States ex rel. Barrett v. Johnson Controls, Inc.*, 2003 WL 21500400, at *4 (N.D. Tex. Apr. 9, 2003) (Lynn, J.).

In response to Relators' FCA causes of action based on false certifications concerning the HM&E work, Northrop Grumman argues that the "essential elements" underlying the HM&E allegations were publicly disclosed prior to Relator's asserting them in this *qui tam* lawsuit. In

support, Northrop Grumman relies on press releases, congressional testimony, Coast Guard documents[14], reports from the United States Government Accountability Office and Relator's answers and supplemental answers to interrogatories propounded by Northrop Grumman. (*See* doc. #116-2, Northrop App. in Support of Mot. to Dismiss at 1-67; doc. #133, Northrop. App. in Support of Reply at 1-113; doc. #152, Northrop Supp. Evidence, Exs. 1-6).

Northrop Grumman argues that "[p]rior disclosures of the precise allegations of fraud is not necessary to invoke the public disclosure bar.  Only the essential elements of the alleged fraud must be publicly disclosed[.]" Northrop Brief at 6 (original emphasis).  Northrop Grumman relies on the following theorem borrowed from the Second Circuit:

> [I]f X+Y=Z, Z represents the allegation of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.

*Id.* (quoting *Wercinski v. Int'l Bus. Mach. Corp.*, 982 F.Supp. 449,  458 (S.D. Tex. 1997) (in turn quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)).

As to the hull condition workmanship allegations, Northrop Grumman contends:

> [P]ublic information revealed that: (1) the hulls were in worse condition than originally anticipated (**X**); and (2) the hulls experienced structural damage, prompting the Coast Guard to remove the vessels from service (**Y**).  Based on this public information, a person not familiar with HM&E issues, like relator, could have linked these elements and erroneously concluded that the contractors may have ignored the pre-existing conditions of the hulls, causing their failure (**Z**).  In this manner, the hull damage allegations were disclosed before relator interposed his HM&E issues into this action.

---

[14]In that it does not change the outcome of the Court's jurisdictional analysis, the Court will assume, without finding, that the Coast Guard documents submitted by Northrop Grumman were "administrative reports". *Compare* Relator Opp. at 19-21 *with* Northrop Grumman Reply at 3.

*Id.* at 10.

As to the shaft alignment workmanship allegations, Northrop Grumman contends:

[P]ublic information revealed that: (1) the contractors received inadequate shafts from the Coast Guard vendor (**X**); and (2) the vessels experienced shaft misalignment and structural damage prompting the Coast Guard to remove them from service (**Y**). Based on these disclosures, an individual familiar with the public record could erroneously conclude that the contractors installed defective shafts or failed to install the shafts properly, leading to the decommissioning of the vessels (**Z**). As such, the shaft allegations were publicly disclosed before relator included them in his Complaint.

*Id.* at 11.

As to the design defect allegations, Northrop Grumman contends:

Public disclosures included allegations that: (1) the contractors provided the Coast Guard with inaccurate and incomplete design information (**X**); (2) the Coast Guard originally believed the vessel failures were anomalies, correctable through engineering solutions, and later concluded they were design flaws (**X**); and (3) the design flaws led to structural problems, resulting in the decommissioning of the vessels (**Y**). The public disclosures could lead any lay person to erroneously suppose that the contractors knew the design was flawed, but nonetheless delivered the boats and convinced the Coast Guard that the problems with the vessels were not systemic design issues (Z).

*Id.* at 13-14.

In response, Relator argues that "[b]ecause the allegations and transactions alleged by Relator were not publicly disclosed, there is no public disclosure bar of Relator's *qui tam* claims." Relator Opp. at 21. In support, Relator contends that the documents upon which Northrop Grumman relies "disclose only that the hulls were in poor condition and shaft alignment problems arose in the course of the ship conversions. None of the documents discloses the 'allegations' and 'transactions' upon which Relator's claims are based. None of the documents disclosed reveals that Northrop Grumman . . . knowingly certified that the ships delivered to the Coast Guard fulfilled contractual specifications, as alleged in Relator's Complaint." Relator Opp. at 21.

**Memorandum Opinion and Order – Page 53**

Further, Relator distinguishes the situation in this case from that presented in *Reagan*, upon which Northrop Grumman relies, where the Fifth Circuit affirmed the entry of summary judgment base on the public disclosure bar: "This is distinguishable from *Reagan*, where investigations and audits specifically disclosed publicly the false statements made by the defendants to get claims paid – the allegations and transactions upon which the FCA claims were based." *Id.* (citing *Reagan*, 384 F.3d at 176-77).

