IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel., | § | |
| MICHAEL J. DEKORT, and | § | |
| MICHAEL J. DEKORT, individually, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:06-CV-1792-O |
| | § | |
| INTEGRATED COAST GUARD | § | |
| SYSTEMS, LLC, LOCKHEED MARTIN | § | |
| CORPORATION, and NORTHROP | § | |
| GRUMMAN SHIP SYSTEMS, INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This is a False Claims Act ("FCA") case brought under 31 U.S.C. §§ 3729 *et seq*.[1] Before the Court is Defendant Northrop Grumman Ship Systems, Inc.'s Trial Brief Regarding Lack of Subject Matter Jurisdiction Over Relator's Hull, Mechanical and Electrical Allegations,[2] which the Court has since construed as a motion for summary judgment.[3] This case arises from the United States Coast Guard's expenditure of over $96 million to retrofit eight 110' patrol boats into 123' boats with updated Command, Control, Communications, Computer, Intelligence, Surveillance, and Reconnaissance ("C4ISR") systems. These boats currently sit useless after being decommissioned by the Coast Guard. Relator Michael J. DeKort alleges that Northrop Grumman violated the FCA by

---

[1] On May 20, 2009, Congress enacted the Fraud Enforcement Recovery Act of 2009 ("FERA"), which amended the FCA, and reorganized various subsections. *See generally* Pub. L. No. 111-21, § 4; 123 Stat. 1617 (2009). Statutory references will be to the prior version of the statute. *See* Memorandum Opinion and Order 14 n.3, April 5, 2010, ECF No. 164.
[2] *See* ECF No. 439.
[3] *See* Order, October 19, 2010, ECF No. 453. Conversion to a motion for summary judgment is consistent with Fifth Circuit precedent where the jurisdictional question is intertwined with the merits. *See* United States ex rel. Reagan v. East Texas Medical Center, 384 F.3d 168, 173 (5th Cir. 2004).

1

fraudulently certifying that the boats would meet the Coast Guard's performance specifications while knowingly or recklessly disregarding various design defects that later resulted in severe hull buckling and shaft misalignments on the 123s. Northrop Grumman denies these allegations and argues that the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4)(A), deprives this Court of subject-matter jurisdiction over Relator's claims.[4] After considering the arguments of the parties, the applicable law, and all admissible evidence in accordance with Rule 56 of the Federal Rules of Civil Procedure, the Court will grant Northrop Grumman's motion for summary judgment based on the public disclosure bar and dismiss Relator's hull, mechanical, and electrical claims against Defendants Northrop Grumman and ICGS for lack of subject-matter jurisdiction.

I.  **FACTUAL BACKGROUND**

In the late 1990s, the Coast Guard began evaluating ways to modernize or replace its assets, including the conversion of forty-nine 110' patrol boats into 123' patrol boats. This effort became known as the Integrated Deepwater System Program ("Deepwater"). In June 2002, the Coast Guard awarded the Deepwater Contract to ICGS, a limited liability company created with two members, the Lockheed Martin Corporation and Northrop Grumman. Lockheed and Northrop Grumman were also first-tier subcontractors to ICGS, responsible for different parts of the Deepwater Contract. Lockheed was responsible for modernizing the patrol boats' C4ISR systems. Northrop Grumman, and its subcontractor Bollinger Shipyards, was primarily responsible for ship design, including propeller shaft alignment and hull construction necessary to convert the 110' boats into 123' boats.

---

[4] Relator's C4ISR claims against Defendants Lockheed Martin Corporation and Integrated Coast Guard Systems, LLC are not at issue in this Order.

The first converted 123' patrol boat, the Matagorda, was delivered to the Coast Guard in March 2004. Later that same year the boat began experiencing problems with hull buckling and shaft misalignments while at sea. After the last boat was delivered in January 2006, it became clear that the hull buckling and shaft misalignments were a serious problem on all eight of the 123s delivered by ICGS.

