**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *Ex rel.* MICHAEL J. DEKORT, and | § | CIVIL ACTION NO.3-06-CV-1792-R |
| MICHAEL J. DEKORT, individually, | § | |
| | § | |
| Plaintiff, | § | SIXTH   AMENDED   COMPLAINT |
| | § | PURSUANT  TO  31  U.S.C  §§ 3729- |
| vs. | § | 3732, FEDERAL FALSE CLAIMS ACT |
| | § | |
| INTEGRATED COAST GUARD | § | |
| SYSTEMS, A JOINT VENTURE, | § | |
| LOCKHEED MARTIN CORPORATION, A | § | JURY TRIAL DEMAND |
| JOINT VENTURE PARTNER, | § | |
| and NORTHROP GRUMMAN SHIP | § | |
| SYSTEMS, INC., A JOINT VENTURE | § | |
| PARTNER | § | |
| | § | |
| Defendants. | § | |

**SIXTH AMENDED COMPLAINT PURSUANT TO
31 U.S.C. §§ 3729-3732, FEDERAL FALSE CLAIMS ACT**

The United States of America, by and through *qui tam* Relator, Michael J.
DeKort, brings this action under 31 U.S.C. §§ 3729-3732 (the "False Claims Act") to
recover from Integrated Coast Guard Systems ("ICGS"), a Joint Venture Partner,
Lockheed Martin Corporation ("Lockheed"), a Joint Venture Partner, and Northrop
Grumman Ship Systems, Inc. ("Northrop"), a Joint Venture Partner, all damages,
penalties and other remedies established by the False Claims Act on behalf of the
United States and Relator and would show the following:

## PARTIES

1.      Relator, Michael J. DeKort ("DeKort"), is an individual citizen of the United States and resides in Kentucky.  He is a former lead engineer for Defendant Lockheed on the relevant Deepwater 123s program at issue herein.

2.      Defendant Integrated Coast Guard Systems ("ICGS") is a joint venture, Delaware L.L.C. owned by Lockheed and Northrop, the latter of which are referred to in the ICGS literature as Joint Venture Partners.  ICGS is headquartered in Rosslyn, Virginia.  ICGS has appeared in this action.

3      Defendant Lockheed Martin Corporation ("Lockheed") is a Maryland corporation with its principal place of business at 6801 Rockledge Drive, Bethesda, MD 20817.  Lockheed Martin Corporation has offices located at 1 Lockheed Street, Fort Worth, Texas 76108 and does business in the State of Texas.  Lockheed has appeared in this action.

4.      Defendant Northrop Grumman Ship Systems, Inc. ("Northrop") is a Delaware corporation with its principal place of business at 1840 Century Park East Los Angeles, California 90067-2199.  Northrop has appeared in this action.

## JURISDICTION AND VENUE

5.      Jurisdiction and venue are proper in this Court for the following reasons:

   a. Jurisdiction for this Court exists pursuant to the False Claims Act (31 U.S.C. § 3730(b)(1) and 31 U.S.C. § 3732(a)), because Relator's claims seek remedies on behalf of the United States for Defendant's multiple violations of 31 U.S.C. § 3729 et seq.  Defendants transact business within the Northern District of Texas.

     b.  Venue exists in the United States District Court for the Northern District of Texas pursuant to 31 U.S.C. § 3732(a), because the Defendants transact business within the Northern District of Texas.

## GENERAL BACKGROUND

6.    *Qui tam* Relator/Plaintiff re-alleges and hereby incorporates by reference each and every allegation contained in preceding paragraphs of this complaint.

### Defendants' Status as a Joint Venture/Alter Ego – Piercing ICGS's Corporate Veil

7.    ICGS is a joint venture, comprised entirely of employees from both Lockheed and Northrop.  Alternatively, Defendants are estopped from denying that they are a joint venture because of their repeated public admissions that they are a joint venture.  ICGS is an alter ego of both Lockheed and Northrop.  Lockheed's Vice President and General Manager of Coast Guard Systems, Dr. Leo MacKay, testified on February 8, 2007 before the U.S. House Oversight Committee that Lockheed was working closely with its, "Integrated Coast Guard Systems, LLC (ICGS) **joint venture partner**, Northrop Grumman . . . ."  See **Exhibit K** (Congressional Testimony Statement, Mackay, February 8, 2007).

8.    Although ICGS is a registered Limited Liability Company, at most it is a shell entity created solely for the purpose of being awarded the Deepwater contract as a prime contractor allowing Lockheed and Northrop (which the Justice Department has refused to allow to merge) to **share**, through their joint venture, the award of an enormous primary contract, to award themselves the first tier subcontracts, and to supervise and certify their own work while wearing their transparent ICGS hats.  ICGS's so-called subcontractors, Lockheed and Northrop, are in reality the two 50% joint

venture owners of ICGS, the prime contractor that awarded them their subcontracts. ICGS has no employees, but is operated by Lockheed and Northrop employees. ICGS's board of directors is dominated by members of Lockheed and Northrop's boards.

9.      Phillip Teel, the Vice Chairman of ICGS's Board of Directors admitted in his February 8, 2007 testimony before the Congressional House Committee on Oversight and Government Reform that, "ICGS has no employees of its own," and, "**ICGS is a joint venture** comprised of NGSS and Lockheed Martin Corporation."  See **Exhibit L** (Congressional Testimony Statement, Teel, February 8, 2007).  Teel was also concurrently serving as the President of Northrop.

10.     Although ICGS is registered as an L.L.C., the day to day operations, business decisions, and actions were made and executed by Lockheed and Northrop because ICGS *admittedly* had no separate employees of its own.  ICGS was more than just commonly owned by Lockheed and Northrop.  Lockheed and Northrop pervasively controlled of the decisions and actions of ICGS, and both Lockheed and Northrop used, in part, ICGS as a front for their own profit-seeking transactions with the end result, at various times, of perpetrating a significant financial fraud on the United States Government.

11.     There is no real delineation between ICGS and Lockheed, nor between ICGS and Northrop.  ICGS **is** Lockheed, and ICGS **is** Northrop, operating merely as the alter ego of Lockheed and Northrop, in their joint venture activities in Deepwater.  For the purposes of the Deepwater program ICGS, Lockheed, and Northrop are all one and

the same.  As Vice Chairman Teel stated in his testimony, "ICGS personnel remain employees of either Northrop Grumman or Lockheed Martin."  See **Exhibit L**.  The ICGS webpage describing the joint venture states, "Both have been partners on the Deepwater effort since day one and established the ICGS **joint venture** formally in June 2001."

12.     The acts of Lockheed and Northrop are deemed the acts of the other on matters pertaining to the joint venture.  Similarly, ICGS was an alter ego of Lockheed and Northrop for the joint venture's actions in connection with the Deepwater contract. Many factors, additionally, justify piercing the LLC veil in order to avoid fraud, injustice, unjust enrichment and damages to national security interests.

13.     ICGS's circumstances satisfy the Fifth Circuit's factors determining that an entity is an alter ego of another:

> A.     ICGS, Lockheed, and Northrop have common directors (six (6) of the nine (9) ICGS directors were Lockheed and Northrop directors);
>
> B.     ICGS, Lockheed, and Northrop have common business departments (Lockheed's and Northrop's engineering and development departments were used by ICGS);
>
> C.     ICGS was funded by Lockheed and Northrop (ICGS had no business other than the Deepwater contract, the tasks of which were carried out by Lockheed and Northrop employees using Lockheed and Northrop resources);

D.   Lockheed and Northrop caused the creation and registration of ICGS (ICGS had no previous or independent existence separate and apart from the joint venture of Lockheed and Northrop which sought the award of the Deepwater contract);

E.   ICGS operated with grossly inadequate capital [undercapitalized] of its own (ICGS did not have employees and was completely staffed by Lockheed and Northrop employees); and

F.   The daily operations of ICGS were not kept separate and distinct from that of Lockheed and Northrop (daily operations and decisions of ICGS were carried out by Lockheed and Northrop employees using Lockheed and Northrop resources).[1]

14.   Additionally, the facts reflect that:

A.   The directors and officers of ICGS did not act independently from Lockheed and Northrop;

B.   Lockheed and Northrop did not take their orders from ICGS, and at all times acted in their self-interests, respectively; and

C.   Lockheed and Northrop employees executed the actions which gave rise to the joint venture's tortious conduct and FCA violations giving rise to this suit.[2]

---

[1] *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 691-2 (5th Cir. 1985).

[2] See, e.g., *Jon-T Chems, Inc.*, 768 F.2d at 692 (citing Baker v. Raymond Int'l, Inc., 656 F.2d 173, 180 (5th Cir. 1981); *Miles v. Am. Tel. & Tel. Co.*, 703 F.2d 193 (5th Cir. 1983)).

15.     Herein, the controlling directors of ICGS are also the directors of Lockheed and Northrop.  So, ICGS took orders from the participating Lockheed and Northrop directors, rather than the other way around.  Lockheed's and Northrop's representatives were, simultaneously, duty-bound to act in Lockheed's and Northrop's best interests, respectively.[3]    Lockheed and Northrop created a joint venture organization wherein ICGS, the shell entity, was woefully undercapitalized.  The joint venture violated the FCA through tortious conduct.[4]

16.     Fraud is present in the instant case, but is not necessary in these circumstances to prove that ICGS is an alter ego of Lockheed and Northrop.  ICGS was severely undercapitalized for a multi-billion dollar Deepwater program which grew to $25 Billion.  ICGS did not have its own employees.

17.     Because of the Joint Venture's FCA violations, piercing the corporate veil of ICGS is additionally appropriate.  Lockheed, Northrop, and ICGS knowingly or with deliberate ignorance or reckless disregard for the truth made false representations and falsely certified products and services in order to obtain significant proceeds from the United States Government and American taxpayers, all of which is set out herein below.

18.     Each of the three joint venture members [Defendants] has violated the FCA, on some occasions, and has agreed to or acquiesced in violations by the other Defendant(s), on other occasions.  ICGS, Lockheed, and Northrop, have placed profits before contractual compliance and truthfulness in divers and sundry manners in connection with the Integrated Deepwater System ("Deepwater") contract.  The shoddy

---

[3.] *Id.* at 692.
[4.] *Id.* at 692-3.

and fraudulent performance of the joint venture has materially undermined the viability of the project, resulted in extensive waste and, jeopardized the security of the United States and its citizens.

### Relator's Employment

19.    Relator is aware, and has reported to several governmental authorities, that the Government has been cheated, to the extent of  millions of dollars, which he learned after being assigned in July 2003 as the Deepwater Lead Systems Engineer for the 123 foot patrol boat operation of the Deepwater Information Technology  Systems program.   Relator is concerned about (1) national security breaches; and (2) the financial losses to the Government as a result of the Defendants' dishonesty in the performance of their obligations to the Government for the 123-foot patrol boat modifications as part of the overall U.S. Coast Guard's Integrated Deepwater System program.   Relator's concern extends not only to the 123s, but also to the National Security Cutters ("NSCs"), Fast Response Cutters ("FRCs"), and Offshore Patrol Cutters ("OPCs") since Lockheed will likely use the same design approach, and possibly some of the exact same equipment and cables, improperly used on the 123s.

20.    Relator initially pursued complaints up the chain of command in Lockheed's organization and, thereafter, the Government.  Subsequent and in response to Relator's complaints, the Inspector General of the Department of Homeland Security issued a stinging public report which criticized Lockheed's performance of the modernization of the 123-foot patrol boats.  See **Exhibit A** (February 2007 Report, Office of Inspector General).  An active investigation continues, currently, on Relator's

other complaints.

21.    Finally, to Relator's knowledge, he is an Original Source as that term is defined under the False Claims Act, and his Complaint, and his claims are not based upon any public disclosure prior to the date of his filing.  Prior to the filing of this action, Relator made disclosure to the Government regarding the information he possessed as it related to (1) the environmental survivability of external equipment; (2) the FLIR video cable; (3) the Physical Configuration Audit and mislabeled cables; (4) the Low Smoke Cables; (5) the video/camera surveillance system; and (6) the installation of non-shielded cables for classified communications.  Prior to the filing the Second Amended Complaint, Relator made disclosure to the Government regarding the shaft misalignment and hull damages.

22.    The information on which Relator based his allegations was disclosed to the United States Government before the filing of the Original and each Amended Complaint.  Relator has extended cooperation to the Government in order to prosecute those responsible for defrauding the Government, and he continues, as well, to offer his time and knowledge in order to expedite: (1) the remedial repairs; (2) the securitization of law enforcement and intelligence agencies communications; and (3) the collection of statutory damages and penalties from the Defendants that may relate to the 123-foot patrol boats, NSCs, FRCs, OPCs, and the national security issues that arise from exposure of the Government's secure communications systems such as SIPRNET through faulty equipment.

**Introduction**

23.    DeKort's background in C4ISR (Command, Control, Communications, Computers, Intelligence, Surveillance and Reconnaissance) included six (6) years as a communications technician for the U.S. Navy, one and a half (1.5) years as a communications officer for the U.S. State Department (including over 6 months as a communications engineer for the counter-terrorism group) and over five (5) years In Lockheed as a Systems Engineer.  Seven (7) more years were spent in Lockheed in Project, Program and Engineering management roles.

24.    Relator complains of several critical security and safety issues that affect not only the U.S. Coast Guard but the general public, key Government agencies such as DOD, FBI, CIA and the DEA as well as any foreign governments which the USCG supports. These deficiencies created by the ICGS joint venture put our nation at risk and may well have enabled our enemies or terrorists to exploit weaknesses, including our covert communications surveillance systems, as a result of corrupted systems that ICGS has created in the newly fielded U.S. Coast Guard systems; especially, the Coast Guard's 123 patrol boat ("WPB 123s") modernization program.  These corrupted communications systems could well have allowed third parties to have covert access to the Government's classified communications systems such as the secret SIPRNET internet system, granting access to highly classified communications and documents to enemies of the United States, placing untold numbers of Americans at risk.

25.    ICGS' corruption of Deepwater's assets, cumulatively, will hamper every mission the USCG undertakes. The critical mission areas affected include: (1) drug

interdiction; (2) search and rescue; (3) supporting DOD and other Government organizations; and (4) the protection of our national resources.  The corruptions or deficiencies have manifested themselves as a direct result of knowing, intentional and informed, or at best, deliberately ignorant or with reckless disregard for the truth, design and implementation choices made by the ICGS joint venture.  Relator advised the U.S. Coast Guard and ICGS representatives of ICGS' knowing failures to perform the contract as ICGS had otherwise represented to the United States.  These discrepancies affected not only the eight WPB 123s, but any other efforts for which ICGS may be leveraging these designs.  Additionally as these deficiencies have corrupted national agency  communications security, there are likely collateral damages to other law enforcement and military organizations, foreign or domestic, that have utilized the same communications systems under the impression that communications were encrypted or protected from eavesdropping, when they were not.  On information and belief, Relator believes the Government's SIPRNET secret internet system is one glaring example of the secure or classified communications systems that have been compromised by the ICGS joint venture, by and through the fraudulent and misleading actions of Lockheed and Northrop.

26.    Finally, the corruption and deficiencies associated with the Hull Damages and Shaft Alignment ultimately resulted in all **eight (8) 123s being decommissioned**, resulting in total losses under the contract of the amount spent through the date of the decommissioning by the United States or the contractual amount, whichever is greater. (It subsequently became known that buckling hulls caused shaft misalignment

problems, rendering the 123s unfit for duty.)  The total loss of the boats due to shoddy and deceptive work by the joint venture likely caused a loss of the total upgrade expenditures of **$11.75 million** per boat or the cumulative sum of **$96 million**.   Further, as a result of the decommissioning of all eight boats because of improper upgrades and repairs, the loss of each boat's fair market value of $30 million, on information and belief, or the cumulative sum of $240 million (or more) had the ICGS contract been honestly and properly performed.  In addition, the eight prosecutors ("SRPs") associated with the eight 123s were lost as well at a cost of $1.3 million.  Relator was an original source on the Shaft Alignment problems occurring at Bollinger [Louisiana], and through further investigation obtained information regarding the related hull damage.