The Court has carefully considered the documents submitted by Northrop Grumman in support of its argument that public disclosure occurred, including press releases, congressional testimony, Coast Guard documents, reports from the United States Government Accountability Office and Relator's answers and supplemental answers to interrogatories propounded by Northrop Grumman (*see* doc. #116-2, Northrop App. in Support of Mot. to Dismiss at 1-67; doc. #133, Northrop. App. in Support of Reply at 1-113; doc. #152, Northrop Supp. Evidence, Exs. 1-6). Resolving all reasonable doubts and inferences in the light most favorable to Relator,  the non-movant, the Court concludes that while the publicly disclosed information submitted by Northrop Grumman discloses in a general sense the subject matter of defective hulls and misaligned shafts, as well as overall design failure, it cannot be said to disclose the "allegations" and "transactions" upon which Relator's claims are based.  This is not a breach of contract or breach of warranty case arising from defective HM&E work.  Rather, the crux of Relator's *qui tam* action is presentment of false statements, and use of false records, to get claims paid by the government in connection with the Deepwater Project.  Northrop Grumman's attempt to reach "Z" (the fraud) from the "X" and "Y" presented in its supporting evidence of publicly disclosed information is simply too much of a stretch.  While Northrop Grumman is correct that prior disclosure of the precise allegations of fraud

is not necessary to invoke the public disclosure bar, at a bare minimum, the essential elements must be disclosed.  That is not the case here.[15]

In sum, the Court concludes that Relator has sufficiently raised a genuine issue of material fact that the "allegations or transactions" upon which Relator's FCA causes of action are based were not publicly disclosed.  Northrop Grumman's Rule 12(b)(1) motion, since converted to a motion for summary judgment, is accordingly denied.  In light of this ruling, the Court need not consider whether Relator qualified as an "original source."

**B.      Northrop Grumman's Motion to Dismiss under Rule 12(b)(6) and 9(b)[16]**

**1.      The Joint Venture and Alter-Ego Allegations**

As an alternative to its subject matter jurisdiction challenge, Northrop Grumman has moved to dismiss Relator's joint venture and alter-ego allegations for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Northrop Grumman makes essentially the same arguments in support of its motion to dismiss these allegations as did Lockheed.  *See* Northrop Brief at 24.  The Court first addresses Northrop Grumman's motion to dismiss the joint venture allegations.

**a.      Joint Venture Allegations**

---

[15]Further, the Court's decision is consistent with the legislature's intent "to prohibit *qui tam* actions only when either the allegations of fraud or the critical elements of the fraudulent transaction were in the public domain."  *Springfield*, 14 F.3d at 654 (holding that publicly disclosed pay vouchers and telephone records did not reveal fraud because neither suggested that the defendant had made a misrepresentation); *see also United States ex rel. Dunleavy v. County of Delaware*, 125 F.3d 734, 741 (3d Cir. 1997) (allegations or transactions element would be satisfied by a disclosure that allows an inference of fraud).

[16]For purposes of deciding Northrop Grumman's motion to dismiss pursuant to Rule 12(b)(6) and Rule 9(b), the Court accepts as true the well-pleaded factual allegations of Relator's Fifth Amended Complaint, and views all facts in the light most favorable to Relator.  *See Sonnier*, 509 F.3d at 675. The Court incorporates by reference the factual allegations previously set forth in relation to  Lockheed's and ICGS's respective motions to dismiss.  (*See* §I.A., *supra*).

As set forth previously, Relator alleges that, notwithstanding that ICGS is a limited liability company formed under Delaware law (and Lockheed and Northrop Grumman are its members), ICGS, Lockheed and Northrop Grumman should be treated as a joint venture partnership, and held jointly liable, in light of "repeated admissions that they are a joint venture." Compl. ¶ 7.   In the context of addressing Lockheed's motion to dismiss (*see supra*), the Court has already rejected Relator's attempts to hold all Defendants jointly liable based on his allegations that Defendants held themselves out as a joint venture partnership, and are therefore estopped from denying they are joint venturers.  The Court hereby incorporates by reference its prior analysis (*see* § I.C.2.b.i., *supra*), and grants Northrop Grumman's  motion to dismiss Relator's joint venture allegations for the same reasons.  Accordingly, allegations arising from installation of non-compliant C4ISR systems (which was solely Lockheed's responsibility under the Deepwater Contract), cannot be imputed to Northrop Grumman, and are hereby dismissed as against Northrop Grumman.