Michael DeKort was an employee of the Lockheed Martin Corporation. He was assigned to the Deepwater Program as the Lead Systems Engineer for the 110/123 conversion project from July 2003 to February 2004 and was only responsible for C4ISR issues. DeKort had no responsibility for the hull, mechanical, and electrical ("HM&E") work performed by Northrop Grumman and Bollinger.[5] However, as Lead Systems Coordinator, DeKort attended status conferences involving personnel from ICGS, Lockheed, Northrop Grumman, and Bollinger where various issues regarding the ongoing 110/123 conversion were discussed. During one of these meetings, DeKort learned that substandard shafts on the boats did not align properly.[6] DeKort was removed from the Deepwater Program in February 2004.

On September 29, 2006 DeKort filed this action based solely on the alleged false claims by ICGS and Lockheed related to their installation of non-compliant C4ISR equipment.[7] On November 28, 2006 DeKort filed an Amended Complaint adding Defendant Northrop Grumman to the case.[8] This Amended Complaint, however, contained no allegations with regard to Northrop Grumman's HM&E work, but only C4ISR-related

---

[5] Def. Northrop Grumman's App. Reply Supp. Mot. Summ J. Relator's HM&E Cls. 473, ECF No.463; DeKort Dep. 54:14-17, June 3, 2010.
[6] App. at 503-04; DeKort Dep. 174-75.
[7] See Relator's Original Compl., ECF No. 1.
[8] ECF No. 4.

issues.[9] Two days later, on November 30, 2006, the Coast Guard publicly announced its decision to suspend "normal operations of eight converted 123-foot patrol boats . . . due to additional structural damage recently discovered in the hulls."[10] DeKort was aware of the Coast Guard's decision, which is apparent from his comments acknowledging it to a reporter for the *Washington Post*.[11] On December 4, 2006, DeKort filed his Second Amended Complaint, alleging for the first time false claims regarding the HM&E work on the 123s.[12] Specifically, Relator alleged that Defendants (1) failed to rebuild the engines on the 123s, (2) failed to attend to problems caused by substandard shafts provided by a vendor, and (3) failed to address issues arising from the fact that the hulls on the 110s were damaged beyond that which was contemplated or bid by ICGS.[13] At his deposition DeKort testified that he "did not recall" doing any additional investigation or receiving any additional information bearing on the HM&E issues between November 28 and December 4, 2006.[14]

On September 8, 2009 DeKort filed his Fifth Amended Complaint, alleging that Defendants' design for the 123s was "inferior."[15] According to DeKort, Northrop Grumman "knew the ship designs were inferior, built the boats anyway, and delivered them to the Coast Guard while representing . . . that the ships were safe for use."[16] Prior to Relator's filing of his Fifth Amended Complaint, the Coast Guard conducted an evaluation

---

[9] *See id.*
[10] Coast Guard Press Release, Northrop Grumman's App. 11-12, ECF No. 463.
[11] Renae Merle, *Coast Guard Finds Flaws In Converted Patrol Boats*, Wash. Post, Dec. 2, 2006; Northrop Grumman's App. 15-16, ECF No. 463.
[12] ECF No. 9.
[13] *See id.* at ¶¶ 78-81.
[14] Northrop Grumman's App. 489-90, ECF No. 463; DeKort Dep. 90:11-91:10.
[15] ¶ 134, ECF No. 144. Northrop Grumman argues that this was the first time Relator alleged a design defect with regard to the 123s, Relator disagrees, arguing that his Second Amended Complaint could be read to include design allegations. The Court will address this conflict *infra*.
[16] *Id.*

of his HM&E allegations as contained in his Fourth Amended Complaint.[17] According to the Coast Guard's analysis, DeKort's allegations were "not factually accurate, and [his] opinions are huge leaps in logic" and "do not appear to add any evidence to the information already known by the government."[18] The analysis further states that "[t]he government has reviewed thousands of documents related to the Deepwater program and performed numerous analyses and test, [sic] and draws conclusion [sic] much different than DeKort regarding hull structure."[19]