## Relevant Dates

27.    ICGS commenced the Deepwater program in 2001.   Relator worked ICGS's program for Lockheed as the Deepwater Lead Systems Engineer for the 123s from 7/2003 to 2/2004.    Relator wanted to remain on the program, but was removed, because of apparent friction arising from his complaints to his direct management about ICGS's concealed defects and its improper and shoddy work.  Since then, Relator has been pursuing various governmental and other channels while seeking a remedy for the ICGS's corruption on the Integrated Deepwater System contract ("IDS contract").

## ADDRESSING THE CORRUPTION

28.    *Qui tam* Relator/Plaintiff re-alleges and hereby incorporates by reference each and every allegation contained in preceding paragraphs of this complaint.

**I.**

## Environmental Survivability of Externally Mounted Equipment

Summary

29.     Several critical externally mounted Navigation, Sensor, Command and Control and Communications Systems components were required to be compliant with the relevant military standard (MIL-STD-1399C) as well as Section 3 of the 123 WPB Performance Specification pertaining to the environmental and all-weather survivability of external equipment installed on the 123s.  The externally mounted equipment will, in all likelihood, not survive the environmental requirements specified in the contract due to ICGS's associated design and implementation flaws.  These environmental areas include but are not limited to temperature, humidity, shock and vibration.  Failure to remedy these failures could result in the boat's **inability to navigate or communicate**.

30.     Relator was permitted to evaluate the FLIR thermal imaging equipment, which failed.  Relator's team was **not permitted** to evaluate the remaining purchased equipment for compliance; it is now known that most of the remaining externally mounted equipment did not meet standards.[5]  A study would need to be done to determine the impact.  It should be noted that Relator made certain that ICGS's higher management, who were also Lockheed or Northrop managers or employees,

---

[5.] Classwide 123' WPB issues include: 24 volt grounds; radio direction finder accuracy; electronic engine control design; transducer space installation; engine diverter valve interface; telephone line/multiple line capability; emergency power requirements; AIS software upgrade and non-conforming topside equipment including: stabilized Gimbal assembly; antenna #2 HF/VHF (EMA-1316); antenna #1 UHF (ANT 2030); wind speed and direction sensor; 3.5' open array; gear box; VHF marine antenna (ICOM_954_VW_ANT); GPS antenna (FU_GPSANT_017); DGPS antennas; FURUNO 8' antenna; performance monitor; FURUNO Antenna pedestal; Fwd and Aft exterior pilothouse loudhailer; exterior water-proof two way speakers; camera and housing no. 1, 2, 3, & 4); HF antenna no. 1 & no. 2; VHF antenna no. 1 & no. 2 & VHF Omni antenna; antenna no. 1; broadband Omni antenna; SATCOM antenna; antenna for wireless paging system; active AM/FM/SW/TV Omni receiving antenna; antenna coupler; whip antenna; F77 antenna unit; mini-M antenna; maritime antenna; UHF Omni antenna; 2.4 GHz 8db Omni antenna; Qty.2.

understood the risks and dangers associated with these corruptions and deficiencies, all of which could easily have remedied before the delivery of the first boat.

## Impact to the Mission

31.     Systems potentially affected: (1) Navigation; (2) Sensor; and (3) Command and Control and Communications Systems.  Failures in any one or more of these mission critical areas could **render the vessel unable to navigate or communicate**.  This risks the lives of the crew, any partnering organizations or vessels and the general public. A catastrophic situation could result in a major loss of life and the loss of the vessel.  Similarly, the same harm would affect any nation which the mission might be supporting.  These failures could easily result in the **loss of life**.

## Resolution

32.     The requirements would have to be changed or the equipment replaced or modified to meet specs.  Additional documentation and training changes would have to be incorporated.  These activities would include significant material and labor costs.

## Cost of Resolution

33.     If any equipment has to be modified or replaced, depending on the quantity of those changes, the cost could be from tens of thousands to, easily, in the millions of dollars per boat.  Damages caused to the mission or any other organizations depending on the WPB 123s to execute assigned missions could be incalculable.

## Relevant Details

34.     Environmental requirements were not flowed down by ICGS's System of Systems ("SoS") team, primarily Lockheed, until late in the project, *after* design review

was completed and the equipment had been purchased and installed.  Equipment was purchased and installation began before, not after, the final design review.  Standard engineering processes dictated, however, that the requirements had to be established prior to the design review.  The joint venture knew this, but disregarded proper design protocol and failed to timely disclose the truth in this regard to the Coast Guard.

35.     Upon receipt of the environmental requirements Relator directed his team to evaluate whether or not the equipment Lockheed had purchased and installed met specifications.  The first device for which the team had a response was the FLIR system – it failed to meet temperature requirements.  When Relator informed Lockheed's management about the defect, management directed Relator's team **not to review any more of the equipment for compliance**.  The joint venture failed to disclose the truth in this regard to the Coast Guard.

36.     When Relator indicated to his superiors and co-workers at Lockheed that there were several issues with the 123s that did not meet the environmental standards set by the Coast Guard, the response from Joshua Hannings on February 23, 2004 was, "A lot of these requirements are too detailed and would require too much time/effort to properly determine (especially for the COTS items).  Recommending waivers for these items."  James Schreiber, the Sensor Engineering Group Lead, wrote in an email dated the same day, "All I know is that on the ship these radars are there, and we are not swapping out, they either accept it or we don't give them the ship right wrong or indifferent."  Such belligerent language from a Group Leader within Lockheed evidences the entrenchment Relator faced when he tried to do the right thing.

37.     Relator immediately suggested to his superiors and Lockheed management that Lockheed's decisions were wrong, unsafe, and produced inconsistencies, in his February 24, 2004 email to Paul J. Messer, Lockheed's Surface Lead Systems Engineer.  Mr. Messer was responsible for the ship systems engineering group for which the 123 was one of the efforts.

38.     Lockheed and Northrop knowingly or with deliberate ignorance or reckless disregard for the truth installed components on the 123s that would not meet the relevant military standard (MIL-STD-1399C).  Lockheed and Northrop knew the MIL-STD-1399C standard was a contractual requirement; Lockheed referenced the standard in the topic heading of a Request for Waiver submitted to the Coast Guard.  Lockheed and Northrop knew that these components were non-compliant and unreliable.  Relator had notified his superiors several times in February of 2004 about what he saw as non-compliant installations.   ICGS, by and through Lockheed and Northrop, began knowingly, or with deliberate ignorance or reckless disregard for the truth, **falsely self-certifying** equipment as being compliant with relevant standards when **it was not**.  This fact was confirmed in the DHS IG 123 report and in Congressional testimony by the IG.  The IG testified that ICGS wrongfully self-certified the components and submitted waiver requests based on fraudulent data.   These **fraudulent** and **misleading** Certifications induced the Coast Guard to accept delivery of ships with components that it believed could be relied upon in bad weather and mission critical situations when **they could not**.

39.     ICGS, by and through Lockheed, omitted information and data regarding

the environmental survivability of externally mounted equipment from the contractually mandated Action Item Database System. ICGS and Lockheed were contractually required to enter this information in the database and knowingly, or with deliberate ignorance or reckless disregard for the truth, and **fraudulently omitted** it, which caused the Coast Guard to rely on false and/or incomplete information. When Relator, himself, entered the information in the database in January of 2004, it was removed by Lockheed's Paul J. Messer. Relator entered the defects marked at a "high" level, meaning that the issues were critical and required management attention. Relator notified ICGS and Lockheed management several times that these defects should not have been deleted and sent emails objecting to their deletion, to no avail. Invoices were submitted for payment by Lockheed to the Coast Guard during this time period notwithstanding the concealed defects.

40.     The ICGS joint venture, by and through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** on the basis of false statements or misrepresentations in the compliance certifications and the omissions from the Action Item Database System.

41.     Later, Relator understood that the joint venture, by and through Lockheed, ordered a topside study to review the rest of the equipment, and that the joint venture, by and through Lockheed, fixed the FLIR. However, Relator does not know the full extent of any remediation, no doubt at the taxpayer's additional cost.

**II.**

**FLIR Video Cable**

Summary

42.     The installation of the FLIR video cable was required to be compliant with Section 3 of the 123 WPB Performance Specification pertaining to the infra-red sensory capabilities of the 123s.   This system is used for navigation.   Relator reported to Lockheed's management that the cables used to transfer the FLIR video signal from the externally mounted sensor to the internal systems were the **incorrect type** and were **not weatherproofed**.  They were not manufactured to be installed externally; that is, to be exposed to any elements.  Again, it should be noted that Relator raised this issue in a timely fashion, and the ICGS joint venture, through Lockheed, could easily have remedied the defects before delivery of the first boat.  The consequential damages far outweighed ICGS's desire to cut corners on costs in order to maximize profits.

Impact to the Mission

43.     Failure of the cables will lead to loss of system video.  This will render the crucial navigation system inoperable.    This situation could leave the vessel incapacitated and unable to carry out its mission and could result in loss of life and the vessel.

Resolution

44.     The requirements would have to be changed or the equipment replaced or modified to meet specs.  These activities would include material and labor costs.

Cost of Resolution

45.     The costs would require the replacement of the non-indicated cables and changes to documentation.  This would involve material and labor charges.  Relator's estimate for remedial repairs or modifications is not less than several thousand dollars per vessel.

Relevant Details

46.     Notwithstanding the objective dangers, Lockheed's management refused to swap out the improper cables and took the position that the cables would simply be replaced when they failed.  Relator stated in a January 28, 2004 email to Brian McLaverty, Douglas Wilhelm, Paul Messer, and Michael Clifford that he was told by Lockheed employee, James Schreiber in a January 21, 2004 email, that Lockheed Deputy Program Manager Patrick Ewing wanted to wait on changing the faulty cable and fix it "when it fails."  Specifically, Schreiber wrote to Relator that Ewing decided that "until there is a problem we won't do anything."

47.     The ICGS joint venture, by and through Lockheed and Northrop, installed and **falsely certified,** knowingly or with deliberate ignorance or reckless disregard for the truth, the faulty FLIR cable as being compliant with Section 3 of the 123 WPB Performance Specifications when it was not.  The false certification by ICGS, Lockheed, and Northrop was **fraudulent**.  Lockheed knew that the FLIR cables were unreliable. Relator told them so in multiple emails in January of 2004.  Lockheed's refusal to change the unreliable cables, despite its knowledge, or at best, deliberate ignorance or reckless disregard for the truth, of the equipment's shortcomings, was egregious and

could have resulted in lives being lost.  Delivering the 123s to the Coast Guard without substituting reliable cables for the known-to-be unreliable FLIR cables, and knowingly or with deliberate ignorance or reckless disregard for the truth **falsely certifying** that the cables were up to specifications, **fraudulently** resulted in payment to the joint venture while the Coast Guard erroneously believed that the FLIR cable could be relied upon in navigation and mission critical situations when **they could not**.

48.     The ICGS joint venture, by and through Lockheed, knowingly or with deliberate ignorance or reckless disregard for the truth **omitted** information and data regarding the FLIR video cable from the contractually mandated Action Item Database System.  ICGS and Lockheed were contractually required to enter this information in the database and knowingly, or with deliberate ignorance or reckless disregard for the truth, and **fraudulently omitted** it, resulting in payments by the Coast Guard which had false and/or incomplete information.    When Relator entered the information himself in January of 2004, it was removed by Lockheed's Paul J. Messer.  Relator entered the defects marked at a "high" level meaning that the issues were critical and required management attention.  Relator notified the ICGS joint venture personnel several times that these defects should not have been deleted and sent emails objecting to their deletion, to no avail.  Invoices were submitted for payment by Lockheed to the Coast Guard during this time period without the truth being disclosed.

49.     The ICGS joint venture, by and through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** without disclosing the false statements or misrepresentations in the compliance certifications and the omissions

from the Action Item Database System.

## III.

## Physical Configuration Audit (PCA)/Mislabeled Cables/Boat 1 (Matagorda)

Summary

50.    The installation of cables onboard the 123s was required to be compliant with 1995 GEN SPEC 305 and 1995 GEN SPEC 400d specifications pertaining to the marking and designating of electrical equipment, cables, and systems, and electronic distribution system cable.  The installation and labeling of cables were also required to be compliant with Section 3 of the 123 WPB Performance Specification as it pertains to the testing, verification, and examination of installed components.

51.    Physical Configuration Audits (PCA) are contractually mandated inspections to ensure that the installation of the systems matches the design, relevant documentation and equipment/cable labeling.  The PCA conducted by Lockheed Quality Assurance on the first boat, the Matagorda, showed **80%** of the cables were **mislabeled**.  This situation could lead to mistakes being made during routine maintenance or repairs, resulting in prospective, critical system failures.  Again, Relator put the ICGS joint venture's management, primarily Lockheed's management, on notice of the non-indicated cables prior to the delivery of the first boat, but the joint venture refused to utilize compliant cables.

Impact to the Mission

52.    The above mistakes could result in damage to critical systems such as Navigation, Sensor, Command and Control and Communications Systems.  These

failures could result in the boats' inability to perform their missions and all of the attendant consequential problems and damages.

Resolution

53.     The cables must be relabeled.

Cost of Resolution

54.     A conservative estimate of labor and material to accomplish the remedial repairs would be $100,000 per boat.

Relevant Details

55.     Relator notified Paul J. Messer, Lockheed's Surface Lead Systems Engineer, in a February 12, 2004 email that a complete Physical Configuration Audit ("PCA") needed to be performed to properly assess the extent of the cable labeling problem and determine the proper solution.  Lockheed Chief Engineer Joe Villani did not agree with Relator according to a February 12, 2004 email from Paul Messer to Relator and felt that the labeling problem was not an urgent problem.  In that email, Messer stated to Relator that Villani felt that a full PCA should not be performed on the mislabeled cables.  Villani's statement, however, was a contradiction to the 1995 GEN SPEC 305, 1995 GEN SPEC 400d, and 123 WPB Performance Specification requirements that pertained to the installation, testing, and verification of the cable labeling.

56.     When notified about this cable corruption, the joint venture's management, primarily Lockheed's management, refused to make corrections.  Management preferred to assign the problem to the shipyards even though the ICGS joint venture,

through Lockheed and Northrop, installed incorrectly labeled cables that did not comply with 1995 GEN SPEC 305 or 1995 GEN SPEC 400d.  ICGS/Lockheed management also took the dubious position that the problem would affect only Lockheed's personnel, since Lockheed was responsible for depot maintenance and repair.  In other words, the joint venture was not going to correct a corrupted system that it constructed.  The ICGS joint venture thereafter knowingly, or with deliberate ignorance or reckless disregard for the truth, and **falsely certified** the cables as compliant with the relevant standards and began delivery of ships to the Coast Guard.  Knowingly or with deliberate ignorance or reckless disregard for the truth falsifying Certification documents and delivering the ships to the Coast Guard with mislabeled cables was **fraudulent**.  The ICGS joint venture led the Coast Guard to believe that the labeling on the ships' cables could be relied upon as compliant with 1995 GEN SPEC 305, 1995 GEN SPEC 400d, and the 123 WPB Performance Specification when **they were not compliant**.

57.     The joint venture knew of the risk of having mislabeled cables on board the Matagorda and did nothing to solve the problem.  They went as far as to falsely certify the work as compliant, knowingly or with deliberate ignorance or reckless disregard for the truth, thereby **fraudulently** inducing the Coast Guard to accept delivery of ships that contained mislabeled cables.