### b.        Alter-Ego Allegations

Relator also alleges that ICGS acted as an alter-ego of Northrop Grumman and of Lockheed, and that "[f]or all the purposes of the Deepwater program ICGS, Lockheed and Northrop are all one and the same."  Compl. ¶ 11.  Northrop Grumman moves to dismiss the alter-ego allegations, arguing that "Relator alleges no appropriate basis to disregard the corporate entity."  Northrop Brief at 25.  The Court has already addressed and denied ICGS's motion to dismiss Relator's alter-ego allegations (*see supra*), and determined that the allegations of alter-ego are sufficient to withstand a motion to dismiss under federal common law and Delaware law.  *See* § I.C.3., *supra*.  The Court incorporates by reference this prior analysis, and accordingly denies Northrop Grumman's  motion to dismiss Relator's alter-ego allegations for the same reasons.

### 2.        Conspiracy Allegations

**Memorandum Opinion and Order – Page 56**

Unlike Lockheed and ICGS, Northrop Grumman moves to dismiss Relator's conspiracy allegations under 31 U.S.C. § 3729(a)(3) for failure to state a claim under Rule 12(b)(6) and for lack of specificity under Rule 9(b).  The Court previously analyzed whether Relator's conspiracy allegations were sufficient to survive a Rule 12(b)(6) and Rule 9(b) challenge, and concluded they were not. As a consequence, the Court *sua sponte* dismissed these allegations as against Lockheed and ICGS.  For the sake of brevity, the Court incorporates by reference its previous analysis (*see* § I.C.4.a., *supra*), and grants Northrop Grumman's motion to dismiss Relator's conspiracy allegations alleging a violation of  31 U.S.C. § 3729(a)(3).

### 3.      "Reverse False Claims Act" Allegations

Northrop Grumman, like Lockheed and ICGS, does not specifically move to dismiss Relator's reverse false claims act allegations under 31 U.S.C. § 3729(a)(7).  The Court hereby incorporates by reference its analysis and *sua sponte* dismissal of these allegations with regard to Lockheed and ICGS (*see* § I.C.4.b., *supra*), and accordingly *sua sponte* dismisses Relator's  § 3729(a)(7) allegations as to Northrop Grumman pursuant to Fed. R. Civ. P. 12(b)(6).

### 4.      Rule 9(b)

Relator alleges that Northrop Grumman violated the FCA by falsely certifying to the Coast Guard that the HM&E work was compliant with contractual and other requirements (while knowing this was false), and by using false records to get claims paid by the Coast Guard, all in violation of 31 U.S.C. §§ 3729(a)(1)-(2).  Northrop Grumman moves to dismiss these allegations for failure to meet the heightened pleading requirements in Rule 9(b).  Northrop Brief at 19-23.  In support, Northrop Grumman makes essentially the same arguments as Lockheed (in connection with its Rule 9(b) motion to dismiss Relator's FCA allegations based on the false certification theory of liability) (*see* § I.C.2.b.ii., *supra*) and ICGS in connection with its Rule 9(b) motion (*see* § I.C.3., *supra*).  The

Court incorporates by reference its prior analysis, and accordingly denies Northrop Grumman's Rule 9(b) motion to dismiss Relator's section 3729(a)(1) and (a)(2) claims stemming from the HM&E work.[17]  *See generally Grubbs*, 565 F.3d at 190 ( "[T]o plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.").

## III.   Conclusion

Based on the foregoing, as to Defendant Lockheed Martin Corporation, the Court **GRANTS IN PART AND DENIES IN PART** Defendant Lockheed Martin Corporation's Motion to Dismiss the Fifth Amended Complaint (doc. #117).  Specifically, the Court **grants** Lockheed's motion to dismiss Relator's section 3729(a)(1) and section 3729(a)(2) FCA causes of action that are premised on: fraud-in-the-inducement of the Deepwater Contract; false certifications pertaining to hull, mechanical and electrical (HM&E) work (for which Northrop Grumman was solely responsible); and omissions from the Action Item Database system.  The Court **dismisses** these claims **with prejudice** pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).[18]  The Court **denies** the motion in all

---

[17]Whereas Relator alleged FCA liability against Lockheed based on the fraud-in-the-inducement *and* false certification theories of liability (*see* § I.C.2., *supra*), as to Northrop Grumman, Relator only appears to be alleging liability based on false certifications.  To the extent Relator can be heard to allege FCA violations against Northrop Grumman based on fraud-in-the-inducement, however, the Court dismisses these claims pursuant to Rule 12(b)(6) and Rule 9(b) with prejudice for the reasons already set forth.  *See* § I.C.2.a., *supra*.