On April 18, 2007, the U.S. House of Representatives, Committee on Transportation and Infrastructure, held a hearing to examine issues related to the Deepwater program.[20] The purpose of the hearing was to allow representatives of ICGS and other experts to discuss "the extent to which the requirements of the Deepwater contract have not been met—particularly on the lengthening of the 110-foot patrol boats to 123 feet."[21] The hearing included extensive testimony regarding the causes of the hull buckling and shaft misalignments on the 123' boats. Specifically, a Coast Guard witness, Scott Sampson, testified that the hull buckling and shaft misalignments resulted from a single cause—the failure to increase the longitudinal stiffness of the 123s.[22] Sampson also testified that the continuous distortion (e.g. buckling) of the hull, resulted in constantly needing to realign the shafts.[23] The committee also heard testimony about (a) Bollinger's

---

[17] ECF No. 47.
[18] Coast Guard's "123' WPB Project Manager Review of Civil Action No. 3:06-CV-1792-R," Feb. 20, 2009; Northrop Grumman's App. 458, ECF No. 463.
[19] *Id*.
[20] *Compliance With Requirements of the Coast Guard's Deepwater Contract Before the H. Comm.on Transportation and Infrastructure*, 110th Cong. 1 (2007); Northrop Grumman's App. 23-312, ECF No. 463.
[21] *Id*. at 27.
[22] *Id*. at 48-49.
[23] *Id*. at 309.

error in calculating the section modulus, or strength, of the legacy hulls,[24] (b) that the Coast Guard had written to ICGS claiming that there was a latent defect in the boats' design,[25] and (c) that Northrop Grumman had certified to the Coast Guard that the boats conformed to the Deepwater Contract specifications.[26]

Northrop Grumman argues that all of DeKort's allegations regarding the design of the 123' boats were publicly disclosed in the April 2007 congressional hearing, in media reports, or by the Coast Guard itself in discovery to the Relator in this lawsuit. DeKort denies these assertions and argues that not only were portions of his allegations never publicly disclosed, but that he was the original source, as that term is defined in § 3730(e)(4)(B), of the information underlying those portions of his allegations which were publicly disclosed.

## II. COURT'S PRIOR RULINGS REGARDING PUBLIC DISCLOSURE BAR

This is not the first time the issue of whether DeKort's HM&E allegations are barred by the FCA's public disclosure bar has come before the Court. On April 5, 2010 the Court issued a Memorandum Opinion and Order holding, in part, that "Relator has sufficiently raised a genuine issue of material fact that the 'allegations or transactions' upon which Relator's FCA causes of action are based were not publicly disclosed."[27] The Court did not reach the issue of whether Relator was an original source of the information underlying his allegations.[28] The Court made this ruling prior to the dispositive motions stage and prior to the Relator's deposition, which took place in June 2010. At that time, it

---

[24] *Id.* at 164.
[25] *Id.* at 174.
[26] *Id.* at 141.
[27] Memorandum Opinion and Order 55, April 5, 2010, ECF No. 164.
[28] *See id.*

was unclear whether and to what extent DeKort relied on publicly disclosed information for his allegations. Moreover, in its May 5, 2010 Order denying Northrop Grumman's Motion for Reconsideration, the Court stated that "should it become apparent to the Court as the case progresses that the public disclosure bar divests this Court of subject matter jurisdiction, the Court will at such time dismiss the case."[29]

Federal courts are courts of limited jurisdiction, and it is incumbent upon the Court to address whether a case falls within its subject-matter jurisdiction.[30] Under Rule 54 of the Federal Rules of Civil Procedure, the Court may freely review and revise interlocutory orders, including orders of summary judgment, at any time before the entry of a final judgment adjudicating all claims of all parties before the Court. Therefore, the Court may modify a prior ruling if the arguments of the parties or new evidence persuade the Court to do so for any reason, so long as the Court is not making a legal error or abusing its discretion.[31] Moreover, this rationale is all the more important when the Court's very power to hear a claim is at issue.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

---

[29] Order 10, May 5, 2010, ECF No. 193.