58.     ICGS, primarily through Lockheed, omitted information and data regarding the mislabeled cables and Physical Configuration Audit from the contractually mandated Action Item Database System.  The ICGS joint venture, primarily Lockheed, was contractually required to enter this information in the database and **fraudulently**

**omitted** them, which caused the Coast Guard to rely on false and/or incomplete information.  Relator was told by Lockheed's Quality Assurance team that they would enter the mislabeled cables into the Action Item Database.  This task was never completed.

59.    The ICGS joint venture, by and through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** while failing to disclose the false statements or misrepresentations in the compliance certifications and the omissions from the Action Item Database System.

## IV.

## <u>Low Smoke Cable Defects</u>

Summary

60.    The installation of low smoke cables onboard the 123s was required to be compliant with Section 3 of the 123 WPB Performance Specification.  Lockheed failed to choose and purchase, and the joint venture failed to install Low Smoke cables on the 123s.  The failure of Lockheed to select and purchase, and the failure of Lockheed and Northrop to install Low Smoke Cables unnecessarily exposed the system to **failure** and the personnel to dangerous **toxic fumes** in the event of fire.  Lockheed and Northrop knowingly or with deliberate ignorance or reckless disregard for the truth failed to install low smoke cables, but instead knowingly or with deliberate ignorance or reckless disregard for the truth installed non-compliant cables without previously gaining approval to do so, and falsely certified them, knowingly or with deliberate ignorance or reckless disregard for the truth, as being compliant with the low smoke requirements.

61.    The non-conforming cables purchased by Lockheed, and installed by the joint venture were also a fire hazard in and of themselves because they would not suppress fires from moving from space to space along wires behind the bulkheads of the ships.  This failure would cause fires to spread even faster.

62.    At the time Relator left the effort, he was told that ICGS, through Lockheed, was going to try to convince the Coast Guard to waive the requirement. Since then, the DHS IG Report on 123 C4SIR has concluded that granting the waiver was inappropriate and that the cables should be replaced.  This defect was disclosed in the report filed by Relator with the Department of Homeland Security Inspector General ("DHS IG") in February of 2006, because the IG had requested a complete listing of any issues that Relator felt had been handled improperly - even if Relator thought the issue was closed.  Information provided by Relator was the basis of the Inspector General's February 2007 110'/123' Maritime Patrol Boat Modernization Project Report.  (The issue was also included in most of Relator's requests to Lockheed management to fix the problems on the 123s).

Impact to the Mission

63.    Failure to use low smoke cables could result in excessive damage to electronic systems even with a small fire (due to residue), aid the spread of fire and create a toxic smoke which could poison the crew.  This failure could result in the **loss of life** and **loss of the vessels** where proper low smoke cables could help curb or retard the spread of fire on board the vessels.

Resolution

64.     The cables should be replaced and the documentation updated.   This should include, as in other filings, a review of every C4ISR asset for any similar C4ISR problems.

Cost of Resolution

65.     If only the 123s are affected – 80 cables per boat.  If any other assets are affected then the cost would increase due to more cables being installed.

Relevant Details

66.     Lockheed submitted several Requests for Waivers to the Coast Guard regarding the non-compliant cables.  The joint venture began delivering ships containing non-compliant cables to the Coast Guard **before** the Waivers had been ruled on. Lockheed expected their joint venture's requested Waivers to be granted, not because the cables were actually safe, but because of the misrepresentations Lockheed made to influence the Coast Guard to *believe* that the cables were safe, when **they were not**. Lockheed requested Waivers and began falsely certifying cables as compliant, knowing full well all the time, or with deliberate ignorance or reckless disregard for the truth, that the bases for requesting these Waivers and submitting the Certifications were **false** and **fraudulent**.  When the Coast Guard rejected all but one of these Waivers, ICGS, by and through Lockheed and Northrop failed to correct their faulty work, and omitted making the corrections, **without** the **knowledge** of the Coast Guard.

67.     The joint venture knew that these requests for waivers and Certifications were misleading and fraudulent because Relator had been fully apprising his Lockheed

superiors about the improprieties to no avail.  On January 7, 2004, Relator emailed his superiors within ICGS/Lockheed Paul Messer (Surface Lead Systems Engineer), Laurence Finnegan III (Software Project Management Manager), and several others to notify them about a list of issues that he found to be contemptible and unethical regarding the 123s.[6]  Among them was the fact that Lockheed was about to supply the Coast Guard with ships not equipped with low smoke cabling.  He stated to his superiors that he had been informed, "we do not have time to look in to or remedy the situation for the first ship."  Relator had by that time became so upset with Lockheed's unlawful behavior that he requested in the same email to be removed from the Deepwater program and reassigned.

68.     Lockheed, as 50% owner of the joint venture prime contractor, and as the dominant actor in this fraud, knowingly or with deliberate ignorance or reckless disregard for the truth caused ICGS to knowingly, or with deliberate ignorance or reckless disregard for the truth, **falsely certify** that the cables on the 123s met the 123 WPB Performance Specification requirements for low smoke cabling.  Lockheed misrepresented the risk of having the non-compliant cables on the 123s and **fraudulently** induced the Coast Guard to take delivery of ships with dangerous and potentially toxic cables installed by the Lockheed and Northrop joint venture.

69.     The ICGS joint venture, primarily through Lockheed, omitted information and data regarding the low smoke cable defects from the contractually mandated Action

---

[6.] In the same January 7, 2004 email, Relator also notified John Ryan (Software Organizational Director), Joseph Villani (Chief Engineer), Jay Hansen (Tech Ops Director), Michael Clifford, Patrick Ewing (Deputy Program Manager), Brian McLaverty (123 Deepwater Program Manager), Thomas Rodgers (Deepwater Program Manager), Douglas Wilhelm (Deputy Program Manager), and David Ponticello (Chief Engineer).

Item Database System.  The ICGS joint venture was contractually required to enter this information in the database and **fraudulently omitted** them, which provided the Coast Guard with false and/or incomplete information related to requests for payment.  When Relator entered the information himself in January of 2004, it was removed by Lockheed's Paul J. Messer.  Relator entered the defects marked at a "high" level meaning that the issues were critical and required management attention.  Relator notified the joint venture management several times about these defects which should not have been deleted.  Relator sent emails objecting to their deletion, all to no avail. Invoices were submitted for payment by Lockheed to the Coast Guard during this time period.

70.     ICGS, by and through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** while it was unaware of the joint venture's false statements or misrepresentations in the compliance certifications and the omissions from the Action Item Database System.

**V.**

**Video/Camera Surveillance System**

Summary

71.     The installation of two (2) moveable video surveillance cameras onboard the 123s that would provide a 360 degree field of view was a contractual requirement. There is a camera surveillance system installed on the boats.  It was supposed to replicate the systems on other Coast Guard vessels that afford a remote 360 degree viewing of the vessel and its perimeter.  The camera system installed on the 123s has

**two significant blind spots** at approximately 10 and 2 o'clock as viewed from the pilot house/bridge.  These blind spots are significant in size and could permit **undetected access** to the boats.  Again, it should be noted that ICGS was fully briefed by Relator on these issues before the delivery of the first boat, and ICGS could easily have been remedied before the delivery of the first boat.

Impact to the Mission

72.    Lockheed's decision resulted in exposing the WPB 123s to undetected [enemy] access which could result in: (1) unwanted boarding of the vessel; (2) tampering with the hull; or (3) sinking the boat.  This action could pose a danger to the crew, the general public and our national security interests, because the USCG shares critical communications systems with other U.S. Government law enforcement, intelligence and military agencies.  These failures could predictably result in **loss of life** and **loss of the vessel**.

Resolution:  Two options

73.    First, the USCG could keep the **flawed system**, as is, and budget for personnel to serve as watch standers to cover the blind spots; that is, as was done before the installation of the system's cameras.  This would mean the USCG would have to maintain a flawed system**,** sacrificing the benefits of decreased manpower (and costs) previously associated with assigning staff used to watch the boats in a USCG port.

74.    Second, the USCG could add the omitted camera on each boat and update the documentation, which is clearly the preferred remedy.

Cost of Resolution

75.     The cost of the first option would need to be assessed by the USCG. There was a material cost savings associated with the use of the surveillance cameras.

76.     The cost of the second option, adding the omitted camera, is estimated to be $25K per boat.

Relevant Details

77.     ICGS, by and through Lockheed and Northrop, received requirements from the Coast Guard to install 2 mast mounted movable cameras (an implementation used for quite some time in the Coast Guard).

78.     Originally, the ICGS joint venture was supposed to procure the cameras and install them, provide the video and control circuitry and, the shore connection box.

79.     The cameras' purpose was to permit remote monitoring of the boat when in a Coast Guard port. No watchstanders would be required if the system was properly installed.

80.     The ICGS joint venture, primarily through Lockheed, was responsible for performing the surveillance camera contract requirements with the exception of choosing the cameras, themselves.  The ICGS joint venture, primarily through Northrop was responsible for the selection of the proper cameras.

81.     Northrop relayed to Lockheed that Northrop was not accustomed to C4ISR work and that Lockheed should decide which cameras were appropriate to comply with the contract.  Because of discord between the joint venture partners, Lockheed refused.  At this time, Relator requested that Lockheed take over Northrop's

responsibilities in an effort to end the bickering between companies and in order to stay on schedule.

82.     Once Relator discovered that Lockheed had failed to design and install circuitry for remote cameras, as it was required to do, Lockheed failed to correct their mistake and decided to install four (4) fixed cameras on the pilot house instead of the remote cameras that the contract called for.  While fixed cameras do avoid the potential for an intruder to sneak around a moving camera, Relator had learned that the real reason fixed cameras were selected was because the ICGS joint venture, primarily through Lockheed, had already installed improper circuitry.

83.     Relator asked Ships' Integration to utilize the camera specs and ships' design to plot the views.  Ships' Integration responded that: (1) the cameras did not afford a 90 degree field of view; and (2) mounting cameras in favorable locations would be problematic due to other items installed on the pilot house. Relator was told there would be blind spots.

84.     These blinds spots were at 10 o'clock and 2 o'clock – directly over the pilot house/bridge windows.  The **blind spots** were over 10ft wide on the deck and hundreds of yards wide to the horizon.

85.     When told about the blind spots, and before any cameras had actually been purchased, Relator suggested to the ICGS/joint venture's management, primarily Lockheed managers, that adding one (1) more fixed camera would be a comprehensive solution to the entire problem.  Lockheed management refused and said the "Design of

Record" was 4 cameras.  Lockheed did not want to admit its design defect to either the Coast Guard or Lockheed's joint venture partner Northrop.

86.    ICGS's management, primarily Lockheed managers, responded by telling Relator that there was no 360 degree requirement.  Relator responded that it was known that the USCG currently had ships with 2 masts mounted moving cameras that supplied 360 degree of view.

87.    On information and belief, Relator believes the 360 degree requirement was not only contractual, but necessary.  The requirements that came down from the Coast Guard called for a camera system the same as the system used on other Coast Guard ships that called for a 360 degree field of view.  In addition, the Coast Guard was trying to do away with watchstanders on the boats which was possible only if there was a complete 360 degree field of view from the surveillance cameras.  The joint venture management refused to concede the obvious, but Lockheed did permit Relator to talk to the Coast Guard tech representative about the defective design.

88.    The Coast Guard Tech Representative, expressing scheduling pressure, appeared to acquiesce to ICGS's refusals, noting that the blind spots would be covered by the locking of the pilot house/bridge windows.  He thought that any covert entry would be discovered by observing broken glass.  Relator inquired about how the blind spots and the locked pilot house/bridge windows would prevent an intruder from planting an explosive charge on the boat, for which neither he nor ICGS offered an acceptable response.  The tech rep said ICGS would have to seek a **waiver** for less

than 360 degree coverage.  Upon Relator's FOIA request, Relator learned that the 360-degree cameras were never waived.

89.     Relator pointed out that the surveillance defect could have been remedied by simply installing an additional camera at a cost of under $1,000.

90.     On January 20, 2004, Coast Guard security inspector, Joe Ricci, inspected the boat.  His January 21, 2004 report stated the boat didn't have the standard 2 camera mast solution but that it had 4 fixed cameras, and that it appeared that the boat had 360 degree views.  Ricci confirmed that the 360 degree view was a requirement.

91.     After reading the Coast Guard security inspector's report Relator informed the joint venture's management, primarily Lockheed managers, that the report indicated that there was a 360 degree requirement, and that ICGS, by and through Lockheed, had an obligation to tell the inspector that the system had two (2), material blind spots of which the Coast Guard was unaware.

92.     The ICGS joint venture's management, primarily Lockheed managers, responded it was not their fault that the inspector missed the blind spots, or that the inspector wrote and conducted a faulty test.   When Relator suggested to ICGS/Lockheed management that they notify the Coast Guard inspector about the error in the blind spot detection, he was told by Lockheed employees Paul Messer (Surface Lead Systems Engineer), Patrick Ewing (Deputy Program Manger), Joseph Villani (Chief Engineer), and Douglas Wilhelm (Deputy Program Manager) not to make the disclosure.

SIXTH AMENDED COMPLAINT – Page 33

93.     Unaware of the blind spots and the corrupted surveillance system, the USCG accepted the design.  **All 8 boats have the blind spots**.

94.     The ICGS joint venture, by and through Lockheed and Northrop, knowingly, or with deliberate ignorance or reckless disregard for the truth, **falsely certified** the surveillance camera system as being contractually compliant when **it was not**.  The use of the false statements was **fraudulent**.  The joint venture induced the Coast Guard to accept delivery of boats that were not secure, while misleading the Coast Guard into believing that they were.  Lockheed knowingly or with deliberate ignorance or reckless disregard for the truth let the Coast Guard believe that there were no blind spots on the ships when they had verified knowledge that the ships did, in fact, have two blind spots which could create a serious security risk.  In so doing, on information and belief, Lockheed knowingly or with deliberate ignorance or reckless disregard for the truth **falsely certified** that the ships' surveillance camera system was compliant with the contract.

95.     ICGS's possession of information that the ships were not secure while allowing the Coast Guard to believe the ships were secure, and knowingly or with deliberate ignorance or reckless disregard for the truth **falsely certifying** the ships' surveillance system as compliant was **fraudulent**.

96.     The ICGS joint venture, primarily through Lockheed, knowingly or with deliberate ignorance or reckless disregard for the truth omitted information and data regarding the surveillance cameras from the contractually mandated Action Item Database System.  The ICGS joint venture, particularly, Lockheed was contractually

required to enter this information in the database and knowingly or with deliberate ignorance or reckless disregard for the truth and **fraudulently omitted** them, while requesting payment from the Coast Guard which was unaware of the false and/or incomplete information.   When Relator entered the information himself in January of 2004, it was removed by Lockheed's Paul J. Messer.   Relator entered the defects marked at a "high" level meaning that the issues were critical and required management attention.   Relator notified the ICGS joint venture, primarily Lockheed management, several times that these defects should not have been deleted and sent emails objecting to their deletion to no avail.   Invoices were submitted for payment by Lockheed to the Coast Guard during this time period.

97.    ICGS, by and through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** while it was unaware of these false statements or misrepresentations in the compliance certifications and the omissions from the Action Item Database System.

## VI.

## Classified Communication Certification Deficiencies/SIPRNET & TEMPEST

### Summary

98.    The installation of shielded cables, transceivers, transmitter, and the distance of separation between black and red cables onboard the 123s was required to be compliant with Government standards applicable to its SIPRNET usage and TEMPEST testing standards, as well as compliant with Section 3.3.7 of the 123 WPB Performance Specification.   The communications systems on the vessels, including

secure voice systems for radio and data (SIPRNET, the government-wide secret network) required certain security parameters (TEMPEST) be satisfied in order to be certified as safe and secure for use.  There are several significant flaws in these areas including the use of **non-shielded cables** where shielded cables should have been used (about 100 on each boat).