[18]The Court is cognizant of the "consequences of dismissal on the pleadings and the pull to decide cases on the merits rather than on the sufficiency of pleadings[.]. . ." *United States ex rel. Coppock v. Northrop Grumman Corp.*, 2002 WL 1796979, at *15 (N.D. Tex. Aug. 1, 2002) (Fitzwater, J.). Relator filed this *qui tam* action on September 29, 2006, and has already had the opportunity to amend his complaint five times, and in certain instances in response to arguments in support of dismissal made by Defendants.  Under these circumstances, the Court concludes that further amendment would be futile.  Accordingly, other than Relator's allegations under sections 3729(a)(3) and (a)(7), which the Court dismissed *sua sponte*, Relator's

remaining part.  Accordingly, with respect to DeKort's Fifth Amended Complaint, as against Defendant Lockheed, remaining are: DeKort's FCA causes of action for violations of 31 U.S.C. §§ 3729(a)(1) and (a)(2) premised on false certifications in connection with the C4ISR systems, specifically with regard to the six areas of noncompliance alleged by Relator: (1) environmental survivability of externally mounted equipment; (2) FLIR video cable; (3) mislabeled cables; (4) the video/camera surveillance system; (5) communications systems (SIPRNET and TEMPEST); and (6) failure to use low smoke cable.

Further, as to Defendant Northrop Grumman Shipbuilding, Inc., the Court **GRANTS IN PART AND DENIES IN PART** Defendant Northrop Grumman's Motion to Dismiss Fifth Amended Complaint.  Specifically, the Court **grants** Northrop Grumman's motion to dismiss Relator's section 3729(a)(1) and section 3729(a)(2) FCA causes of action that are premised on: (i) false certifications pertaining to the C4ISR systems (for which Lockheed was solely responsible), and (ii) omissions from the Action Item Database system; and further **grants** the motion to dismiss Relator's section 3729(a)(3) FCA conspiracy claim.  The Court **dismisses** these claims **with prejudice** pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).  The Court **denies** the motion in all remaining part.  Accordingly, with respect to DeKort's Fifth Amended Complaint, as against Defendants Northrop Grumman, remaining are: DeKort's FCA cause of action for violations of 31 U.S.C. §§ 3729(a)(1) and (a)(2) premised on false certifications in connection with the hull,

---

FCA claims against Lockheed and ICGS based on fraud-in-the inducement of the Deepwater Contract are dismissed with prejudice, as are Relator's FCA claims against ICGS and Lockheed based on false certifications in connection with the hull, mechanical and electrical work , or arising from alleged omissions in the Action Item Database system. *See Wilson*, 525 F.3d at 376 (affirming district court's denial of motion for leave to file third amended complaint in FCA case); *Marcy*, 520 F.3d at 392 (affirming denial of motion for leave to amend because plaintiff "had no right to make a futile amendment"); *Willard*, 336 F.3d at 387 (upholding lower court's denial of motion to amend, since plaintiff "has already had two opportunities to amend the complaint" and "a third chance would prove to be futile.").

mechanical and electrical (HM&E) work, specifically with regard to areas of noncompliance alleged by Relator, namely, shaft alignment, hull damage and inferior design.

Further, as to Defendant Integrated Coast Guard Systems LLC, the Court **GRANTS IN PART AND DENIES IN PART** Defendant Integrated Coast Guard Systems LLC's Motion to Dismiss Fifth Amended Complaint (doc. #114).  Specifically, the Court **grants** ICGS's motion to dismiss Relator's section 3729(a)(1) and section 3729(a)(2) FCA causes of action that are premised on: (i) fraud-in-the-inducement of the Deepwater Contract, and (ii) false certifications to the Coast Guard based on any omissions from the Action Item Database system.  The Court **dismisses** these claims **with prejudice** pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b). The Court **denies** the motion in all remaining part.  Accordingly, with respect to DeKort's Fifth Amended Complaint, as against Defendant ICGS, remaining are: DeKort's FCA causes of action for violations of 31 U.S.C. §§ 3729(a)(1) and (a)(2) premised on false certifications in connection with the C4ISR systems and HM&E work.

Finally, Relator has twenty days from the date of this memorandum opinion and order to submit a brief to the Court, if he chooses to, that addresses the Court's decision to *sua sponte* dismiss his Section 3729(a)(3) claims pursuant to Rule 12(b)(6) and Rule 9(b) against Lockheed and ICGS, and his Section 3729(a)(7) claims pursuant to Rule 12(b)(6) against Northrop Grumman, ICGS and Lockheed.

**SO ORDERED** this 5th day of April, 2010.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**