[30] Save the Bay, Inc. v. U.S. Army, 639 F.2d 1100, 1102 (5th Cir. 1981); *see also* Ruhrgas AG v. Marathon Oil Co., 526 U.S.574, 583, (1999)("Subject-matter delineations must be policed by the courts on their own initiative even at the highest level.").

[31] *See* Matagorda Ventures Inc. v. Travelers Lloyds Ins. Co., 208 F.Supp.2d 687, 688 (S.D. Tex. 2001) (interlocutory orders of the court are subject to revision on motion or *sua sponte* before entry of final judgment).

as a matter of law.[32] "[T]he substantive law will identify which facts are material."[33] A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.[34] When ruling on a motion for summary judgment, the Court must view all inferences drawn from the factual record in the light most favorable to the nonmoving party.[35] Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.[36] As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied.[37]

Once the movant has made this initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue.[38] Conclusory allegations are not competent summary judgment evidence, and are insufficient to defeat a motion for summary judgment.[39] Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.[40] The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports her claim.[41] Rule 56 does not impose a duty on the court to "sift through the record in search of

---

[32] Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986); Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998).
[33] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[34] *Id*.
[35] Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986); Ragas, 136 F.3d at 458.
[36] Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Anderson, 477 U.S. 254-55.
[37] Anderson, 477 U.S. at 250.
[38] Matsushita, 475 U.S. at 586.
[39] Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996).
[40] *See* Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S. Ct. 195 (U.S. 1994).
[41] Ragas, 136 F.3d at 458.

evidence" to support the nonmovant's opposition to the motion for summary judgment.[42] If the nonmoving party fails to make a showing sufficient to establish the existence of a genuine fact issue on an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.[43]

## IV. ANALYSIS

The FCA's public disclosure bar, located in § 3730(e)(4), provides as follows:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

In *United States ex rel. Reagan v. East Texas Medical Center*, the Fifth Circuit enunciated the following test for the jurisdictional inquiry of § 3730(e)(4): (1) whether there has been a public disclosure of allegations or transactions; (2) whether the action is based upon these publicly disclosed allegations; and (3) if so, whether the relator is the original source of the information.[44] Where the relator has asserted multiple theories of recovery under the

---

[42] *Id.*; *see also* Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992).
[43] Celotex, 477 U.S. at 322-23.
[44] 384 F.3d 168, 173 (5th Cir. 2004).

FCA, it is incumbent upon the Court to determine whether the relator has established jurisdiction as to each theory.[45]

In his Fifth Amended Complaint, Relator alleges three theories of recovery. He argues that Defendants submitted false claims regarding their failure to: (1) attend to serious problems caused by propeller shafts, which were received from the associated vendor in substandard condition; (2) disclose that the hulls were damaged beyond what was contemplated by ICGS; and (3) disclose that they knew the ship designs were inferior, but built the boats anyway and delivered them to the Coast Guard. In this motion, Northrop Grumman focuses on Relator's third theory of recovery: the defective design allegation, arguing that it is based on allegations publicly disclosed allegations during a Congressional hearing for which Relator is not the original source. The Court must first determine whether there has been a public disclosure of allegations or transactions relating to the allegedly defective design of the 123s converted as a part of the Deepwater program.

A.  Public Disclosure

The parties do not appear to dispute that information disclosed in a congressional hearing or report constitutes public disclosures within the meaning of § 3730(e)(4)(A).[46] The plain language of § 3730(e)(4)(A) explicitly includes matters disclosed in a congressional hearing or report. Therefore, the Court is satisfied that any allegations or transactions disclosed in the April 2007 congressional hearing on Deepwater fall within the ambit of the FCA's public disclosure bar.

---

[45] *See* Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473, 476 (2007).
[46] *See also* United States ex rel. Fine v. Sandia Corp., 70 F.3d 568, 571 (10th Cir. 1995).