99.     Additionally, several installations on the 123s failed visual testing procedures.  The RT-1794 transceiver was located too close to classified servers, and the RT9000 transceiver was located too close to cryptographic equipment.  Red and black cables entering the MARCOM switch were installed too close to each other, and the IFF transmitter was installed too close to the red printer.  These, and other deficiencies that did not comply with TEMPEST requirements, have resulted in **corrupted communications systems** which are exposed to **unwanted eavesdropping** on all governmental organizations (including law enforcement, intelligence, and military) that share the same communications systems.  National security has likely been compromised by the absence of shielded cables.  For instance, the Coast Guard's own press releases have stated that several of the 123s used the classified SIPRNET system on missions to Cuba while the system was unprotected.

100.   Not only is it possible for **terrorists or narco governments to eavesdrop**, but the violations are sufficiently significant to permit these 8 WPB 123 boats to retransmit clear communications traffic from one classified circuit to another; thereby, making it relatively easy for anyone, including our national enemies, to **access**

**classified U.S. communications** within a very large area, without the need to utilize sophisticated eavesdropping equipment.

101.    As before, these issues were acknowledged, and could easily have been remedied, before the delivery of the first boat.  In the war on terror, the terrorists could hardly have done more damage to the security or the Coast Guard's "secure communications" than have the ICGS joint venture of Lockheed and Northrop, all recklessly done, without conscience, in the pursuit of **undeserved profits**.

102.    In fact, TEMPEST design issues have now affected a new group of assets in the Deepwater "system of systems," the National Security Cutters ("NSC").  Lockheed refused to perform the TEMPEST design for the NSCs until 2008—several years late, and on information and belief (given the predicate conduct on the 123s), not until after they had extracted extra funding [taxpayer losses] from the Coast Guard to create this design, which should have been completed properly for the 123s.  Because of Lockheed's delay, Northrop proceeded with the NSC vessel design **prior to** completion of the TEMPEST design.  This out-of-order process has caused serious problems in the NSCs.  In addition, the instrumented TEMPEST testing is now more than one year late.  All of these NSC issues are consequences of the ICGS joint venture of Lockheed and Northrop failures in connection with the eight 123s.

Impact to the Mission

103.    These defects, including the cables could easily:

(1) compromise national security;

(2) compromise mission operations;

(3) compromise identities of protected individuals; and

(4) result in the unnecessary loss of life and property.

Not only is it possible for other governments to **eavesdrop** on allegedly "secure communications," but the defective cables enable these 8 boats to retransmit clear communications traffic from one classified circuit to another, thereby making it **relatively easy for anyone, including the enemies of our country, to access classified communications within a very large area, even globally,** and to break our codes by comparing the scrambled and clear versions of the same communication**.**

Resolution

104.   The complete rerunning of the TEMPEST and SIPRNET certification procedures needs to be done – visual and instrumented.   All failures should be addressed where feasible.  If the visual report from ICGS is accurate and discloses the full extent of the issues (document can be provided), then the estimated cost must include replacing 100 cables and fixing other problems such as, but not limited to, grounding, bonding and separation failures.   Additionally there would have to be documentation changes and more tests would need to be performed.  Lastly, if other Government agencies (law enforcement, intelligence or military) have already been compromised they would need to perform a damage assessment.

Cost of Resolution

105.   If other Government agencies' "secured communications" have already been compromised, the remedial costs could be very significant.

106.   If the costs are confined to the errors in the ICGS's Visual TEMPEST

Inspection Report, rather than a full audit, the remedial costs would exceed $250,000.00 per boat.

Relevant Details

107.   Again, **well after** the design review and the equipment was purchased, Relator's team first received the TEMPEST requirements—the **opposite** of the sequence which should have occurred.  Those requirements called for the standard set of military sea-going requirements – shielding, grounding, bonding, separation of equipment etc.

108.   ICGS/Lockheed's Chief Engineer on the program had directed, months earlier, that Lockheed not buy the requisite shielded cables because they were too expensive (not bid).  The requirements were never changed, but the defect was not disclosed by management.

109.   Until this point, ICGS/Lockheed had not involved anyone on the project who had a **TEMPEST background**, despite the fact that Lockheed and Northrop had some employees with that critical background.

110.   At the time the 123 Matagorda was being tested, and well after the design had been completed and most of the equipment had been procured, Lockheed technical teams had the gall to contend in communications with Coast Guard technical teams that there were no TEMPEST requirements for the 123s.  The Coast Guard technical authority stated that because the requirements included secret communications radio systems, TEMPEST requirements were inherently included.  This is because TEMPEST requirements are standard Government and industry-wide in connection with the

relevant secure radio communications systems. TEMPEST standards were requirements and not guidance. Lockheed's Ship's Integration team prepared a report on what their TEMPEST solutions should be. They did an excellent job, given that the responsible engineer had not previously worked on TEMPEST. The TEMPEST engineer whom Lockheed had on its staff was not asked to participate. The report clearly indicated that **shielded cables, in addition to specified separation of equipment distances and other relevant standards,** were **required** for the intended use, standard operations.

111.    Management was informed that to remedy the defects, the joint venture of ICGS, Lockheed, and Northrop needed to buy and install shielded cables and fix other problems such as, but not limited to, grounding, bonding and separation failures, or seek a change of the requirements. Lockheed, however, informed Relator that the design of record would stand, that it would do neither.

112.    Thereafter, the ICGS joint venture, primarily through Lockheed, arranged for the TEMPEST engineer from Ships' Integration to perform a site inspection. ICGS's, Lockheed's, and Northrop's work **failed** in several areas, **including the shielded cables issue, the distance of separation between equipment**, and other problems such as, but not limited to grounding, and bonding**.**

113.    Initially, the ICGS joint venture agreed to fix the "visual failures." Lockheed's management asked Relator's team to draft an impact and resolution document. The result was that most of the fixes would add significant cost and schedule delays. Upon hearing this Lockheed's management decided to wait until the

instrumented test to see if it could pass.  **No effort** was made to buy or install the required shielded cables based on the visual test failure or fix other problems such as but not limited to grounding, bonding and separation failures.

114.   Two and one-half (2.5) years later, all 8 boats have had the predictable SIPRNET certification problems.  Relator independently confirmed that shielded cables have not been installed and other problems such as but not limited to grounding, bonding and separation failures have not been fixed.  Thus, the parade of horribles continues daily.

115.   Relator contacted several TEMPEST inspectors around the country.  All of them confirmed that the chances of passing a **bona fide test** were extremely unlikely without shielded cables.  Similarly, the boats were unlikely to pass a bona fide test without fixing other problems such as, but not limited to, grounding, bonding and the failures to adequately separate equipment according to TEMPEST standards.

116.   It appears that the ICGS joint venture either: (1) has falsified the tests; or (2) the Coast Guard lowered the requirements.  On information and belief, every other Coast Guard or Navy ship in the present fleet has shielded cables in their secure communication systems.  Security does not otherwise exist on those ships.

117.   **Ironically**, the ICGS joint venture, through Lockheed and Northrop, actually went as far as to knowingly or with deliberate ignorance or reckless disregard for the truth take 100 compliant shielded cables **off** each these boats when Relator's team installed the non-shielded cables.  In other words, the Defendants knowingly or

with deliberate ignorance or reckless disregard for the truth made the 123s and the Unites States less secure by removing required existing components from the ships.

118. As the USCG now has a requirement to be able to communicate with DOD and several other law enforcement or military organizations, the communications between those entities and the USCG are at severe risk. **Any enemy or foreign government** monitoring these boats – from shore or from "fishing boats" will be able to pick up all the "secured communications" from these boats. Since the USCG has no shielded cables on these patrol boats, the cables will emanate like antennae. Additionally, the boats could retransmit clear bleed-over information from other circuits. The communications heard will be in the clear and easily understood. This is not a good thing, according to Homeland Security. See **Exhibit B** (E-mail complaint to CEO of Lockheed from Michael DeKort).

119. Regarding SIPRNET, the Department of Homeland Security IG's report stated that the contractor admitted there were issues, but that they could not be fixed without rendering the system inoperable, and without disclosing the ICGS joint venture's complicity in the corruption of the system.

120. In April 2006, well after the boats became operational, the SIPRNET certification organization admonished ICGS, Lockheed, and Northrop and allowed 45 days to correct the problems, or the **accreditation would be pulled**. Relator does not believe that ICGS, by either Lockheed or Northrop, has addressed constructively all the indicated problems, the same problems which could easily have been avoided in a timely manner.

121.   ICGS, Lockheed, and Northrop actions were egregious in that they actually removed 100 compliant, shielded cables from the 123s and replaced them with non-compliant, unshielded ones.  This activity was neither necessary nor prudent, and the consequences could be devastating to our national security and the security of those that serve aboard vessels in the Coast Guard.  The ICGS joint venture, primarily through Lockheed, knowingly or with deliberate ignorance or reckless disregard for the truth **falsely certified** that the non-shielded cables were TEMPEST compliant when they weren't, and began delivering ships to the Coast Guard.  Such actions were knowingly or with deliberate ignorance or reckless disregard for the truth **fraudulent** and the Coast Guard unknowingly accepted ships with cabling that did not meet the TEMPEST requirements for secret communications.

122.   ICGS, Lockheed, and Northrop knew that the cables inherently needed to be shielded because they were told so by the Coast Guard technical authority.   In addition, Relator had told his superiors at Lockheed in a January 12, 2004 email, as well as in a February 24, 2004 email to Joseph Cappello, Jr. (Quality Assurance Engineer) that several efforts on the 123s did not meet TEMPEST standards and that, "expecting the requirements to be lessened just because doing so is favorable to the schedule is not, in my opinion, the odds on favorite as a course of action."[7]

123.   ICGS, primarily through Lockheed, knowingly or with deliberate ignorance or reckless disregard for the truth **falsely certified** the non-shielded cables, transceivers, transmitters, and other installed equipment as being compliant with the

---

[7.] In the January 12, 2004 email, Relator notified Douglas Wilhelm (Deputy Program Manager), Robert Jones, Patrick Ewing (Deputy Program Manager), Paul Messer (Surface Lead Systems Engineer), Thomas Daniels, and Mark Kmiec (Deputy Program Manager).

federal Government's standards for its SIPRNET network and TEMPEST testing requirements when they were **not actually compliant**.

124.    The ICGS joint venture, primarily through Lockheed, knowingly or with deliberate ignorance or reckless disregard for the truth and **fraudulently omitted** information and data regarding the classified communication certification deficiencies from the contractually mandated Action Item Database System.   The ICGS joint venture, primarily through Lockheed, knew that they joint venture was contractually required to enter this information in the database and knowingly or with deliberate ignorance or reckless disregard for the truth and **fraudulently omitted** them, while requesting payment from the Coast Guard which was unaware of the false and/or incomplete information.   When Relator entered the information himself in January of 2004, it was removed by Lockheed's Paul J. Messer.   Relator entered the defects marked at a "high" level meaning that the issues were critical and required management attention.   Relator notified ICGS and Lockheed management several times that these defects should not have been deleted and sent emails objecting to their deletion to no avail.  Invoices were submitted for payment by Lockheed to the Coast Guard during this time period.

125.    ICGS, by and through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** while it was unaware of the false statements or misrepresentations in the compliance certifications and the omissions from the Action Item Database System.

## VII.

## Shaft Alignment and Hull Damages

### Summary

126.    The shaft alignment and hull construction was required to be compliant with the contract and with Section 3 of the 123 WPB Performance Specification.  During the continuous status conferences with the Bollinger Program Managers, Relator became aware of their complaints that the propeller shafts received from the associated vendor were in substandard condition.   The Program Managers were extremely concerned that the shafts would not align properly.   Recent events indicate that the ICGS joint venture, primarily through Northrop, failed to attend to this serious problem, resulting, in part, in the decommissioning of all eight (8) 123s.

127.    Finally, the Relator was aware through an ICGS/Lockheed employee in Moorestown, New Jersey, that in the summer or fall of 2004, ICGS was informed that the hulls were damaged beyond that which was contemplated or bid by ICGS.  Yet the information was suppressed in order to prevent the discovery of the unseaworthiness of the eight (8) 123s.   Recent events have indicated that the ICGS joint venture management failed to address these issues.

### Impact to the Mission

128.    This issue could contribute or directly cause core ship systems failure, which apparently it has.

### Resolution

129.    Propeller Issue – Repair or replace the propeller shafts.

130.   Hull Damages – Repair, replace or engineer hull components that are required in order to ensure the integrity of the hulls.

Costs of Resolution

131.   As each of the eight (8) 123s was decommissioned due to problems on the vessels, primarily associated with the mechanical, electrical and hull issues, the resulting costs would be the greater of the original upgrade cost for each vessel or the amount spent by the United States, whichever is greater; that is, assuming that $11.75 million was spent on the upgrades on each of the eight (8) 123s.

132.   As a result of the decommissioning of all eight (8) 123s, the total upgrade costs are damages in the approximate sum of $96 Million, plus the loss of the market value of the eight (8) 123s.

Relevant Details

133.   Relator was a party to the conversations on these topics.

134.   ICGS, primarily through Northrop, knew the ship designs were inferior, built the boats anyway, and delivered them to the Coast Guard while representing to the Coast Guard that the ships were safe for use.   Northrop provided incomplete and inaccurate information to the Coast Guard regarding the design thereby **fraudulently misleading** the Coast Guard to accept the ships while convincing them that the problems on the first few boats were nothing more than mere anomalies.  The ICGS joint venture denied the obvious until all eight (8) boats were objectively having the same problems.  Only then was the issue was properly communicated, and only after the Coast Guard had begun objecting.  Northrop failed to remedy the issue when it first

had knowledge and did not disclose the truth to the Coast Guard at any time during its term of service for the joint venture.

135.   ICGS's, particularly Northrop's, actions were **fraudulent** and **misleading** in that they provided incomplete and inaccurate information to the Coast Guard regarding the designs, built the ships anyway, knowingly or with deliberate ignorance or reckless disregard for the truth **falsely certified** them as compliant with the contract and Section 3 of the 123 WPB Performance Specification, and thereafter submitted **false claims** for **payment** based on their false statements or misrepresentations to the Coast Guard that the ships were safe for use.

136.   On information and belief, ICGS, primarily through Northrop, omitted information and data regarding the shaft alignment and hull damages from the contractually mandated Action Item Database System.   ICGS and Northrop were contractually required to enter this information in the database and knowingly or with deliberate ignorance or reckless disregard for the truth and **fraudulently omitted** them when requesting payment from the Coast Guard without disclosing the false and/or incomplete information.   Invoices were submitted for payment by Northrop to the Coast Guard during this time period.

137.   ICGS, by and through Northrop, submitted **false claims** to the Coast Guard for **payment** while it was unaware of the false statements or misrepresentations in the compliance certifications and the omissions from the Action Item Database System.

## **Overall Costs Associated with Resolution of the Issues**

Safety Issues

Environmental Survivability of External Equipment and Cable Labeling

138.   Costs associated with the resolution of these issues would primarily involve the vessel on which the discrepancies exist.  However, should the vessels be part of a critical event or working jointly with other organizations in a critical event, the boats' capabilities may be degraded to a point where the vessel is unusable, thereby posing serious risks to the mission(s) in which it is actively participating.  In such an event the costs would be great, and the consequential costs could be immense.

139.   Specific costs will be estimated in following sections.  However, due to recent events, Relator is aware that all eight (8) of the 123s have been decommissioned by the Coast Guard, thus resulting in at least the loss of the upgrade funds spent on the eight (8) 123s, or the sum of $96 million, and the loss of the market value of all eight (8) boats, which were previously seaworthy.  On information and belief, had the upgrades been properly performed, the fair market value of each of the boats would have been not less than $30 million, and that sum may be far short of the real value.  Thus, the decommissioning resulted in a loss of contemplated benefits of not less than $30 million or a cumulative sum of $240 million.