Northrop Grumman argues that "every significant aspect of Relator's design claim was disclosed during [the April 2007] hearing, including allegations that" (1) the hull buckling and shaft misalignment issues resulted from a single design flaw; (2) the design was flawed because Bollinger failed to strengthen the legacy portion of the hull when it expanded the boats; (3) an erroneous section modulus calculation contributed to disguising the design flaw; (4) the ABS did not certify the entire hull design even though they offered to do so; (5) the 123s were required to conform to the same performance specifications as the 110s; (6) because of the design flaw it would not be cost effective to repair the boats; and (7) Northrop Grumman certified that each boat conformed to the contract specifications.[47]

Relator does not appear to dispute this assertion, arguing instead that the "April 18, 2007 Congressional hearing supports Relator's allegations, but it is not the basis for Relator's allegations."[48] Relator disputes whether the information disclosed in the hearing was the basis of his allegations. This argument is appropriately addressed *infra* at step three, whether Relator is an original source of the information disclosed at the hearing. At this step, the pertinent question is whether Relator's inferior design claim is based on testimony publicly disclosed during the April 2007 Congressional hearing.

It is undisputed that the Congressional hearing disclosed both the alleged causes of the hull buckling and the subsequent shaft misalignment issues. It is also undisputed that testimony in the hearing disclosed that Northrop Grumman certified to the Coast Guard

---

[47] Northrop Grumman's Reply Supp. Mot. Summ. J. Relator's HM&E Claims 17, ECF No. 463.

[48] Relator's Surreply to Northrop Grumman's Reply Supp. Mot. Summ. J. 7, ECF No. 473. Relator argues that the Coast Guard announcement regarding the decommissioning of the 123s and the *Washington Post* article reporting on this development are not public disclosures because neither document discloses his allegations of fraudulent certification. There is no need to address this issue as a result of the decision reached in this order.

that the converted 123s met the Deepwater Contract's performance specifications. In its April 5, 2010 Memorandum Opinion and Order the Court referenced the following theorem:

> [I]f X+Y=Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transactions publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.[49]

If, in this case, X represents the hull and shaft problems on the 123s, while Y represents the Defendants' certifications to the Coast Guard that the converted 123s complied with all contract specifications, the Court finds that those exposed to this information could infer that the Defendants falsely certified to the Coast Guard that the boats met their contractual specifications. Thus, the Court finds that the allegation that Northrop Grumman and the other Defendants falsely certified that the 123s conformed to the contract specifications was publicly disclosed within the meaning of § 3730(e)(4)(A). Moreover, the Court finds, and the parties do not appear to dispute, that Relator's HM&E design claim is substantially similar to the publicly disclosed allegations, meaning that his claim is based on those allegations for purposes of the public disclosure bar.[50] Therefore, Relator's HM&E design claim is jurisdictionally barred unless he is an original source of the information underlying his allegations.[51]

B.    Original Source

An original source within the meaning of § 3730(e)(4)(B) must satisfy a two-part test by (1) demonstrating that he has direct and independent knowledge of the information

---

[49] Wercinski v. Int'l Bus. Mach. Corp., 982 F. Supp. 449, 458 (S.D. Tex. 1997) (quoting United States ex rel. Springfield Rail Terminal Ry. Co. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994).
[50] See United States ex rel. Johnson v. Shell Oil Co., 33 F. Supp.2d 528, 540-41 (E.D. Tex. 1999).
[51] See United States ex rel. Fried v. West Indep. Sch. Dist., 527 F.3d 439, 442 (5th Cir. 2008).

on which the allegations are based, and (2) that he voluntarily provided the information to the Government before filing suit.[52] A relator must have direct and independent knowledge of the information on which his allegations are based, as opposed to information on which the publicly disclosed allegations are based.[53] "The plain meaning of the term 'direct' requires 'knowledge derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others.'"[54] A relator's knowledge is "independent" if is not derived from public disclosure.[55] The Court must "'look to the factual subtleties of the case before [it] and attempt to strike a balance between . . . individuals who . . . simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim.'"[56]

Northrop Grumman argues that DeKort "had no knowledge of the information underlying his design claim against Northrop Grumman—much less the direct and independent knowledge required—prior to his attendance at the Congressional hearing and receipt of Coast Guard documents."[57] Northrop Grumman also directs the Court to the Relator's admissions in his deposition testimony that he relied, in large part, on the 2007 Congressional testimony in crafting his design defect claim.