Security Issues

140.   Classified Communications Issues – TEMPEST – Costs associated with the resolution of these issues would involve the vessels for which these have deficiencies are present, but must also include the costs relating to compromised,

classified communications of several law enforcement and military organizations within our Government, as well as foreign governments.  In order to ascertain this cost each organization would have to evaluate whether communications have been compromised, the likely period of the infraction, as well as estimate the damage to the security of the agency or the nation.  Types of information that could have been compromised:

1.    Mission parameters;

2.    Ship or troop location;

3.    Names of protected personnel.

Total Cost Estimates - Labor and Materials

141.    Minimum remedial damages for ICGS's objective performance defects are in excess of $400,000.00 for each of Deepwater's 123 foot patrol boats.    Cumulatively, the minimum remedial amount needed to correct known and identified problems with the 123 foot patrol boats is **$3,200,000.00** for the 8 boats.

142.    If the boats' Exterior Equipment Survivability is an issue across a wide array of systems the remedial costs would easily **exceed $2 million per boat.**

143.    Estimated turnkey damages are **$19,200,000.00** for the eight (8) boats. The damages caused by the ICGS joint venture, through both Lockheed and Northrop, may well be an order of magnitude much greater than this sum if the "secure communications systems" of our Government have been eavesdropped by criminals and enemies.

144.    If these defective designs are being leveraged on **other projects,** per the policy of "System of Systems Requirement," there will be similar type damages for each

of those platforms as well as changes that must be made.  A conservative estimate of those projects' damages, if any, would be the same costs as for the 123s, per project.

145.   If national security has been damaged as a result of breaches of the ostensible "secure communications systems," each affected organization whose communications have been compromised would have to do an audited damages assessment.   This cost would be geometrically greater than the known damages outlined above.

146.   Due to recent developments, it is now objectively conceded that the deficiencies and corruption attendant to the upgrades and repairs to the eight (8) 123s has resulted, at least, in the loss of the $96 million paid by the Government for the upgrades and repairs.  If the upgrades and repairs had been properly performed, the fair market value of each of the 123s would have been not less than approximately $30 million per boat, or, cumulatively, **the sum of $240 million**.  That loss is real, and the United States has suffered that loss.   Yet, the eight (8) 123s had a pre-ICGS seaworthiness and operational value of an estimated $15.3 million each, all of which has been destroyed for an additional cumulative loss in excess of $80 million.

## FALSE CLAIMS ACT

147.   *Qui tam* Relator/Plaintiff re-alleges and hereby incorporates by reference each and every allegation contained in preceding paragraphs of this complaint.

148.   This is an action which has alleged violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-3732,  seeking damages and civil penalties on behalf of the United States and Relator as a result of the Defendants' false statements and claims.

149.   The False Claims Act provides that any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the Government for a civil penalty of not less than $5500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim.

150.   The False Claims Act allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.  Relator claims entitlement to a portion of any recovery obtained by the United States as *qui tam* Relator/Plaintiff is, on information and belief, the first to file and, in any event an original source for the complaints in this action.

151.   Based on these provisions, Relator, on behalf of the United States Government, seeks through this action to recover damages and civil penalties arising from the Defendants' submissions of false claims for payment or approval.  In this case, such claims were submitted to Government entities for payment of fraudulently inflated invoices resulting in fraudulent profiteering.    As a result of a fraudulent audit process, refusals to adhere to TQM (Total Quality Management), and the concealment of defective services and goods, *Qui tam* Relator/Plaintiff believes the United States has

suffered significant damages, as a result of the Defendants' false claims, jointly and severally.

152.   As required under the False Claims Act, *qui tam* Relator/Plaintiff has provided the offices of the Attorney General of the United States and the United States Attorney for the Northern District of Texas a statement of material evidence and information related to this complaint.  The pre-filing disclosure statements, supported by documentary evidence, support the claims of Defendants' wrongdoing, and have been previously provided to various governmental investigative agencies**.**  The Relator continues to provide supplemental disclosures to the Government to enhance the ongoing investigation of its Deepwater losses by the United States Department of Justice.

## FALSE RECORDS AND STATEMENTS

153.   *Qui tam* Relator/Plaintiff re-alleges and hereby incorporates by reference each and every allegation contained in preceding paragraphs of this complaint.

### "Guidance" Rather than "Requirements"

154.   Relator, a C4ISR expert, was a member of ICGS's proposal-planning group, through his employment with Lockheed, for a short time in 2001 or 2002, prior to the Coast Guard awarding the ICGS joint venture the Deepwater contract in July of 2002.  In proposal-planning meetings, ICGS, primarily through Lockheed, developed a strategy of persuading the Coast Guard to delete its standard "will" or "shall" language from much of the requirements portions of the Deepwater contract.  ICGS's and Lockheed's expressed intention was to persuade the Coast Guard to replace

"requirements" language with "guidance" language, allowing the ICGS joint venture nearly unlimited latitude in developing the Deepwater "system of systems." ICGS, by and through Lockheed and Northrop, planned to promise the Coast Guard that ICGS, through both Lockheed and Northrop, would **deliver superior design and products** if the Coast Guard would "untie the contractors' hands" from inflexible requirements. In the course of these planning meetings, Relator objected specifically to the absence of any other C4ISR experts from the planned staffing of the Deepwater project, and objected to the substitution of guidance language for requirements. ICGS not only did not staff the Deepwater team with additional qualified C4ISR experts, it removed Relator from the project, virtually guaranteeing that the C4ISR would not be a superior design, but an inferior design.

155.   About a year and a half later, in the summer of 2003, Relator was once again assigned to the Deepwater project. At that time, he learned that ICGS, primarily through Lockheed, had succeeded with its "guidance" pitch; the contractual project requirements included guidance language rather than firm "shall" or "will" requirements.

156.   Yet, the ICGS joint venture, primarily through Lockheed, did not intend or believe—as evidenced by discussions at proposal-planning meetings attended by Relator—that guidance language rather than firm requirements language in the Deepwater contract would produce superior design and products. Rather, ICGS and Lockheed simply wanted the contract to give the joint venture maximum flexibility to conduct the work in whatever manner it saw fit and to circumvent fiscal or timing impediments that might be encountered in the course of the program. ICGS and

Lockheed **misled** the Coast Guard into believing the less stringent "Guidance" language would **yield superior ships and materials** that would still satisfy the needs of the Coast Guard and be able to withstand the rigors of use on the seas better than boats and materials built under the less flexible, and more commonly used, "Requirements" language.  The joint venture sold the Coast Guard the "free lunch theory."

### False Certifications

157.   The ICGS joint venture misled the Coast Guard as to the facts of the proposed seaworthiness of all 8 123's.   The ICGS joint venture knowingly or with deliberate ignorance or reckless disregard for the truth **falsely certified** equipment as compliant with relevant standards, contractual requirements, and the laundry list of requirements in Section 3 of the 123 WPB Performance Specification.  The ICGS joint venture submitted **claims for payment** to the United States Government on the 123's while knowing or with deliberate ignorance or reckless disregard for the truth that the ships were not compliant with relevant standards, contractual requirements, and performance specifications.  Each of the false Certificates of Compliance referred to in this Complaint, and others submitted in connection with requests for progress payments, was a pre-condition for payment.  Moreover, maintenance of the Action Item Database System (discussed in greater detail, *infra*) was contractually required.  The defects omitted from the Action Item Database System were contractually required pre-conditions for payment, and thus, the omission constituted false certification that were also pre-conditions for payment.

158.   The falsity and fraudulent nature of the ICGS joint venture's

misrepresentations were most objectively evidenced by the fact that all 8 boats, after being submitted to the joint venture, became totally unseaworthy and had to be decommissioned, which cost the United States Government and taxpayers many millions of dollars in damages.

159.   Yet, from the beginning, ICGS, Lockheed, and Northrop did not believe the false statements that the 123's would be seaworthy and **superior** to 123's hypothetically produced under "Requirements" language.   In fact, the ICGS joint venture, primarily through Lockheed, misled the Coast Guard into signing off on standards that produced much inferior, not superior, and potentially dangerous products and services.   Their statements to the Coast Guard were **fraudulent**.   Those **false statements** made by ICGS, Lockheed, and Northrop were important to the Coast Guard and were a basis for the Coast Guard contracting with the ICGS joint venture of Lockheed and Northrop for the Deepwater project.

160.   ICGS's actions, by and through Lockheed, were not part of a fair, honest, and forthright contractual negotiation or modification, but part of their intent and desire to manipulate their own workload requirements in a financially advantageous manner without regard to any mission or financial detriments to the Coast Guard.

161.   ICGS, by and through Lockheed, knew or recklessly disregarded the fact that loosening the build quality standards on the 123's would not yield a superior quality boat, but would likely produce a more inferior product that could easily threaten the property and national security of the United States and/or the lives of the crew members who would have served onboard these shoddy vessels.

162.   In February of 2007, the Inspector General (IG) of the Department of Homeland Security (DHS) issued its report on investigations into the 123's as a result of complaints received from the Relator on February 10, 2006.   The DHS IG issued a scathing rebuke to ICGS, saying that ICGS, by and through Lockheed, had knowingly or with deliberate ignorance or reckless disregard for the truth falsely submitted a S016 Certification document on topside equipment for the 123's to the Coast Guard stating, "that there were no applicable requirements stipulated in regard to weather environment requirements, and that the certification is 'not really beneficial.'"

163.   ICGS's statement, by and through Lockheed, was patently, and knowingly or with deliberate ignorance or reckless disregard for the truth, false.   Environmental requirements, in fact, did exist in MIL-STD 1399C, Section 302.   Not only did the standards exist, but ICGS *knew* they existed because they referenced the standard in the topic heading of the S016 Certification document.   Submission of the S016 Certification which claimed there were no applicable environmental standards, while knowing that such standards did exist was knowingly or with deliberate ignorance or reckless disregard for the truth false and **fraudulent**.   ICGS had a duty to disclose the truth to the Coast Guard and not to mislead them into believing that the 123's would be superior product, compliant and safe as designed when these were not the ICGS primary considerations.

164.   The 123's non-compliance with environmental requirements was not part of a contractual modification, since the Coast Guard indicated to the IG that they were not even aware that the 123's were not compliant with applicable military environmental

standards until several months *after* the S016 Certification was submitted by the ICGS joint venture, primarily through Lockheed.

165.    Moreover, ICGS, by and through Lockheed, went to such lengths as to state to the Coast Guard in an August 2006 letter that testing the topside components would be "time consuming, expensive, and of limited value." This statement was knowingly or with deliberate ignorance or reckless disregard for the truth false and misleading. Providing proper topside components would not have been of limited value, but on the contrary, they could have protected lives and saved money. Clearly, the requirements were not as expensive as the loss of over one hundred million dollars lost by the ICGS joint venture's rendering eight (8) useless 123s after a $96 million retrofitting. Clearly, the ICGS joint venture worried less about the functionality and usability of the 123's than performing the work they were under contract to complete "on the cheap." ICGS, primarily through Lockheed, submitted a Request for Waivers, seeking to have the environmental standards ignored for the purposes of the contract. The DHS IG Report said this request was invalid because the ICGS joint venture could not possibly know exactly how and in what situations the Coast Guard would need to deploy the ships in the future.

166.    ICGS's complaints, by and through Lockheed, regarding testing the topside components were based on their desire to not spend the extra money it would have taken to correct their initial mistakes. Testing would not have been of "limited value," but would have exposed any further weaknesses in the topside components' design that needed to be remedied prior to launching the 123's. The ICGS joint

venture's statement dismissing further testing was knowingly or with deliberate ignorance or reckless disregard for the truth **false and fraudulent** and was made with the purpose of misleading the Coast Guard into enhancing the joint venture's financial outcome irrespective of the damage to the Coast Guard's operational readiness.

167.    The DHS IG placed the blame for the topside failures squarely on ICGS stating, "it was incumbent on them to obtain the necessary clarification *before* purchasing, installing, and certifying the installation as meeting the requirements" (emphasis added).   ICGS, primarily through Lockheed, had chosen to take the exact opposite detrimental course of action when it begin purchasing, installing, and self-certifying equipment on the 123's before having the proper clearance to do so.

168.    ICGS held itself out to be a joint venture between Lockheed Martin and Northrop Grumman.   ICGS had knowledge or was deliberately ignorant or acted with reckless disregard for the truth of its fraudulent and misleading activities, because, at least, its 50% owner in the joint venture, Lockheed, had knowledge.

169.    As early as January 17, 2006, Relator notified Lockheed's CEO Robert Stevens and Lockheed's Vice President & Associate General Counsel Scott W. MacKay via email about his concerns regarding Lockheed's questionable conduct, actions, and decisions in the Deepwater program.   Relator gave detailed indications of his concerns with the Shielded Cables, Surveillance Cameras, FLIR Cable.   Relator also made a point of notifying CEO Stevens that, "at no point in this process has anyone demonstrated that my position . . . is not technically accurate or is not the best option for the customer or Lockheed Martin . . . [t]he pushback has centered on the schedule,

costs or what the customer would or could accept." Not only had Relator relayed his concerns to Lockheed, but he also gave notice that the obstacles he faced from his superiors were centered around Lockheed trying to save money as opposed to doing what was right.

170.   Lockheed had notice from Relator and had responded to him several times. Scott MacKay wrote Relator in a January 19, 2006 email that he had been provided the letter Relator sent to Stevens, "as well as with a substantial volume of materials related to similar allegations you have made, together with the investigations and responses provided to you in response [to] those allegations. I am reviewing the file . . . "

171.   Regardless of Lockheed's current stance on Relator's claims, they had knowledge or were deliberately ignorant or acted with reckless disregard for the truth at the time of their actions, because Relator had been declaring to the ICGS joint venture's management that the decisions and actions they were (1) taking were unethical (2) and not compliant with their contractual obligations.

172.   ICGS, Lockheed, and Northrop were aware of both of Relator's concerns and the reasons that their actions were possibly fraudulent and/or misleading. Michael Cerrone, the Director of Hardware Systems Quality Assurance for MS2 emailed Relator on February 12, 2004 to say that he was going to elevate Relator's concerns to Yvonne Hodge, Vice President of MS2 Quality. In addition, Relator notified Lockheed's Board of Directors of his concerns on April 21, 2006 and received an email response from Lockheed General Counsel James Comey on June 26, 2006.

## **Omissions from Action Item Database System**

173.    ICGS, by and through Lockheed, omitted information and data regarding:

(1) the environmental survivability of externally mounted equipment;

(2) the FLIR video cable defects;

(3) the Physical Configuration Audit and mislabeled cables;

(4) the video camera surveillance system defects;

(5) the classified communications and SIPRNET/TEMPEST requirement

defects; and

(6) the low smoke cable defects, from the contractually mandated Action

Item Database System.

ICGS, primarily through Lockheed, was contractually required to enter this information in the database and **fraudulently omitted** them, without advising the Coast Guard of the falsely incomplete information.

174.    ICGS, by and through Northrop, omitted information and data regarding the shaft alignment and hull damages from the contractually mandated Action Item Database System.  ICGS, primarily though Northrop, was contractually required to enter this information in the database and **fraudulently omitted** them, without advising the Coast Guard of the falsely incomplete information.

175.    When Relator entered some of this information himself in January of 2004, it was removed by Lockheed's Paul J. Messer, who stated that Relator's entries lacked detail.   After deleting Relator's entries, ICGS and Lockheed never re-entered any information regarding the above defects, nor did they disclose the concealed facts.