As discussed *supra*, Relator first argues that his design claim cannot possibly be based on the 2007 Congressional testimony because he filed his Second Amended Complaint in December 2006, more than four months before the hearing took place. In his

---

[52] Reagan, 384 F.3d at 177. The parties do not dispute whether DeKort provided the information he had to the government.
[53] Rockwell, 549 U.S. at 470-72.
[54] Reagan, 384 F.3d at 177.
[55] *Id.*
[56] *Id.*
[57] Northrop Grumman's Reply Supp. Mot. Summ. J. Relator's HM&E Claims 20, ECF No. 463.

Second Amended Complaint, Relator added allegations relating to HM&E issues for the first time. Specifically, he claimed that Defendants had (1) failed to perform necessary engine rebuilding services, (2) failed to fix substandard shafts provided by a vendor, and (3) failed to disclose to the Coast Guard that the hulls on the 110' boats were in worse condition than Defendants had anticipated in bidding on the project.[58] Relator also argues that he alleged a design defect claim in this complaint.[59] To support this argument Relator points to ¶ 11 stating: "The corruptions or deficiencies have manifested themselves as a direct result of knowing, intentional and informed design and implementation choices made by ICGS."[60] Northrop Grumman argues that this statement is a reference to Relator's preexisting C4ISR allegations and is not a separate allegation of a design defect with regard to HM&E issues.

The Court agrees with Northrop Grumman. This identical statement appears in Relator's Amended Complaint, where he indisputably made allegations solely related to the C4ISR systems.[61] It is clear that Relator did not intend, by this statement, to allege a defect in the design of 123' patrol boats. Any argument to the contrary is disingenuous. Relator's design claim was raised for the first time in his Fifth Amended Complaint, filed on September 8, 2009, more than two years after the Congressional hearing publicly disclosing the information.

It is clear to the Court that Relator's only direct and independent knowledge relating to his HM&E claims is the complaints by Bollinger employees of substandard shafts that would not align properly. Relator heard these comments in 2003, in a meeting, while he

---

[58] *See* ¶¶ 78-81, ECF No. 9.
[59] Relator's Opp'n Def. Northrop Grumman's Third Mot. Dismiss Fifth Am. Compl. 10, ECF No. 459.
[60] ECF No. 9.
[61] *See* ¶ 11, ECF No. 4.

was the Lead Systems Engineer on the Deepwater project visiting the Bollinger facility in Louisiana. However, as Relator appears to concede,[62] the shaft alignment complaints he heard about in 2003 were a completely separate issue, having nothing to do with the subsequent hull buckling and shaft misalignments that occurred after the 123s were delivered. Nonetheless, at times, Relator still attempts to blur the lines between these entirely separate issues by implying that his direct and independent knowledge of the first set of shaft problems somehow translates to direct and independent knowledge of the design defects that caused the hulls to buckle and the second set of shaft issues.[63] The 2003 shaft alignment issues have nothing to do with DeKort's defective design allegations and his knowledge of one does not equate to knowledge of the other.