176.    Invoices were submitted for payment by Lockheed to the Coast Guard throughout this time period.

177.    ICGS, by and through Lockheed and Northrop, submitted **false claims** to the Coast Guard for **payment** while it was unaware of the above problems associated with the guidance language, the false statements or misrepresentations in the compliance certifications, and the omissions from the Action Item Database System.

### DEFENDANTS FRAUDULENT INDUCEMENT OF IDS CONTRACT

178.    Separate and distinct from the manner in which the Defendants performed the IDS contract on the conversion of the 123s is the fraudulent procurement of the IDS contract in the first instance from the USCG based upon material false statements made in the September 2001 Proposal from ICGS to the USCG and in the June 2002 IDS contract which incorporated the misleading September 2001 Proposal in the IDS contractual documents.

179.    The Defendants were aware that the Coast Guard conditioned the the award to ICGS with the inducement of the **written Guarantees** from both Lockheed and Northrop.    That is confirmed in the ICGS LLC Agreement at Exhibit D (Form Of Parent Guarantees To The Customer)("Whereas, the **Coast Guard is unwilling to award** said contract to the Company, **without the inducement of this Guarantee**.").    On the cover letter from ICGS to the USCG in the proposal ICGS represented to the USCG: **"ICGS performance is fully guaranteed by Lockheed martin and Northrop Grumman."**    Again, in the ICGS proposal to the USCG in the executive summary entitled "Corporate Commitment" ICGS represents, over the signatures of senior

Lockheed Martin and Northrop Grumman officers also serving with ICGS, "**ICGS performance is fully guaranteed by Lockheed Martin and Northrop Grumman."** These statements were false then, and they are false now, as the referenced Guarantee of Lockheed and Northrop was never executed in writing and provided to the USCG as represented in the documents.

180.   Defendants Lockheed and Northrop executed Exhibit E to the ICGS LLC Agreement which was a cross-indemnity agreement between Lockheed and Northrop regarding the work done by each on the Deepwater Program in relation to the proposal submitted by ICGS to the USCG.      In that document, at paragraph 5 of the recitals, Lockheed and Northrop state, in this ICGS attachment transmitted to the USCG, "Whereas, **LMC and NORTHROP** have each **executed and delivered Guaranty Agreements to the United States Coast Guard guaranteeing the Company's performance under the Coast Guard Contract**;"      The statement was false.      Both companies' respective Rule 30(b)(6) representatives denied that had occurred, notwithstanding that the Exhibit D recited that without the Guarantees the USCG would not award the contract to ICGS.      The false statement was material, as it had a tendency or the potential to affect the decision of the USCG to award the IDS contract to ICGS.      All Defendants knew of the falsity, acted with deliberate ignorance of the truth or the falsity of the information provided or acted with reckless disregard of the truth or falsity of the information provided when the Defendants induced the USCG to award the contract to ICGS.    See Longhi, 575 F.3d 458, 468.

181.   Since November 30, 2006, all eight defective 123s taken out of service

have remain unseaworthy.  No Defendant has performed any Guarantee work to make the 123s operable so that they could perform the twelve (12) Ship Mission Requirements in Section 3 of the Performance Specifications, as contractually required. No bona fide Guarantee in any form has ever existed, and no written guarantee of Lockheed or Northrop was ever executed or delivered to the USCG as expressly represented in ICGS' contractual proposal to the USCG.

182.  Defendants have also caused ICGS from the Proposal forward in the contracting process to represent to the USCG that ICGS was a joint venture of Lockheed and Northrop. That material statement was false according to the Defendants, all of whom have denied the joint venture.  The Defendants so urged the Court who disallowed the joint venture claim based upon Defendants position that ICGS couldn't be a joint venture.  Yet, what the Defendants represented to the Court was not what they represented to the USCG and the general public from their websites on the internet and in numerous publications.  In the September 28, 2001 ICGS proposal's cover letter to to the USCG's Commandant, ICGS represented in the **very first sentence**, " Integrated Coast Guard Systems (ICGS), **a joint venture established by Lockheed Martin and Northrop Grumman Ingalls Operations** is pleased to submit its proposal for Phase 2 of the Integrated Deepwater System  **(IDS).**

183.  The above false statements regarding Guarantees and a Joint Venture relationship are some examples among several material false representations made to induce the UCSG to award the IDS contract to ICGS.  As a result, the U.S. should be awarded all damages flowing therefrom as set forth in Longhi, supra at 472-74, as a

payments requested by ICGS and paid by the U.S. are false claims under the FCA, as well as all other relief available under the FCA.

184.   Because of the pervasive false statements and fraudulent conduct in obtaining the Deepwater contract, every claim or request for payment submitted to the Coast Guard by ICGS under the Deepwater contract constituted a false claim under the FCA.   *See, e.g., United States v. Mackby,* 339 F.3d 1013, 1018 (9th Cir. 2003), *cert. denied,* 541 U.S. 936 (2004); *United States ex. rel. Marcus v. Hess,* 317 U.S. 537, 543 (1943); *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 787-88 (4th Cir. 1999) (seeking payment on a contract that was "obtained originally through false statements or fraudulent conduct," violates the False Claims Act under a "fraud-in-the-inducement" theory); S. Rep. No. 99-345, at 9 (1986), reprinted in 1988 U.S.C.C.A.N. 5266, 5274 ("[E]very claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim.").   See Longhi, supra at 467-68.

## Matagorda

185.   On or about March 1, 2004, ICGS submitted to the Coast Guard an ICGS Certificate of Conformance in connection with its delivery to the Coast Guard of the 123-foot cutter Matagorda.   ("Matagorda Certificate," attached hereto as **Exhibit D** and incorporated herein by reference.)   The Matagorda Certificate was signed on behalf of ICGS by or for its Director of Contracts.   The Matagorda Certificate certifies that:

> the ICGS Deepwater Program furnished the supplies and/or services called for in accordance with all applicable requirements.   I

> further certify that the supplies and/or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification, and are in the quantity shown on the attached acceptance document.

186.   In addition, on or about March 1, 2004, in connection with the delivery of the Matagorda to the Coast Guard, Lockheed Martin submitted to the Coast Guard an "External Certification of Conformance" signed by Lockheed Martin Corporation Maritime Systems & Sensors' ("MS2") Authorized Quality Representative and Authorized Contract's Representative.   ("External Certificate" attached hereto with Matagorda Certificate as **Exhibit D** and incorporated herein by reference.)   The External Certificate applies to "C4ISR Equipment Integration, Installation, Testing & Training for the CGC Matagorda 123."  The External Certificate certifies:

> that the material supplied on the referenced purchase order/Contract Number fully conforms to tall applicable specifications and requirements.   The material is supplied in compliance with the latest ECN's/Revision noted.   All material supplied under this order was originally purchased or manufactured by Lockheed Martin Maritime Systems and Sensors (MS2).   All original purchasing and/or incoming inspection data is on file at MS2 and available for review upon request.

187.   The Matagorda Certificate lists multiple "Exception(s)" from the certified applicable requirements.

188.   These are also reflected on the Matagorda DD 250 in the chart in the middle of page 1 (items 15-20), which is continued on page 2.  The DD 250 item 15-20 chart first lists the item delivered—the "Services and Supplies: Matagorda, WPB 123 conversion," and the contractual unit price.  Below this are indicated the exceptions with

dollar values, which are subtracted from the contract unit price, yielding the price to be paid by the Government.   The Matagorda Certificate, External Certificate, and Matagorda DD 250 do not reflect any exceptions for (1) topside/exterior equipment, or (2) HME (hull, mechanical, and electrical) issues, including shaft problems.  They reflect "Tempest and Classified Testing $121,000" in connection with TEMPEST equipment.[8]

189.   ICGS knew and failed to disclose, however, that (1) topside equipment did not conform to requirements; (2) shielded cables and other required TEMPEST items were not provided and would not pass testing; (3) hull, mechanical, and electrical items failed to comply with requirements, including major problems with shaft alignment due to the hulls buckling.

190.   At the top of the Matagorda DD 250 item 15-20 chart in columns 19 and 20, the "unit price" for the cutter Matagorda is reflected--$14,875,235.00.  At the end of the chart, on page 2, the Matagorda DD 250 reflects a total invoice amount due of $14,211,420.00, reflecting the unit price less the disclosed exceptions.   The Coast Guard Contracting Officer, Catherine Martindale, signed the Matagorda DD250 in box 22, indicating that the Matagorda was "received in apparent good condition except as noted."  Box 6 on page 1 of the Matagorda DD 250 indicates the related invoice number and date "ICGS0300-0008/ 03/01/04."   These documents demonstrate that ICGS knowingly or with deliberate ignorance or reckless disregard for the truth made false statements to the Coast Guard in connection with claims for payment, and that ICGS

---

[8.] The Matagorda Certificate, External Certificate, and DD 250 failed to disclose camera blind spots and the failure to supply low smoke cables as well.  The Coast Guard subsequently granted waivers of these failures.  The Coast Guard also granted an unlawful, and thus ineffective, waiver of the failure of all TEMPEST items to pass visual and instrumental inspections.

made one or more claims for payment in the form of invoices including ICGS0300-0008/ 03/01/04 for at least $14,211,420.00.

191.    Because of the undisclosed problems, especially the hull/shaft problems, the total cost paid, in excess of $96 million, by the United States for the retrofitting of the Matagorda was a total waste.   Every penny was wasted, because the Defendants' failures rendered the boat unfit and so unseaworthy that it cannot be operated safely in any environment.   The Matagorda reportedly will be scuttled by the Coast Guard, on information and belief, after the resolution of all of the litigation related to the 123 cutters.   The Coast Guard would not have paid ICGS for the retrofitting under the contract if ICGS had not concealed its failures and its destruction of the pre-existing seaworthiness of the Matagorda.

192.    Thus, in addition to the total loss of the Government's payments for the retrofitting of the vessel, the Matagorda lost all of its pre-existing market value, estimated at $15.3 million.

193.    Similar false certifications were made knowingly or with deliberate ignorance or reckless disregard for the truth in connection with each Request for Performance payment and each of these constitutes a false statement used to get a claim paid under the False Claims Act.

### Vashon

194.    On or about March 9, 2005, ICGS submitted to the Coast Guard an ICGS Certificate of Conformance in connection with its delivery to the Coast Guard of the 123-foot cutter Vashon.   ("Vashon Certificate," attached hereto as **Exhibit C** and

incorporated herein by reference.)   The Vashon Certificate was signed on behalf of ICGS by or for its Domain Program Manager, Quality Assurance Manager, and Director of Contracts.  The Vashon Certificate certifies that:

> the ICGS Deepwater Program furnished the supplies and/or services called for in accordance with all applicable requirements.  I further certify that the supplies and/or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification, and are in the quantity shown on the attached acceptance document.

195.   The "attached acceptance document" refers to the Material Inspection and Receiving Report (sometimes referred to as "MIRR"), DD Form 250 ("Vashon DD 250").  The DD 250 is essentially a receipt, filled in by the delivering contractor for signature by the Government contracting officer.   The Vashon Certificate lists under the heading "Exception(s)" several variations from the applicable requirements.   These are also reflected on the Vashon DD 250 in the chart in the middle of page 1 (items 15-20), which is continued on page 2.   The DD 250 item 15-20 chart first lists the item delivered—the "WPB 123 conversion, shipset #3" (incorrectly referred to in box 16 as the Nunivak rather than the Vashon, as correctly indicated in box 13), and the contractual unit price.  Below this are indicated the exceptions with dollar values, which are subtracted from the contract unit price, yielding the price to be paid by the Government.  Neither the Vashon Certificate nor the accompanying Vashon DD 250 reflects any exception for (1) topside/exterior equipment, (2) TEMPEST (Telecommunications Electronics Material Protected from Emanating Spurious Transmissions) items, such as shielded cables, or (3) HME (hull, mechanical, and

electrical) issues, including shaft problems.[9]

196.   ICGS knew and failed to disclose, however, that (1) topside equipment did not conform to requirements; (2) TEMPEST items failed to pass visual and instrumental inspections, including, *inter alia*, failure to provide shielded cables; (3) hull, mechanical, and electrical items failed to comply with requirements, including major problems with shaft alignment due to the hulls buckling.

197.   At the top of the Vashon DD 250 item 15-20 chart in columns 19 and 20, the "unit price" for the cutter Vashon is reflected--$6,866,302.00.   At the end of the chart, on page 2, the Vashon DD 250 reflects an amount paid to date, $5,746,168.00, and a handwritten total invoice amount due of $1,004,738.50, with a handwritten notation, "pd 3/15/05."  These two amounts plus the indicated values of the exceptions total $6,866,302.00—that is to say, the Government paid in full the contract price for the Vashon minus the value of the items specifically listed as exceptions from the contract requirements, including those items ICGS knowingly or with deliberate ignorance or reckless disregard for the truth failed to list as exceptions.   Box 6 of the Vashon DD 250 provides the related ICGS invoice number, ICGS030048 03/07/05.   The final page of **Exhibit C** is a "Payment Approval" authorizing payment for that invoice in the amount of $1,004,738.50.

198.   These documents demonstrate that ICGS knowingly or with deliberate ignorance or reckless disregard for the truth made false statements to the Coast Guard

---

[9.] The Vashon Certificate and DD 250 failed to disclose camera blind spots and the failure to supply low smoke cables as well.  The Coast Guard subsequently granted waivers of these failures.  The Coast Guard also granted an unlawful, and thus ineffective, waiver of the failure of all TEMPEST items to pass visual and instrumental inspections.

in connection with claims for payment, that ICGS made claims for payment in the form of multiple invoices including ICGS030048, and that the Coast Guard paid ICGS $6,750,906.50 for the cutter Vashon.

199.   Because of the undisclosed problems, especially the hull/shaft problems, the total cost paid, in excess of $96 million, by the United States for the retrofitting of the Vashon was a total waste.   Every penny was wasted, because the Defendants' failures rendered the boat unfit and so unseaworthy that it cannot be operated safely in any environment.   The Vashon reportedly will be scuttled by the Coast Guard, on information and belief, after the resolution of all of the litigation related to the 123 cutters.   The Coast Guard would not have paid ICGS for the retrofitting under the contract if ICGS had not concealed its failures and its destruction of the pre-existing seaworthiness of the Vashon.

200.   Thus, in addition to the total loss of the Government's payments for the retrofitting of the vessel, the Vashon lost all of its pre-existing market value, estimated at of $15.3 million.

201.   Similar false certifications were made in connection with each Request for Performance payment and each of these constitutes a false statement used to get a claim paid under the False Claims Act.

## Metompkin

202.   On or about May 13, 2004, ICGS submitted to the Coast Guard an ICGS Certificate of Conformance in connection with its delivery to the Coast Guard of the 123-foot cutter Metompkin.   ("Metompkin Certificate," attached hereto as **Exhibit E** and

incorporated herein by reference.)  The Metompkin Certificate was signed on behalf of ICGS by or for its Domain Program Manager, Quality Assurance Manager, and Director of Contracts.  The Metompkin Certificate certifies that:

> the ICGS Deepwater Program furnished the supplies and/or services called for in accordance with all applicable requirements.  I further certify that the supplies and/or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification, and are in the quantity shown on the attached acceptance document.

203.  The Metompkin Certificate lists under the heading "Exception(s)" several variations from the applicable requirements.  These are also reflected on the Metompkin DD 250 in the chart in the middle of page 1 (items 15-20), which is continued on page 2.  The DD 250 item 15-20 chart first lists the item delivered—"Services and Supplies: Metompkin, (thru/mod 5w/o lock) WPB 123 conversion," and the contractual unit price.  Below this are indicated the exceptions with dollar values, which are subtracted from the contract unit price, yielding the price to be paid by the Government.  Neither the Metompkin Certificate nor the accompanying Metompkin DD 250 reflects any exception for (1) topside/exterior equipment, or (2) HME (hull, mechanical, and electrical) issues, including shaft problems.[10]  "TEMPEST POA&M" (Plan of Action and Milestones) is excepted, but the documents fail to except numerous missing or inadequate TEMPEST items.