In *Rockwell International Corporation v. United States*, the Supreme Court rejected a relator's claim because he did not have direct and independent knowledge of the actual defect underlying the alleged false claim at issue.[64] In *Rockwell*, the relator's claim was

---

[62] "Relator learned in 2003 in a Bollinger meeting of the first set of shaft problems. Between 2004 & 2006 Relator learned of several of the hulls buckling. Relator incorrectly concluded the hull buckling caused the first set of shaft problems because the two shaft problems both involved shaft alignment issues." Relator's Surreply 8, ECF No. 473. Relator, or his counsel, continue to attempt to confuse these issues. For instance, as written, his statement that "the hull buckling caused the first set of shaft problems" is indisputably incorrect. The only plausible interpretation of this statement is that Relator incorrectly believed that the first set of shaft problems he heard about in 2003 caused the hull buckling between 2004 and 2006 because, in truth and in fact, the problems he heard about in 2003 were unrelated to the hull buckling which led to the second shaft misalignment issue. Any statement that Relator continues to believe the hull buckling at issue was caused by the 2003 shaft problems is illogical because the hulls began buckling in 2004 after the 2003 shaft problems Relator knew of had been resolved. *See also* Relator's Opp'n Northrop Grumman's Mot. Dismiss 16-17, ECF No. 459; Northrop Grumman's App. 502; DeKort Dep. 172:4-21; Show Cause Order, October 19, 2010, ECF No. 452 and materials cited therein; Relator's Br. Resp. Show Cause Order, ECF No. 455. It is undisputed that the hull buckling and second set of shaft problems were not caused by the 2003 shaft problems. As is apparent from these documents, and others, Relator's testimony and arguments have been consistently imprecise or deliberately misleading. The Court is separately reviewing pleadings and deposition testimony where it appears Relator has pursued claims in which he admits he had no basis for pursuing them and/or instances in which he has testified one way on occasion and contradicted that testimony when it suited him on other occasions and will take action on these issues as appropriate.
[63] *See* Relator's Surreply 8, ECF No. 473 and *supra* at n.63.
[64] 549 U.S. at 475-76.

based on his prediction that the pondcrete would fail.[65] However, the relator's prediction was at variance with how the pondcrete actually failed.[66] In holding that the relator did not have "direct and independent knowledge" of the pondcrete defect, the Court stated that a "relator's misunderstanding of *why* a concealed defect occurred would normally be immaterial as long as he knew the defect actually existed" (emphasis in original).[67] Here, DeKort did not have direct and independent knowledge of a concealed defect, let alone why it occurred—having direct and independent knowledge of an earlier problem, the first set of shaft alignment issues, does not translate to direct and independent knowledge of an unrelated defect that manifested itself more than a year later.[68]

Additionally, to the extent DeKort argues that he is an original source of the information underlying his design defect allegations because of his accusations of knowledge and fraudulent conduct on the part of Northrop Grumman, the Court rejects those arguments. A relator cannot evade the FCA's public disclosure bar by adding a conclusory allegation of knowledge to publicly disclosed allegations.[69] Relator conclusively asserts that Northrop Grumman, and by extension ICGS, knew their design for the 123s was flawed yet proceeded anyway and failed to disclose these flaws to the Coast Guard. DeKort's allegations of knowledge, or fraudulent concealment, fail to introduce new, undisclosed elements of the wrongful transaction to the publicly disclosed information. As discussed *supra*, the Congressional hearing disclosed that the boats had

---

[65] *Id.*

[66] *Id.*

[67] *Id.* at 475.

[68] *See* Reagan, 384 F.3d at 177 ("'[W]e are required to look to the factual subtleties of the case . . . and attempt to strike a balance between those individuals who . . . simply stumble upon a lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim.'").

[69] United States ex rel. Findley v. FPC-Boron Emps. Club, 105 F.3d 675, 687-88 (D.C. Cir. 1997).

deformed hulls and misaligned shafts, as a result of design flaws, and the fact that Northrop Grumman certified to the Coast Guard that these boats met their contractual specifications. Relator does not add anything to this equation; he has no knowledge of any situations where a Northrop Grumman, Bollinger, or ICGS employee concealed a known design defect from the Coast Guard.[70]

In a final effort to demonstrate that he had direct and independent knowledge of the information underlying his design defect claim before the April 2007 Congressional hearing, DeKort attaches a series of August 2006 e-mails between himself and Anthony D'Armiento of the Coast Guard to his Surreply.[71] At best, these e-mails reveal that DeKort was aware of, and had discussed, the hull issues before the hearing. However, the significance of these e-mails is not apparent to the Court. It was publicly disclosed as early as September 2004 that the Matagorda was having hull problems, as illustrated by the news article Relator also attached.[72] These e-mails do not indicate that DeKort had "direct and independent" knowledge of the information underlying his design defect allegations and no reasonable finder of fact could conclude as much on the basis of these emails alone.