204.  ICGS knew and failed to disclose, however, that (1) topside equipment did

---

[10.] The Metompkin Certificate and DD 250 failed to disclose camera blind spots as well.  The Coast Guard subsequently granted waivers of this failures and the failure to provide low smoke cables.  The Coast Guard also granted an unlawful, and thus ineffective, waiver of the failure of all TEMPEST items to pass visual and instrumental inspections.

not conform to requirements; (2) numerous TEMPEST items did not meet requirements; and (3) hull, mechanical, and electrical items failed to comply with requirements, including major problems with shaft alignment due to the hulls buckling.

205.   At the top of the Metompkin DD 250 item 15-20 chart in columns 19 and 20, the "unit price" for the cutter Metompkin is reflected--$7,288,106.00.  At the end of the chart, on page 2, the Metompkin DD 250 reflects an amount paid to date, $5,752,765.00, and a total invoice amount due of $1,181,807.53.  These two amounts plus the indicated values of the exceptions total $7,288,106.00—that is to say, the Government paid in full the contract price for the Metompkin minus the value of the items specifically listed as exceptions from the contract requirements, including those items ICGS knowingly or with deliberate ignorance or reckless disregard for the truth failed to list as exceptions.  Box 6 of the Metompkin DD 250 provides the related ICGS invoice number, ICGS0300-0016/ 05/13/04.  These documents demonstrate that ICGS knowingly or with deliberate ignorance or reckless disregard for the truth made false statements to the Coast Guard in connection with claims for payment, that ICGS made claims for payment in the form of multiple invoices including ICGS0300-0016/ 05/13/04, and that the Coast Guard paid ICGS at least  $5,752,765.00 for the cutter Metompkin.

206.   Because of the undisclosed problems, especially the hull/shaft problems, the total cost paid, in excess of $96 million, by the United States for the retrofitting of the Metompkin was a total waste.  Every penny was wasted, because the Defendants' failures rendered the boat unfit and so unseaworthy that it cannot be operated safely in any environment.  The Metompkin reportedly will be scuttled by the Coast Guard, on

information and belief, after the resolution of all of the litigation related to the 123 cutters.  The Coast Guard would not have paid ICGS for the retrofitting under the contract if ICGS had not concealed its failures and its destruction of the pre-existing seaworthiness of the Metompkin.

207.    Thus, in addition to the total loss of the Government's payments for the retrofitting of the vessel, the Metompkin lost all of its pre-existing market value, estimated at in excess of $15.3 million.

208.    Similar false certifications were made in connection with each Request for Performance payment and each of these constitutes a false statement used to get a claim paid under the False Claims Act.

### Padre

209.    On or about June 24, 2004, ICGS submitted to the Coast Guard an ICGS Certificate of Conformance in connection with its delivery to the Coast Guard of the 123-foot cutter Padre.  ("Padre Certificate," attached hereto as **Exhibit F** and incorporated herein by reference.)  The Padre Certificate was signed on behalf of ICGS by or for its Domain Program Manager, Quality Assurance Manager, and Director of Contracts.  The Padre Certificate certifies that:

> the ICGS Deepwater Program furnished the supplies and/or services called for in accordance with all applicable requirements.  I further certify that the supplies and/or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification, and are in the quantity shown on the attached acceptance document.

210.    The Padre Certificate lists under the heading "Exception(s)" several

variations from the applicable requirements.  These are also reflected on the Padre DD 250 in the chart in the middle of page 1 (items 15-20), which is continued on page 2. The DD 250 item 15-20 chart first lists the item delivered—"Services and Supplies: Padre, (thru/mod 2) WPB 123 conversion," and the contractual unit price.  Below this are indicated the exceptions with dollar values, which are subtracted from the contract unit price, yielding the price to be paid by the Government.

211.    Neither the Padre Certificate nor the accompanying Padre DD 250 reflects any exception for (1) topside/exterior equipment, or (2) HME (hull, mechanical, and electrical) issues, including shaft problems.[11]  "TEMPEST POA&M" (Plan of Action and Milestones) is excepted, but the documents fail to except numerous missing or inadequate TEMPEST items.

212.    ICGS knew and failed to disclose, however, that (1) topside equipment did not conform to requirements; (2) numerous TEMPEST items did not meet requirements, including, *inter alia*, failure to provide shielded cables; and (3) hull, mechanical, and electrical items failed to comply with requirements, including major problems with shaft alignment due to the hulls buckling.

213.    At the top of the Padre DD 250 item 15-20 chart in columns 19 and 20, the "unit price" for the cutter Padre is reflected--$7,080,060.00.  At the end of the chart, on page 2, the Padre DD 250 reflects an amount paid to date, $5,746,348.00, and a total invoice amount due of $1,114,834.29.  These two amounts plus the indicated values of

---

[11.] The Padre Certificate and DD 250 failed to disclose camera blind spots and the failure to supply low smoke cables as well.  The Coast Guard subsequently granted waivers of these failures.  The Coast Guard also granted an unlawful, and thus ineffective, waiver of the failure of all TEMPEST items to pass visual and instrumental inspections.

the exceptions total $7,080,060.00—that is to say, the Government was billed the contract price for the Padre minus the value of the items specifically listed as exceptions from the contract requirements, including those items ICGS knowingly or with deliberate ignorance or reckless disregard for the truth failed to list as exceptions.  Box 6 of the Padre DD 250 provides the related ICGS invoice number, ICGS030023 06/24/04. These documents demonstrate that ICGS knowingly or with deliberate ignorance or reckless disregard for the truth made false statements to the Coast Guard in connection with claims for payment, that ICGS made claims for payment in the form of multiple invoices including ICGS030023 06/24/04, and that the Coast Guard paid ICGS at least $5,746,348.00 for the cutter Padre.

214.   Because of the undisclosed problems, especially the hull/shaft problems, the total cost paid, in excess of $96 million, by the United States for the retrofitting of the Padre was a total waste.  Every penny was wasted, because the Defendants' failures rendered the boat unfit and so unseaworthy that it cannot be operated safely in any environment.  The Padre reportedly will be scuttled by the Coast Guard, on information and belief, after the resolution of all of the litigation related to the 123 cutters.  The Coast Guard would not have paid ICGS for the retrofitting under the contract if ICGS had not concealed its failures and its destruction of the pre-existing seaworthiness of the Padre.

215.   Thus, in addition to the total loss of the Government's payments for the retrofitting of the vessel, the Padre lost all of its pre-existing market value, estimated at in excess of $15.3 million.

SIXTH AMENDED COMPLAINT – Page 75

216.    Similar false certifications were made in connection with each Request for Performance payment and each of these constitutes a false statement used to get a claim paid under the False Claims Act.

### Attu

217.    On or about August 2, 2004, ICGS submitted to the Coast Guard an ICGS Certificate of Conformance in connection with its delivery to the Coast Guard of the 123-foot cutter Attu.   ("Attu Certificate," attached hereto as **Exhibit G** and incorporated herein by reference.)   The Attu Certificate was signed on behalf of ICGS by or for its Domain Program Manager, Quality Assurance Manager, and Director of Contracts.   The Attu Certificate certifies that:

> the ICGS Deepwater Program furnished the supplies and/or services called for in accordance with all applicable requirements.  I further certify that the supplies and/or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification, and are in the quantity shown on the attached acceptance document.

218.    The Attu Certificate lists under the heading "Exception(s)" several variations from the applicable requirements.  These are also reflected on the Attu DD 250 in the chart in the middle of page 1 (items 15-20), which is continued on page 2. The DD 250 item 15-20 chart first lists the item delivered—"Services and Supplies: Attu, (thru/mod 3) WPB 123 conversion," and the contractual unit price.   Below this are indicated the exceptions with dollar values, which are subtracted from the contract unit price, yielding the price to be paid by the Government.

219.    Neither the Attu Certificate nor the accompanying Attu DD 250 reflects any

exception for (1) topside/exterior equipment, or (2) HME (hull, mechanical, and electrical) issues, including shaft problems.[12]  "TEMPEST POA&M" (Plan of Action and Milestones) is excepted, but the documents fail to except numerous missing or inadequate TEMPEST items.

220.   ICGS knew and failed to disclose, however, that (1) topside equipment did not conform to requirements; (2) numerous TEMPEST items did not meet requirements, including, *inter alia*, failure to provide shielded cables; and (3) hull, mechanical, and electrical items failed to comply with requirements, including major problems with shaft alignment due to the hulls buckling.

221.   At the top of the Attu DD 250 item 15-20 chart in columns 19 and 20, the "unit price" for the cutter Attu is reflected--$7,016,731.80.  At the end of the chart, on page 2, the Attu DD 250 reflects an amount paid to date, $5,746,168.00, and a total invoice amount due of $1,163,168.41.  These two amounts plus the indicated values of the exceptions total $7,016,731.80—that is to say, the Government was billed the contract price for the Attu minus the value of the items specifically listed as exceptions from the contract requirements, including those items ICGS knowingly or with deliberate ignorance or reckless disregard for the truth failed to list as exceptions.  Box 6 of the Attu DD 250 provides the related ICGS invoice number, ICGS030030 08/02/04.  These documents demonstrate that ICGS knowingly or with deliberate ignorance or reckless disregard for the truth made false statements to the Coast Guard in connection with

---

[12.] The Attu Certificate and DD 250 failed to disclose camera blind spots and the failure to supply low smoke cables as well.  The Coast Guard subsequently granted waivers of these failures.  The Coast Guard also granted an unlawful, and thus ineffective, waiver of the failure of all TEMPEST items to pass visual and instrumental inspections.

claims for payment, that ICGS made claims for payment in the form of multiple invoices including ICGS030030 08/02/04, and that the Coast Guard paid ICGS at least $5,746,168.00 for the cutter Attu.

222.    Because of the undisclosed problems, especially the hull/shaft problems, the total cost paid, in excess of $96 million, by the United States for the retrofitting of the Attu was a total waste.  Every penny was wasted, because the Defendants' failures rendered the boat unfit and so unseaworthy that it cannot be operated safely in any environment.  The Attu reportedly will be scuttled by the Coast Guard, on information and belief, after the resolution of all of the litigation related to the 123 cutters.  The Coast Guard would not have paid ICGS for the retrofitting under the contract if ICGS had not concealed its failures and its destruction of the pre-existing seaworthiness of the Attu.

223.    Thus, in addition to the total loss of the Government's payments for the retrofitting of the vessel, the Attu lost all of its pre-existing market value, estimated at in excess of $15.3 million.

224.    Similar false certifications were made in connection with each Request for Performance payment and each of these constitutes a false statement used to get a claim paid under the False Claims Act.

### Nunivak

225.    On or about February 15, 2005, ICGS submitted to the Coast Guard an ICGS Certificate of Conformance in connection with its delivery to the Coast Guard of the 123-foot cutter Nunivak.  ("Nunivak Certificate," attached hereto as **Exhibit H** and

incorporated herein by reference.)  The Nunivak Certificate was signed on behalf of ICGS by or for its Domain Program Manager, Quality Assurance Manager, and Director of Contracts.  The Nunivak Certificate certifies that:

> the ICGS Deepwater Program furnished the supplies and/or services called for in accordance with all applicable requirements.  I further certify that the supplies and/or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification, and are in the quantity shown on the attached acceptance document.

226.    The Nunivak Certificate lists under the heading "Exception(s)" several variations from the applicable requirements.  These are also reflected on the Nunivak DD 250 in the chart in the middle of page 1 (items 15-20), which is continued on page 2.  The DD 250 item 15-20 chart first lists the item delivered—"Services and Supplies: Nunivak, (thru/mod 9) WPB 123 conversion," and the contractual unit price.  Below this are indicated the exceptions with dollar values, which are subtracted from the contract unit price, yielding the price to be paid by the Government.

227.    Neither the Nunivak Certificate nor the accompanying Nunivak DD 250 reflects any exception for (1) topside/exterior equipment, (2) TEMPEST (Telecommunications Electronics Material Protected from Emanating Spurious Transmissions) items, such as shielded cables, or (3) HME (hull, mechanical, and electrical) issues, including shaft problems.[13]

228.    ICGS knew and failed to disclose, however, that (1) topside equipment did

---

[13.] The Nunivak Certificate and DD 250 failed to disclose camera blind spots and the failure to supply low smoke cables as well.  The Coast Guard subsequently granted waivers of these failures.  The Coast Guard also granted an unlawful, and thus ineffective, waiver of the failure of all TEMPEST items to pass visual and instrumental inspections.

not conform to requirements; (2) TEMPEST items failed to pass visual and instrumental inspections, including, *inter alia*, failure to provide shielded cables; (3) hull, mechanical, and electrical items failed to comply with requirements, including major problems with shaft alignment due to the hulls buckling.

229.   At the top of the Nunivak DD 250 item 15-20 chart in columns 19 and 20, the "unit price" for the cutter Nunivak is reflected--$6,866,302.00.   At the end of the chart, on page 2, the Nunivak DD 250 reflects an amount paid to date, $5,746,168.00, and a total invoice amount due of $1,052,972.80.   These two amounts plus the indicated values of the exceptions total $6,866,302.00—that is to say, the Government was billed the contract price for the Nunivak minus the value of the items specifically listed as exceptions from the contract requirements, including those items ICGS knowingly or with deliberate ignorance or reckless disregard for the truth failed to list as exceptions.   Box 6 of the Nunivak DD 250 provides the related ICGS invoice number, ICGS030042 02/14/05.   These documents demonstrate that ICGS knowingly or with deliberate ignorance or reckless disregard for the truth made false statements to the Coast Guard in connection with claims for payment, that ICGS made claims for payment in the form of multiple invoices including ICGS030042 02/14/05, and that the Coast Guard paid ICGS at least $5,746,168.00 for the cutter Nunivak.

230.   Because of the undisclosed problems, especially the hull/shaft problems, the total cost paid, in excess of $96 million, by the United States for the retrofitting of the Nunivak was a total waste.   Every penny was wasted, because the Defendants' failures rendered the boat unfit and so unseaworthy that it cannot be operated safely in any

environment.   The Nunivak reportedly will be scuttled by the Coast Guard, on information and belief, after the resolution of all of the litigation related to the 123 cutters.   The Coast Guard would not have paid ICGS for the retrofitting under the contract if ICGS had not concealed its failures and its destruction of the pre-existing seaworthiness of the Nunivak.

231.   Thus, in addition to the total loss of the Government's payments for the retrofitting of the vessel, the Nunivak lost all of its pre-existing market value, estimated at in excess of $15.3 million.

232.   Similar false certifications were made in connection with each Request for Performance payment and each of these constitutes a false statement used to get a claim paid under the False Claims Act.

### Monhegan

233.   On or about October 3, 2005, ICGS submitted to the Coast Guard an ICGS Certificate of Conformance in connection with its delivery to the Coast Guard of the 123-foot cutter Monhegan.  ("Monhegan Certificate," attached hereto as **Exhibit I** and incorporated herein by reference.)  The Monhegan Certificate was signed on behalf of ICGS by or for its Quality Assurance Manager, Finance/Business Manager, Domain Program Manager, and Director of Contracts.  The Monhegan Certificate certifies that:

> the ICGS Deepwater Program furnished the supplies and/or services called for in accordance with all applicable requirements.  I further certify that the supplies and/or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification, and are in the quantity shown on the attached acceptance document.