Finally, dismissal of Relator's design defect allegations furthers the substantive policies underlying the FCA's public disclosure bar. Relator has not revealed any information, with regard to his HM&E allegations, that was not already within the possession of the government. In fact, as noted *supra*, the Coast Guard not only disagreed with DeKort's original HM&E allegations, but found that they involved "huge leaps in logic." Moreover, DeKort's design defect allegations track exactly the arguments of the

---

[70] Northrop Grumman's App. 512-514, 516-519, 520; DeKort Dep. 206:9-208:10, 219:18-222:14, 227:7-12.
[71] App. Relator's Declaration 1-3, ECF No. 473.
[72] *Id*. at 6-7.

Coast Guard regarding the hull deformation and shaft alignment issues. Relator does not present any evidence that he was the original source of the information underlying those allegations. Rather, Relator's original source arguments are limited to his awareness of the first set of shaft issues from 2003 and the conclusory allegations of knowledge on the part of Northrop Grumman. DeKort did not lead the Coast Guard to discover that that there was a design defect afflicting the 123s. The Coast Guard learned this as a result of its own investigations and DeKort relied on the information uncovered by those investigations to lend substance to his design defect claim.

C. Remaining Allegations

The dismissal of Relator's design defect claim leaves two HM&E allegations from his Fifth Amended Complaint, namely that Defendants submitted false claims as a result of their failure to: (1) attend to serious problems caused by propeller shafts that were received from the associated vendor in substandard condition and (2) disclose that the hulls were damaged beyond what was contemplated by ICGS. The first claim is based on the first set of shaft issues and is unrelated to the later hull buckling and second set of shaft misalignment issues which is the basis of Relator's HM&E design claim.[73] With regard to the second allegation, which originates from ¶ 127 of the Fifth Amended Complaint, Relator admitted under oath that he did not recall the factual basis on which this claim is based, believed it was "inaccurate," and acknowledged that it concerned him that an inaccurate statement appeared in his complaint.[74] Because Relator has no foundation for these claims the Court dismisses them.[75]

---

[73] *See supra* at pages 14-15 and n.62.
[74] DeKort Dep. 180:6-181:13, 182:3-6.
[75] In the event Relator contends the 2003 shaft claim provides a basis for this suit he must file on the docket a pleading, submitted under oath and subject to penalty of perjury, with the evidence he has in support of

## V. CONCLUSION

The Court finds that Relator has not met his burden to establish this Court's jurisdiction over his design defect claim by a preponderance of the evidence.[76] Moreover, he has failed to come forth with legally sufficient evidence that his claim is not based on publicly disclosed allegations and that he had direct and independent knowledge of the information underlying his claim.[77] Therefore, Relator's HM&E design defect claim must be dismissed for lack of subject-matter jurisdiction pursuant to § 3730(e)(4). This claim is based on publicly disclosed allegations and Relator is not an original source of the information underlying this claim. Accordingly, Relator's HM&E claims are dismissed.

**SO ORDERED** on this 27th day of October 2010.

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

these claims and explain how he intends to pursue them at trial apart from his design claims. This pleading must be filed by 5:00 PM on Thursday, October 28, 2010.

[76] *See* Vantage Trailers, Inc. v. Beall Corp., 567 F.3d 745, 748 (5th Cir. 2009) ("The plaintiff has the burden of proving subject matter jurisdiction by a preponderance of the evidence.").

[77] *See* Ragas, 136 F.3d at 458 (The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports her claim.).