234.   The Monhegan Certificate lists under the heading "Exception(s)" several variations from the applicable requirements.  These are also reflected on the Monhegan DD 250 in the chart in the middle of page 1 (items 15-20), which is continued on page 2.  The DD 250 item 15-20 chart first lists the item delivered—"Services and Supplies: Monhegan, (thru/mod 9) WPB 123 conversion, shipset #7" and the contractual unit price.  Below this are indicated the exceptions with dollar values, which are subtracted from the contract unit price, yielding the price to be paid by the Government.

235.   In addition, on or about October 3, 2005, in connection with the delivery of the Monhegan to the Coast Guard, Northrop Grumman Corporation Ship Systems submitted to the Coast Guard an "NGSS Certification of Conformance."  ("NGSS Certificate" attached hereto with Monhegan Certificate as **Exhibit I** and incorporated herein by reference.)  The NGSS Certificate *also* certifies:

> the ICGS Deepwater Program furnished the supplies and/or services called for in accordance with all applicable requirements.  I further certify that the supplies and/or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification, and are in the quantity shown on the attached acceptance document.

236.   In addition, on or about October 3, 2005, in connection with the delivery of the Monhegan to the Coast Guard, Lockheed Martin submitted to the Coast Guard an "External Certification of Conformance" signed by Lockheed Martin Corporation Maritime Systems & Sensors' Authorized Quality Representative and Authorized Contract's Representative.  ("External Certificate" attached hereto with Monhegan

Certificate as **Exhibit I** and incorporated herein by reference.)  The External Certificate

applies to "C4ISR Equipment Integration, Installation, Testing & Training for the CGC

Monhegan-123."  The External Certificate certifies:

> that the material supplied on the referenced purchase
> order/Contract Number fully conforms to tall applicable
> specifications and requirements.  The material is supplied in
> compliance with the latest ECN's/Revision noted.  All material
> supplied under this order was originally purchased or manufactured
> by Lockheed Martin Maritime Systems and Sensors (MS2).  All
> original purchasing and/or incoming inspection data is on file at
> MS2 and available for review upon request.

237.  The Monhegan Certificate, the NGSS Certificate, the External Certificate,

and the accompanying Monhegan DD 250 fail to reflect any exception for (1)

topside/exterior equipment, (2) TEMPEST (Telecommunications Electronics Material

Protected from Emanating Spurious Transmissions) items, such as shielded cables, or

(3) HME (hull, mechanical, and electrical) issues, including shaft problems.[14]

238.  ICGS, Northrop Grumman, and Lockheed Martin knew and failed to

disclose, however, that (1) topside equipment did not conform to requirements; (2)

TEMPEST items failed to pass visual and instrumental inspections, including, *inter alia*,

failure to provide shielded cables; (3) hull, mechanical, and electrical items failed to

comply with requirements, including major problems with shaft alignment due to the

hulls buckling.

239.  At the top of the Monhegan DD 250 item 15-20 chart in columns 19 and

20, the "unit price" for the cutter Monhegan is reflected--$6,760,196.80.  At the end of

---

[14.] The Monhegan Certificate, NGSS Certificate, External Certificate, and DD 250 failed to disclose camera blind spots and the failure to supply low smoke cables as well.  The Coast Guard subsequently granted waivers of these failures.  The Coast Guard also granted an unlawful, and thus ineffective, waiver of the failure of all TEMPEST items to pass visual and instrumental inspections.

the chart, on page 2, the Monhegan DD 250 reflects an amount paid to date, $5,746,168.00, and a total invoice amount due of $518,966.80.  These two amounts plus the indicated values of the exceptions total $6,760,196.80—that is to say, the Government was billed the contract price for the Monhegan minus the value of the items specifically listed as exceptions from the contract requirements, including those items ICGS knowingly or with deliberate ignorance or reckless disregard for the truth failed to list as exceptions.  Box 6 of the Monhegan DD 250 provides the related ICGS invoice number, ICGS0300102 10/03/05.  These documents demonstrate that ICGS knowingly or with deliberate ignorance or reckless disregard for the truth made false statements to the Coast Guard in connection with claims for payment, that ICGS made claims for payment in the form of multiple invoices including ICGS0300102 10/03/05, and that the Coast Guard paid ICGS at least $5,746,168.00 for the cutter Monhegan.

240.   Because of the undisclosed problems, especially the hull/shaft problems, the total cost paid, in excess of $96 million, by the United States for the retrofitting of the Monhegan was a total waste.  Every penny was wasted, because the Defendants' failures rendered the boat unfit and so unseaworthy that it cannot be operated safely in any environment.  The Monhegan reportedly will be scuttled by the Coast Guard, on information and belief, after the resolution of all of the litigation related to the 123 cutters.  The Coast Guard would not have paid ICGS for the retrofitting under the contract if ICGS had not concealed its failures and its destruction of the pre-existing seaworthiness of the Monhegan.

241.   Thus, in addition to the total loss of the Government's payments for the

retrofitting of the vessel, the Monhegan lost all of its pre-existing market value, estimated at in excess of $15.3 million.

242.   Similar false certifications were made in connection with each Request for Performance payment and each of these constitutes a false statement used to get a claim paid under the False Claims Act.

### Manitou

243.   On or about January 13, 2006, ICGS submitted to the Coast Guard an ICGS Certificate of Conformance in connection with its delivery to the Coast Guard of the 123-foot cutter Manitou.  ("Manitou Certificate," attached hereto as **Exhibit J** and incorporated herein by reference.)   The Manitou Certificate was signed on behalf of ICGS by or for its Quality Assurance Manager, Finance/Business Manager, Domain Program Manager, and Director of Contracts.  The Manitou Certificate certifies that:

> the ICGS Deepwater Program furnished the supplies and/or services called for in accordance with all applicable requirements.  I further certify that the supplies and/or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification, and are in the quantity shown on the attached acceptance document.

244.   The Manitou Certificate lists under the heading "Exception(s)" several variations from the applicable requirements.  These are also reflected on the Manitou DD 250 in the chart in the middle of page 1 (items 15-20), which is continued on page 2. The DD 250 item 15-20 chart first lists the item delivered—"Services and Supplies: Manitou, (thru/mod 16) WPB 123 conversion with dry-dock package, shipset #8" and the contractual unit price.  Below this are indicated the exceptions with dollar values,

which are subtracted from the contract unit price, yielding the price to be paid by the Government.

245.   The Manitou Certificate and the accompanying Manitou DD 250 fail to reflect any exception for (1) topside/exterior equipment, (2) TEMPEST (Telecommunications Electronics Material Protected from Emanating Spurious Transmissions) items, such as shielded cables, or (3) HME (hull, mechanical, and electrical) issues, including shaft problems.[15]

246.   ICGS knew and failed to disclose, however, that (1) topside equipment did not conform to requirements; (2) TEMPEST items failed to pass visual and instrumental inspections, including, *inter alia*, failure to provide shielded cables; (3) hull, mechanical, and electrical items failed to comply with requirements, including major problems with shaft alignment due to the hulls buckling.

247.   At the top of the Manitou DD 250 item 15-20 chart in columns 19 and 20, the "unit price" for the cutter Manitou is reflected--$7,719,003.80.   At the end of the chart, on page 2, the Manitou DD 250 reflects an amount paid to date, $6,960,941.80, and a total invoice amount due of $958,238.80.   These two amounts plus the indicated values of the exceptions total $7,719,003.80—that is to say, the Government was billed the contract price for the Manitou minus the value of the items specifically listed as exceptions from the contract requirements, including those items ICGS knowingly or with deliberate ignorance or reckless disregard for the truth failed to list as exceptions.

---

[15.] The Manitou Certificate and DD 250 failed to disclose camera blind spots and the failure to supply low smoke cables as well.  The Coast Guard subsequently granted waivers of these failures.  The Coast Guard also granted an unlawful, and thus ineffective, waiver of the failure of all TEMPEST items to pass visual and instrumental inspections.

Box 6 of the Manitou DD 250 provides the related ICGS invoice number, ICGS0300136 01/13/06.   These documents demonstrate that ICGS knowingly or with deliberate ignorance or reckless disregard for the truth made false statements to the Coast Guard in connection with claims for payment, that ICGS made claims for payment in the form of multiple invoices including ICGS0300136 01/13/06, and that the Coast Guard paid ICGS at least $6,960,941.80 for the cutter Manitou.

248.   Because of the undisclosed problems, especially the hull/shaft problems, the total cost paid, in excess of $96 million by the United States for the retrofitting of the Manitou was a total waste.  Every penny was wasted, because the Defendants' failures rendered the boat unfit and so unseaworthy that it cannot be operated safely in any environment.   The Manitou reportedly will be scuttled by the Coast Guard, on information and belief, after the resolution of all of the litigation related to the 123 cutters.  The Coast Guard would not have paid ICGS for the retrofitting under the contract if ICGS had not concealed its failures and its destruction of the pre-existing seaworthiness of the Manitou.

249.   Thus, in addition to the total loss of the Government's payments for the retrofitting of the vessel, the Manitou lost all of its pre-existing market value, estimated at in excess of $15.3 million.

250.   Similar false certifications were made in connection with each Request for Performance payment and each of these constitutes a false statement used to get a claim paid under the False Claims Act.

## CAUSES OF ACTION

### Count I - False Claims (31 U.S.C. § 3729)

251.   *Qui tam* Relator/Plaintiff re-alleges and hereby incorporates by reference each and every allegation contained in preceding paragraphs of this complaint.

252.   Based on the acts described above, Defendants, jointly or severally, knowingly or with deliberate ignorance or reckless disregard for the truth violated one or more of the following:

a.   knowingly or with deliberate ignorance or reckless disregard for the truth presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

b.   knowingly or with deliberate ignorance or reckless disregard for the truth made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

c.   conspired to defraud the Government by getting a false or fraudulent claim allowed or paid;

d.   knowingly or with deliberate ignorance or reckless disregard for the truth made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

253.   The United States Government unaware of the falsity of these claims, records, and/or statements made by the Defendants and in reliance on the accuracy thereof, paid the Defendants for the fraudulent claims.

254.   Because of the Defendants' fraudulent conduct, the United States Government did not receive the contractual value or contemplated benefits to which it was entitled by law, all of which violated the False Claims Act.

255.   Due to the Defendant's conduct, the United States Government has suffered substantial monetary damages of as much as $240 million for the loss of eight (8) 123s, and it is entitled to all relief provided under the False Claims Act.

## RELIEF

256.   On behalf of the United States Government, the Relator/Plaintiff seeks to recover monetary damages from the Defendants, jointly and severally, equal to three (3) times the damages suffered by the United States Government.   In addition, the Relator/Plaintiff seeks to receive all civil penalties and other relief on behalf of the United States Government in accordance with the False Claims Act.

257.   The *qui tam* Relator/Plaintiff should, for his contribution to the Government's investigation and recovery, be awarded a fair and reasonable amount allowed pursuant to 31 U.S.C. § 3730(b) of the False Claims Act; alternatively, and in addition, his attorney is entitled to a fee from the Common Fund ("settlement") created by filing this cause of action to the extent that the case generates benefits not created by 31 U.S.C. § 3730(b).

258.   The *qui tam* Relator/Plaintiff seeks to be awarded all costs and expenses for this action, including statutory attorneys' fees and court costs.

259.   Pre-judgment interest at the highest rate allowed by law and post-judgment interest as applicable.

## PRAYER

WHEREFORE, Relator/Plaintiff prays that this District Court enter judgment on behalf of the Plaintiff and against the Defendants, jointly and severally for the following:

a.    Damages in the amount of three (3) times the actual damages of $240 million, or more, suffered by the United States Government as a result of the Defendants' conduct which violated the False Claims Act;

b.    Relator/Plaintiff be awarded attorneys fees from any Common Fund ("settlement"), if any, created for any benefits not covered by 31 U.S.C. § 3730(b);

c.    Relator/Plaintiff be recover from Defendants, jointly and severally, all costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

d.    Pre-judgment and post-judgment interest, at the highest rate allowed by law;

e.    All other relief on behalf of the Relator/Plaintiff or the United States Government to which they may be justly entitled, whether at law or inequity, and which the District Court deems just and proper.

Dated: September 8, 2009

**UNITED STATES OF AMERICA, ex rel. Michael DeKort**

Respectfully submitted:

/s/Samuel L. Boyd
Samuel L. Boyd
SBN: 02777500
Catherine C. Jobe
SBN: 10668280
Boyd & Associates
6440 North Central Expressway
Suite 600
Dallas, Texas 75206-4101
Telephone (214) 696-2300
Facsimile (214) 363-6856
sboyd@boydfirm.com

**ATTORNEYS FOR RELATOR/PLAINTIFF**

## CERTIFICATE OF SERVICE

On this date, October 28, 2010, I electronically submitted the foregoing SIXTH AMENDED COMPLAINT PURSUANT TO 31 U.S.C. §§ 3729-3732, FEDERAL FALSE CLAIMS ACT with the clerk of the United States District Court for the Northern District of Texas using the electronic filing system of the court.  I hereby certify that I have served the following counsel of record electronically or by other means authorized by Federal Rule of Civil Procedure 5(b)(2):

Mr. Eric Holder
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Mr. Arnold Auerhan
Mr. Paul Wogaman
Attorneys, Civil Division
601 "D" Street NW, Room 9006
Washington, DC 20044
Paul.Wogaman@usdoj.gov.
Arnold.auerhan@usdoj.gov

John Scott Hogan, AUSA for the Northern Dist. of TX
801 Cherry St., Unit #4
Burnett Plaza, Ste. 1700
Ft. Worth, TX 76102-6882
Scott.Hogan@usdoj.gov
**Attorneys for the United States**

Sam F. Baxter
Jill Bindler
McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Fax: (214) 978-4044
sbaxter@mckoolsmith.com
jbindler@mckoolsmith.com
**Attorneys for Lockheed Martin Corporation**

Sarah R. Teachout
Haynes & Boone
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Fax (214) 200-0605
sarah.teachout@haynesboone.com
**Attorneys for Northrop Grumman Ship Systems, Inc.**

Richard B. Clifford, Jr. (*pro hac vice pending*)
W. Harmann Young (*pro hac vice pending*)
Suzette W. Derrevere (*pro hac vice pending*)
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2001
Telephone (202) 628-6600
***Of-Counsel for Northrop Grumman Ship Systems, Inc.***

SIXTH AMENDED COMPLAINT – Page 91

W. Jay DeVecchio *(pro hac vice pending)*
Edward Jackson *(pro hac vice pending)*
Daniel E. Chudd *(pro hac vice pending)*
Nicholas O. Stephanopoulos *(pro hac vice pending)*
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Tel: (202) 639-6893
Fax: (202) 637-6375
jdevecchio@jenner.com
***Of Counsel for Lockheed Martin Corporation***

William G. Whitehill, Esq.
Texas Bar No.21356550
Kaylee D. Higginbotham
Texas Bar No. 24037952
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201
Tel.: (214) 999-4633
Fax: (214) 999-3633
bwhitehill@gardere.com
khigginbotham@gardere.com
**Counsel for Defendant Integrated Coast Guard Systems, L.L.C.**

Robert R. Vieth, Esq. *(pro hac vice pending)*
Gregory A. Smith, Esq. *(pro hac vice pending)*
COOLEY GODWARD KRONISH LLP
One Freedom Square, Reston Town Center
11951 Freedom Drive
Reston, Virginia 20191
Tel.: (703) 456-8000
Fax: (703) 456-8100
rvieth@cooley.com
gsmith@cooley.com

Craig A. Guthery, Esq. *(pro hac vice pending)*
COOLEY GODWARD KRONISH LLP
777 6th St., N.W., Suite 1100
Washington, D.C. 20001
Tel.: (202) 842-7831
Fax: (202) 842-7899
cguthery@cooley.com
**Of Counsel for Defendant Integrated Coast Guard Systems, L.L.C.**

                                    /s/Samuel L. Boyd
                                    Samuel L. Boyd